IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOHN BERGE III | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) |
| | ) |
| MARK ANTRIM, et al. | ) |
| | ) |
| Respondent. | ) |
| _____ | ) CASE NO: A05-0290-CI (JWS) |

**MR. BERGE'S AMENDED PETITION**

Hugh W. Fleischer, as attorney for Petitioner, John Berge III, hereby files his amended petition pursuant to 28 U.S.C. §

2254. This petition is based upon the factual and legal arguments contained herein as well as the documents incorporated herewith. This amendment also incorporates Mr. Berge's initial § 2254 petition filed on or about December 12, 2005.

**STATEMENT OF JURISDICTION**

From the judgment in 1KE-S97-1085 CR, distributed on August 14, 1998 (RE 275-277)[1], and the post-conviction appeals and other court actions this Court has jurisdiction to determine petitioner's amended petition under 28 § 2254.

## STATEMENT OF THE ISSUES

1.  Trial counsel was ineffective in violation of the 6th Amendment to the  U.S. Constitution.  *See* Section I, *infra*.

2.  Admission of petitioner's statement to the troopers, which was

obtained in violation of **Miranda v. Arizona**, 384 U.S. 436 (1966), and of  his right to counsel, was reversible error.  *See* Sections II & IV, *infra*.

3.  Admission of evidence and comment on petitioner's exercise of his rights to cut-off questioning and to remain silent was reversible plain error.  *See* Sections III & IV, *infra*.

4.  The trial court's instruction to the jury -- that the defense of self-defense     was not available to petitioner -- violated his rights to due process         and trial by jury, and was reversible error.  *See* Sections IV.A.-D., *supra*.

5. The trial court's instruction to the jury -- that the defense of self-defense     was not available to petitioner -- constitutes a devastating judicial          comment         against petitioner's credibility, and requires reversal.  *See*      Sections III.3 (d); IV, *infra*.

## STATEMENT OF THE CASE

---

[1]References to petitioner's record excerpts appear as "(RE ___ )."

The badly decomposed body of Ernie Taylor was found floating next to his log-float in Dall Bay on August 27, 1997. (Tr. 212-15)[2] The initial autopsy found the cause of death to be drowning. (Tr. 188-89) A later autopsy revealed bullet wounds and fragments in the decedent. (Tr. 138, 141-57)

On September 8, 1997, Robert, aka "Froggy" Bob, Dickerson contacted the troopers through an intermediary, and ultimately reported that petitioner had been making comments to him about having killed Taylor. (Tr. 221) AST Inv. McPherron obtained an Alaska-Glass warrant. On September 10, McPherron succeeded in surreptitiously recording a conversation between "Froggy" Bob and petitioner, in which petitioner "confessed" to killing Taylor. (Tr. 222-29)

On September 14, 1998, Inv. McPherron filed a felony complaint charging petitioner with first-degree murder, and obtained a warrant for his arrest. (Tr. 24, 55) Later that morning, McPherron and Anchorage AST Inv. Seigfried stopped, frisked, questioned, and arrested petitioner. Prior to trial, petitioner moved to suppress the results of trooper questioning. The trial judge denied the motion to suppress. (RE 15-18) A tape-recording of the troopers' interrogation was admitted at trial. (Tr. 237-39)

Petitioner was indicted for first-degree murder, theft-2 of Taylor's shotgun, and tampering with evidence for disposing of "the weapon he used to shoot" Taylor and the shotgun, neither of which was recovered. (Tr. 241) The state's case depended on efforts to corroborate petitioner's confession. There was no corroborative evidence specifically connecting petitioner and the

---

[2] Transcript cite appear as "(Tr. ___)."

crimes.  Moreover, the secretly recorded confession contained petitioner's  explicit

assertion that he killed Taylor in self-defense.  Petitioner testified,  repudiated        his

confession, and denied that he was the person who killed Taylor.

Over  defense  objection,  the  trial  court  instructed  the  jurors  that  "[t]he

defense of self-defense is not available to the defendant in this case."  (RE 129)

At the end of the second day of deliberations, the jury convicted petitioner on all

counts.  (Tr.712-13)  He was sentenced on August  14,  1998,  to  a  combined

sentence of 62 years imprisonment.  (Tr. 745-50; RE 275-277)

## I.    TRIAL COUNSEL WAS INEFFECTIVE

Mr. Berge asserts that his trial attorney failed to provide him with

adequate representation.  He claims   that he failed to obtain a written opinion

from the trial court regarding the petitioner's sixth amendment claims as well as

failing to file a motion to suppress the Alaska-Glass warrant issued to record

conversations between petitioner and Robert Dickerson.

In *McMann v. Richardson*, 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 25

L.Ed.2d 763 (1970), the U.S. Supreme Court declared that "the right to counsel is

the right to the effective assistance of counsel." Cited in *Jennings v. Woodford*,

290 F. 3rd 1006, 1012 (9th Cir.        2002).

In *Strickland v. Washington*, the Supreme Court      formulated a

two prong test.  A petitioner claiming ineffective assistance of counsel must

demonstrate (1) that his attorney's representation "fell below an objective

standard of reasonableness," (the "performance prong") and (2) the attorney's

deficient performance prejudiced the defendant such that "there     is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (the "prejudice prong")     *Strickland*, 466 U.S. @ 688. 694, 104 S. Ct. 2052.

*Strickland's* two-prong test applies to ineffectiveness claims arising from the plea process.  *Hill v. Lockhart*, 474 U.S. 52, 57-58, 106 S. Ct. 366, 88 L.Ed.2d 203 (1885) (holding that voluntariness of a guilty plea depends on the adequacy of counsel's legal advice).

The principal errors, which meet the *Strickland* test, are 1) the failure to insist on an opinion that set out the findings in regard to the denial of petitioner's sixth amendment claim and 2) the failure of trial counsel to file a motion to suppress the said Glass warrant.   These omissions by defense counsel clearly fall within the holding of *Strickland*, *supra*.  Either or both of such matters were crucial to petitioner's defense and easily could be seen, had either act been carried out, to have reversed the outcome of the trial.   See *U.S. v. Blaylock*, 20 F.3d 1458 (9th Cir. 1994); *Betancourt v. Willis*, 814 F.2d 1546 (11th Cir. 1987).

## II     THE ADMISSION OF PETITIONER'S

## STATEMENT TO THE TROOPERS WAS ERROR.

The existence, validity, and voluntariness of any purported **waiver** of an accused's constitutional rights is a mixed question of law and fact, subject to this Court's *de novo* review.  *Brewer v. Williams*, 430 U.S. 387, 403-04 (1977).

This Court "must 'indulge in **every reasonable presumption against waiver**.'" ***Brewer v. Williams***, 430 U.S., 404 (emphasis added).

## A.  Statement Of Relevant Facts

On September 14, 1997, AST Inv. McPherron swore to and filed a criminal complaint, charging petitioner with murder-1. (RE 103-105)  The Judge accepted and signed the complaint. (<u>Id</u>.; Tr. 55)  Simultaneously, McPherron obtained a warrant for petitioner's arrest on that charge.  (RE 103-105; Tr. 24)

At about 11:35 a.m., Invs. McPerron and Siegfried stopped petitioner on the street in Ketchikan.  McPherron instructed petitioner to enter the trooper vehicle.  (Tr. 11-12)  Inv. Siegfried frisked petitioner for weapons, finding and seizing a folding knife on petitioner's person.  (Tr. 12)  Siegfried then instructed him to sit down in the trooper van.  (Tr. 13)  Petitioner sat in the front passenger seat, while Siegfried sat behind him, and Inv. McPherron sat in the driver's seat. (Tr. 12-13)

Petitioner was not told that charges had been filed against him.  (Tr. 15)  Nor was he told that he was not under arrest.  (<u>Id</u>.; Tr. 14)  He was never told that he was free to go.  (<u>Id</u>.)  In truth, he was in custody.  Had he refused to talk to the troopers, they would have arrested him on the spot.  (Tr. 26-27, 32)  Had he attempted to defy their instructions to sit in the van, by trying to leave the scene, they would have apprehended him.  (Tr. 28-32)

After obtaining petitioner's name and address, Inv. Siegfried said that he had been "sent down" from Anchorage due to the Taylor death.  (Tr. 53)

Petitioner responded with a brief description of how he met Taylor, of his initial good impression of him, and of his ultimate conclusion that Taylor "had a bad reputation" and that Bob Dickerson had told him that Taylor that he, Bob, was afraid of Ernest Taylor and cautioned Berge against being around Taylor

(Tr. 553)  After further questioning, petitioner estimated that he stayed at Dall     Bay with Taylor sometime in June.  (Tr. 548)

Siegfried said Taylor's family reported some items stolen, and added, "We don't know whether you had anything to do with that..."  (RE 105c)  For this purported, and false, reason, Siegfried directed Inv. McPherron to read petitioner his rights.  (Id.)  McPherron falsely assured appellant, "Uh, it's just routine;" petitioner replied, "I've told you everything I know."    (Id.)  McPherron then read the ***Miranda*** warnings to appellant.  (Id.)  Asked if he understood his rights, petitioner replied by asking McPherron to "[r]ead it  again."

(Id.)

Inv. McPherron again read the ***Miranda*** warnings.  (Id)    This time, however, **he did not ask if petitioner understood them.  Nor did the troopers elicit any waiver of those rights.**  (Tr. 43-44)  Instead, McPherron and petitioner each said "Okay," and Inv. Siegfried immediately resumed questioning.  (RE 105d)[3]

_____

[3] McPherron later testified he inferred that, by "Okay," petitioner meant both that he now understood his rights and that he wanted to waive them, **even though neither trooper had yet asked him to do so.**  (Tr. 43-44)  Although he routinely asks a waiver question after advising suspects of their rights, here McPherron unaccountably failed to do so.  (Tr. 37-38)

After the warnings, the interrogation became more and more accusatory, and steadily progressed from inquiries about the possible theft of Taylor's possessions to whether petitioner shot and killed him. (RE 105g-h) Petitioner tried to exercise his right to cut-off the questioning, but the troopers continued to interrogate him. (RE 105h) Petitioner again asserted his rights to cut-off questioning and to silence, but still the troopers pressed him, and played a portion of his surreptitiously recorded conversation with "Froggy" Bob. (RE 105i) Again petitioner tried to cut-off questioning and remain silent. (Id.) Finally, after petitioner's fourth assertion of the rights they had promised him, the troopers terminated their interrogation. (RE 105j)

Prior to trial, petitioner moved to suppress the statements he made to the troopers, alleging *Miranda* and Sixth Amendment/right to counsel violations. (RE 62-81) Following hearing, (Tr. 3-101), the trial judge issued a written Order denying the motion to suppress. (Tr. 15-18) Remarkably, the trial judge found the interrogation to be non-custodial. (Id.) Since the *Miranda* principle was therefore inapplicable, the trial judge declined to decide "whether there was a waiver of rights." (Tr. 17) For reasons unknown, the court ignored, and thus implicitly rejected, the Sixth Amendment/right to counsel claim. As stated above in Section I, it was clear error on the part of petitioner's trial counsel to fail to insist that the Judge explicitly set out a basis for his denial of the Sixth Amendment right.

The state introduced petitioner's statements in its case-in-chief. (Tr. 237-39) Moreover, the prosecutor concluded his cross-examination of

petitioner by hammering him on the "coincidence" that his statement to the troopers turned out to be the very "false" story he earlier told "Froggy" Bob he would use if questioned about Taylor's demise. (Tr. 590-91) The prosecutor also used the statement in an improper impeachment of petitioner, repeatedly referring to his assertions of his rights to cut-off questioning and to silence. (Tr. 592-93)[4]

**B. The Statement Was Obtained In Violation Of Miranda.**

For 33 years, the law has been clear -- the results of custodial interrogation are inadmissible, unless the suspect is first advised of, and validly waives, his rights to silence, to counsel/court-appointed counsel, and to cut-off questioning at any time, and is told his answers can, and will, be used against him. *Miranda v. Arizona*, 384 U.S. 436 (1966).

**1. Appellant was subjected to custodial interrogation.**

**a. The Stansbury analysis.**

The seminal case in the United States for determining whether a suspect is in custody for *Miranda* purposes is *Stansbury v. California,* 511 U.S. 318, 323-24 (1994). Analysis focuses on three main categories of facts, which encompass **pre-**, **during**, and **post-questioning circumstances**. *Stansbury* @ 323-24. When an **objective** assessment of these circumstances reveals that "a reasonable person would feel he was not free to leave and break off police questioning," then "custody" has been shown. Id. Application of the *Stansbury*

_____

[4] See Section II, infra (introduction of evidence and comment on petitioner's exercise of rights is reversible error).

standard here clearly establishes that petitioner was in custody when questioned by the troopers.

### i. Pre-questioning facts.

Prior to questioning, the troopers **filed formal charges** against, and obtained an **arrest warrant** for, petitioner. The existence of probable cause to arrest is strong evidence that the accused's interrogation is custodial. ***Stansbury*** @ 322; ***U.S. v. Bravo***, 295 F.3d 1002(9th Cir. 2002); See, ***California v. Beheler***, 463 U.S. 1121, 103 S. Ct. 3517 (1982). Moreover, the **troopers**, not petitioner, **"initiated"** all the events culminating in interrogation. .[5]

Immediately prior to questioning, the troopers **stopped and frisked petitioner, seized** his folding knife, and **directed him to sit** in the trooper van.[6] Such circumstances are indicative of "custody." ***Florida v. Royer***, 460 U.S. 491 (1983) (seizure of property pending questioning); *See*, ***U.S. v. Williams***, 951 F.2d 1287 (DC 1991) (***Terry*** stop escalating to arrest)

---

[5] Courts tend to find custody lacking when suspects voluntarily initiate contact with the police, resulting in brief questioning. *See*, *e.g*., ***California v. Beheler***, *supra* ; ***Beckwith v. U.S.***, 425 U.S. 341 (1976); ***U.S. v. Dockery***, 736 F.2d 1232 (8th Cir.), *cert. denied*, 469 U.S. 862 (1984); ***Thompson v. State***, 768 P.2d 127 (Alaska App. 1989), *vacated*, ***Thompson v. Keohane***, 516 U.S. 99 (1995).

Where, as here, questioning is instigated by law enforcement, courts frequently find custody. *See*, e.g., ***Miranda v. Arizon*a**, *supra*; ***Griffin v. U.S.***, 922 F.2d 1343 (8th Cir. 1990); ***U.S. v. Longbehn***, 850 F.2d 450 (8th Cir. 1988); ***U.S. v. Beraun-Panez***

, 812 F.2d 578, *mod*., 830 F.2d 127 (9th Cir. 1987).

[6] The trial judge's purported finding that petitioner "entered the vehicle on his own" is not supported by the record. Only Trooper McPherron testified at the motion hearing, and he admitted he could not witness the physical contact between Inv. Siegfried and petitioner on their side of the van. (Tr. 50)

### ii. **During questioning facts**.

During questioning, petitioner was in the close confines of the trooper van, surrounded by two armed officers, including one who had flown all the way from Anchorage for the occasion.

Here, petitioner, like any reasonable person, perceived himself to be in custody while being **questioned by two armed troopers in their vehicle**.[7]  *U.S. v. Lee*, 699 F.2d 466 (9th Cir. 1982) (suspect questioned in police car parked in front of his house was in custody).

In the context of the trooper-initiated stop, frisk, and seizure, it is apparent petitioner was in the **equivalent... of actual physical restraint.** *Stansbury*, 511 U.S. 318 (1994).   This conclusion is confirmed by Inv. McPherron, who admitted the troopers would have formally arrested petitioner had he declined to talk to them or attempted to leave.  (Tr. 26-32)  Early on, petitioner was informed that he was, and he was questioned as, a suspect -- first as a thief, and shortly thereafter as a murderer.  (RE 105i-l) Where, as here, it is communicated to the detainee, such a **suspect focus** is indicative of custody. *Stansbury*, *supra*; Highly significant, and ignored by the court, is the fact that the **troopers** **did** **"Mirandize" petitioner**.    Under the "totality of circumstances" test set out in *Thompson v. Keohane*, 516 U.S. 99 (1995) to determine custody determinations under *Miranda,* it appears that there was custody present in the case at bar.  Any reasonable person, seated in a trooper

---

[7] Assuming their sidearms were concealed, as the trial judge found, the fact remains that any reasonable person understands that on-duty troopers bear arms. Petitioner so testified at trial.  (Tr. 594-95)

vehicle following a frisk, who is told he has rights to silence and to counsel, and that anything he says can, **and will**, be used against him, will infer he is no longer free to leave and break off police questioning. ***Stansbury***, *supra.*

Apparently, the trial judge only finds custody when the police are not polite -- not "even-toned" and "even-tempered." (RE 17) That is not the law. The issue is a reasonable person's perception of his freedom to defy the authorities and depart from their presence, not the professionalism of the agents.

Also very significant is the troopers' "polite," but wholly improper, response to appellant's ultimate efforts expressly to assert his rights. **Only after four separate assertions of his desire to cut-off questioning did the troopers call it quits.** They may have been "even-toned," but they utterly failed to insure that his "'right to cut off questioning' was 'scrupulously honored'." ***Michigan v. Mosley,*** 423 U.S. 96, 104 (1975) (citation omitted). Continued questioning in the face of repeated assertions of the right to silence violates the ***Mosley*** principle. "Where[, as here,] the police fail[] to honor a [suspect's] decision to cut off questioning, [both] by refusing to discontinue the interrogation upon request [and] by persisting in repeated efforts to wear down his resistance and make him change his mind," the conclusion that he is in custody is unavoidable. ***Mosley***, 423 U.S., 105-06.

### iii. <u>Post-questioning facts</u>.

After questioning, the troopers **immediately, and formally, arrested** petitioner. ***Stansbury***, *supra.*

### b. <u>The Griffin "particularly significant" factors analysis</u>.

In a different formulation of the same subject matter, Federal Courts recently approved analysis of six "particularly significant" factors in determining the existence of "custody" for *Miranda* purposes.

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;
>
> (2) whether the suspect possessed unrestrained freedom of movement during questioning;
>
> (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official request to respond to questions;
>
> (4) whether strong arm tactics or deceptive stratagems were employed during questioning;
>
> (5) whether the atmosphere of the questioning was police dominated; or
>
> (6) whether the suspect was placed under arrest at the termination of the questioning.

*U.S. v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). A finding of custody does not require proof of facts in each category. Strong evidence of one particular factor can itself establish custodial interrogation. *Griffin, supra.*

All of the circumstances held to be "particularly significant" in *Griffin* cut in favor of a conclusion of custody in the present case. **First,** petitioner was never told he was free to leave, nor that he was not under arrest; to the contrary, he was read his *Miranda* rights! **Second,** petitioner had no freedom of movement, seated in a trooper van surrounded by armed officers, and would have been physically stopped if he attempted to leave. (Tr. 26-32) *U.S. v. Lee*, 699 F.2d 466 (9th Cir. 1982). **Third,** troopers initiated the contact on a public street, by stopping and frisking petitioner, seizing his knife, and instructing him to sit in

their vehicle.  *Stansbury*, *supra*.  **Fourth,** the troopers tried to deceive petitioner, by trying to trivialize the frisk and the giving of *Miranda* warnings, by initially telling him he was only suspected of theft, and by feigning interest in the possibility that petitioner killed Taylor in self-defense.  (RE 105e-h)[8]  **Fifth,** from the time they initiated the stop, frisk, and seizure, through the time they read petitioner his rights and interrogated him, until the time they drove him off to jail, the "atmosphere" appellant breathed was entirely trooper-dominated. **Sixth,** petitioner was immediately "placed under arrest at the termination of questioning."  *Griffin*, *supra*.

### c.  Whatever the analysis, petitioner was in custody.

By any applicable standard, then, petitioner was in custody.  Federal courts are adamant about strict compliance with *Miranda* when questioning is custodial, and consistently reverse convictions where judges erroneously fail to find "custody."  *See, Griffin*, *supra*  Plainly, petitioner -- who was never told he was free to leave, who was, instead, given *Miranda* warnings, and who was formally arrested when he explicitly asserted his rights -- was "in custody."

### 2.  The warning was inadequate.

Although he purportedly advised petitioner of his rights twice, Inv. McPherron never advised him of his right to "decide at any time to exercise

---

[8] Ironically, the trial judge twisted these flimsy efforts at deception into a rationale for finding no-custody.  (RE 67)  Apparently, the theory is that, by deceiving a reasonable man, the troopers can enable him to feel free to leave, although, in fact, he is not.  It is doubtful that the courts will approve such deliberate deceptions in lieu of simple compliance with *Miranda*.  Moreover, any reasonable American knows that when the police stop you, frisk you, tell you to get in their car, and *Mirandize* you, you are not free leave.

these rights and not to answer any questions or make any statement."  (RE 105a-

k)     The failure to advise a suspect of the substance of <u>any</u> of his rights renders statements he makes thereafter inadmissible.  ***Miranda v. Arizona***, 384 U.S.     436 (1966);

### 3.  <u>Interrogation was not preceded by a valid waiver.</u>

Since petitioner was in custody, the troopers were prohibited from questioning him unless they first obtained his intelligent and voluntary waiver of constitutional rights.  ***Miranda,*** 384 U.S., 475.

Here, the troopers **never even asked** petitioner if he would waive his rights. Instead, Inv. McPherron read the rights card to petitioner, and asked him, "Do you understand everything I just read to you?"  (RE 105c)  Apparently, petitioner did not; he asked McPherron to "read it again."  (<u>Id</u>.)  McPherron re-read the rights card, but this time failed even to ask if petitioner understood it. McPherron and petitioner both said, "Okay."  (RE 105d)  **Neither trooper asked if petitioner was willing to waive his rights.**  (Tr. 43-44)  Instead, Inv. Siegfried simply resumed his interrogation.  (<u>Id</u>.)

This record cannot support a finding that petitioner made a valid waiver of his rights, and the trial court never suggested it did.  The state bears the  "heavy burden" of "demonstrat[ing] that the defendant knowingly and     intelligently waived" his rights.  ***Miranda***, 384 U.S., 475.  Moreover, this Court     "must   'indulge   every reasonable presumption against waiver.'"  ***Brewer   v.   Williams***, 430  U.S. 387,  404 (1977).  Significantly, "[p]resuming waiver from  a  silent  record  is  impermissible." ***Carnley v. Cochran,*** 369 U.S. 506, 516     (1962).    "[A]  valid  waiver  will  not  be

presumed simply from the fact that a confession was in fact eventually obtained."

*Miranda*, 384 U.S., 475.

Here, there was no waiver at all. The troopers never sought, and petitioner never gave, any actual waiver of his rights. Accordingly, the statement must be suppressed.

Additionally, and independently, when officers seize personal belongings and retain them during questioning, or try to deceive a suspect as to the purpose of questioning, any purported waiver is rendered involuntary. Here, the seizure and retention of petitioner's knife, the attempted trivialization of the *Miranda* warning, and the misrepresentation of the warning as pertaining only to theft invalidate any purported waiver.

### D. Additionally, And Independently, The Trooper Questioning Violated Petitioner's Right To Counsel.

#### 1. Petitioner's right to counsel attached when the court accepted the complaints and issued the arrest warrant.

In *Brewer v. Williams,* 430 U.S. 387, 398 (1977), the U.S. Supreme Court held that the Sixth Amendment "means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him, 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" (Citation omitted.)

The Court has yet to decide whether the right to counsel attaches with the filing of a complaint as a matter of federal law. *Edwards v. Arizona*, 451 U.S. 477, 480 n.7 (1981). But other courts have recognized that, in jurisdictions, like Alaska, where the complaint can, and does, serve as a charging document, its

filing demonstrates that the state "has committed itself to prosecute, and... the adverse positions of government and defendant have solidified.  It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Kirby v. Illinois*, 406 U.S. 682, 689 (1972).

Accordingly, these courts hold that the Sixth Amendment attaches with the filing of a complaint.  *See, e.g.*, *Felder v. McCotter*, 765 F.2d 1245, 1247-48  (5th Cir. 1985) (complaint and affidavit filed); *U.S. ex rel. Johnson v. Lane*, 573 F.Supp. 967, 969-70 (N.D. Ill. 1983) ("prosecutions begin upon the issuance and filing of a complaint, information or indictment"); *U.S. ex rel. Sanders v. Rowe*, 460 F.Supp. 1128, 1139 (N.D.Ill. 1978) (issuance of complaint).

The point at which the Sixth Amendment attaches is defined by state law and procedure.  *Moore v. Illinois*, 434 U.S. 220, 227 (1977); *Felder v. McCotter*, 765 F.2d, 1247.  In Alaska, countless "judicial proceedings" are "initiated against" the accused by the filing of a criminal complaint.  *Brewer*, 430 U.S., 398.  As Alaska Criminal Rule 3(a) states, "The complaint is a  written statement of the essential facts constituting **the offense charged**."  Complaints **must be made "upon oath or affirmation before any judge or** **magistrate**," except in circumstances not applicable here.  Alaska Criminal Rule 3(a).  Alaska Criminal Rule 12(a) provides that the "[p]leadings in criminal proceedings shall be the complaint, the indictment and the information, and the pleas of not guilty, guilty, and nolo contendere..."  As a charging document, the complaint may be dismissed

at any time prior to trial by the state's unilateral     action.  Alaska Criminal Rule 43(a).
An Alaskan complaint can also be refused    by the Court to whom it is presented if it
fails to allege and adequately support      an offense.  *See*, ***State v. District Court***, 962
P.2d 895 (Alaska App. 1998).

### 2.  <u>No valid waiver of the right to counsel</u>.

Since petitioner's right to counsel had attached, it is immaterial
whether or not he was in custody when the troopers questioned him.  Once the
right to counsel attaches, he may not be interrogated by a state agent in the
absence of counsel, unless he makes a prior, valid waiver of his right to counsel.
***Maine v. Moulton***, 474 U.S. 159 (1985); ***Massiah v. U.S***., 377 U.S. 201 (1964).

As demonstrated in section II.c.3., *supra*, here there was no waiver of
rights, let alone a knowing, intelligent and valid waiver.  Accordingly, it was
constitutional error to admit appellant's recorded statements to the troopers.

### III.

### ADMISSION OF EVIDENCE OF / COMMENT ON PETITIONER'S EXERCISE OF HIS <u>CONSTITUTIONAL RIGHTS WAS PLAIN ERROR</u>.

### A.  <u>Statement Of Relevant Facts</u>.

The prosecution introduced petitioner's statement to the troopers in its
case-in-chief.  (Tr. 239)  After directly asking petitioner if he shot Taylor, the
troopers encouraged him to admit the shooting and claim self-defense.  (RE 105h)
They summarized the findings of the second autopsy, discredited petitioner's
story, and stated, "[W]e know you're the one that shot him.  Shot him with a

.243."  (Id.)  Petitioner denied responsibility.  When the troopers continued to question him about "the rifle you shot him with," petitioner attempted to cut-off questioning, stating -- "I've said all I have to say.  You know you guys are making a lot of accusations here I don't know anything about."  (Id.)

The troopers ignored petitioner's effort to cut-off questioning.  After confronting him with the facts that Taylor had been shot four times and that they "knew" he had been back out to Dall Bay since then, the troopers pressed petitioner to offer a self-defense justification for the shooting.  (RE 10h-i) Petitioner again attempted to cut-off questioning, replying, "I told you all I have to say, that's all I have to say."  (RE 105i.)  This was the last sentence of his statement that was published to the jury.  (Tr. 105i)[9]

Apparently not satisfied, the prosecutor then specifically cross-examined petitioner at trial about his exercise of rights.  The prosecutor explicitly suggested that petitioner's post-warning decision to cut-off questioning and invoke his right to silence undermined the credibility of his trial testimony --

>    Q:    Do you remember them asking you those questions
>          about self-defense, well did Ernie threaten you,  did
>          any of that...
>
>    A:    I remember...
>
>    Q:    ... that type of thing?
>
>    A:    ...them asking the questions about self-defense.
>
>    Q:    Okay.  Dou you remember them saying, quote, we'd
>          love to hear your story, unquote?

---

[9] Ironically, the parties terminated the statement prior to petitioner's assertion of his right to counsel (RE 105j), but were apparently oblivious to his assertions of the rights to cut-off questioning and to silence.

A:    Yes, I do.

Q:    All right.  **And your statement was, quote, I told you all I have to say, that's all I have to say, unquote?**

A:    That's right.

Q:    Okay.  **You didn't say anything about I just made up a big bunch of BS to get Dickerson, did you?**

\* \* \* \* \*

Q:    Okay.  And the troopers were saying we're being fair with you, aren't we; we're trying to get the truth out, right; we're being fair aren't you [sic]; **and you said, quote, I told you all I have to say; that's all I have to say?**

A:    That's right...

(Tr. 592-93) (emphasis added).

## B.  Inadmissible On Evidentiary And Constitutional Grounds.

### 1.  Evidentiary principles bar admission/argument.

Alaska Rule of Evidence 512(a) provides as follows: "The claim of privilege, whether in the present proceeding or upon a prior occasion, is not a proper subject of comment by judge or counsel.  No inference may be drawn therefrom."[10]   Thus, evidence or comment on a party/witness's assertion of a valid privilege, whether in or out of court, is prohibited.  Moreover, Federal Rule of Evidence 403 precludes prosecution evidence or comment on a suspect's pre-arrest silence.

### 2.  Constitutional principles bar such evidence/comment.

---

[10]There is an exception to this rule permitting an inference to be drawn from an assertion of the privilege against self-incrimination in civil cases.

In addition to these evidentiary principles, the Alaska and U.S. Constitutions forbid prosecutors to inflict such penalties on the accused for exercising his rights. In ***Doyle v. Ohio***, 426 U.S. 610 (1976), the Court held that the prosecution could not introduce evidence of, nor make comment upon, an accused's assertion of his right to remain silent, once he had been advised of his ***Miranda*** rights. Significantly, the Due Process Clause, not the privilege against self-incrimination, supported this holding. *Supra*, 426 U.S., 619.

The Court reasoned that it "would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial," <u>after</u> he had been explicitly assured by a law enforcement officer that he had the right to remain silent. ***Doyle v. Ohio***, 426 U.S., 618.

> [W]hen a person under arrest is informed, as ***Miranda*** requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, it seems to me that it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at the time, as he was told he need not do, an unfavorable inference might be drawn as tot the truth of his trial testimony.... Surely [he] was not informed here that his silence, as well as his words, could be used against him at trial. Indeed, anyone would reasonably conclude from ***Miranda*** warnings that this would not be the case.

***U.S. v. Hale***, 422 U.S. 171, 182-83 (1975) (White, J., concurring), cited with approval in ***Doyle***, 426 U.S., 619.

**IV**.


**PRECLUDING JURY CONSIDERATION OF SELF-DEFENSE <u>WAS REVERSIBLE ERROR</u>.**

A.  **Statement Of Relevant Facts**

        The explicit defense theory in this case was that petitioner did not kill Ernie Taylor, and that his confession that he did was false in fact.  (Tr. 656-86) However, in trying to prove that petitioner did kill Taylor, the state introduced a confession he made to an acquaintance, Robert, "Froggy" Bob, Dickerson. That confession was surreptitiously recorded by law enforcement officials, and constituted the core of the state's case.  (Tr. 222-29)  The state's problem was that, although petitioner admitted shooting Taylor on the tape, he also asserted the justification of self-defense. (RE 60e-f)  Specifically, petitioner stated  Taylor threatened his life and threatened him with a shotgun before petitioner      shot him.  (Id.)

JB      Actually, the only thing he had that was worth a damn was his **12 gauge shotgun**, I got that.

BD      Alright.

JB      **Fucker pointed it at me, scared me for my own fucking life.**

BD      Fucking pointed it at you.

JB      **Damn right he did why do you think he died.**

BD      Jesus Christ a 12 gauge, no fucking way.

JB      **Son of a bitch pulled 12 gauge pump on me.**

BD      How the hell did you get out of it.

JB      **Well he tried.**

BD      Just kinda beats, I mean, I know how I'd get out of it anyway.

JB      Well I, I, I went out there, I'll tell you what happened.  I can see it, I saw how crazy the son of a bitch, he didn't...

BD     I told you that in the beginning.

JB     Yeah, that started (inaudible)  [] said man get this fucking dog and get out of here.  I can see you know, the son of a bitch was queer, and well, he like my butt, and I ain't that way.

BD     Ain't that way, I didn't know he was queer.

JB     Oh yeah, he was fucking queer as a three dollar bill man, but anyway, I said, you know, this other guy named Bob was out there too, he just a pin headed son of a bitch, but he, **he got ornery with Bob a couple times, called him mother fucker, pulled a gun on him one time you know, and, that fucking Ernie was, his uh concept of reality was way off base.**

BD     Geez, I told ya.

JB     Anyhow, I went out there to get Skip's dogs, you know, I packed up my shit to come to town right, well Skip wanted me to get his dogs, so I went, fine, I wasn't afraid of Ernie, he's crazy.

BD     I am, er was.

JB     Well maybe a person in their right mind should have been you know, I was cautious of him, but that's different tha[n] being afraid you know.

BD     Yeah.

JB     Anyway, I went out there, which **this fucker pulls up with his boat, got a shotgun**, which, **he was always armed**, comes up, he, **marched up as much fucking bunch a bullshit as he could,** cause he was acting like a jilted lover, and, **points a shotgun at me.**

BD     Where the hell was you at?

JB     I don't know, I was up on Skip's houseboat, he's got a houseboat on the skull.  You ever been to Dall Head?

BD     Huh-uh, no but I heard of it.

JB     Anyway, I'm up there getting these dogs, I don't have any weapons on me, **this guy comes up, points the shot gun at me**, he runs off a list of crap that's a bunch of bullshit, Bob and I in love, he says

I'm coming to town next week and he says want $700, and I don't have it.

BD     For what?

JB     **Points the shotgun at**, oh a bunch of imagined bullshit, I didn't owe him a dime. **He says I'm gonna hunt you and he points the shotgun at me and its loaded, he says you hear, you want to meet your maker right now?** I mean this is typical terrorist crap, you know, I just fucking looked at the ground. I wouldn't make eye contact with him, you know, just ignored him, and about the second or third time, I said yeah I hear every fucking word you said, and I thought in my mind, this time you're dead mother fucker.

BD     Yeah that'd make me a little nervous.

JB     Cause I'll be damned, you know, I coulda come into town, I thought about it, I thought about what I could do. I could come into town, I coulda come to the law and told them what happened and they coulda gone out there and talked to him, but **this was a vindictive son of a bitch. I'll be damned if I'm gonna walk out of the bar some fucking dark night and get a knife stuck in me. That's the[] way he thought, so fuck him, he fucked up. Don't tell me you're gonna hunt me.** (laughing) That's all I'm saying you know, just do it, don't talk about it.

BD     Jesus.

JB     **I, I would never have messed with that guy if he hadn't pulled that crap on me. As far as I was concerned it was purely self-defense, cause he was threatening to go up to Thorne Bay and rip my fucking float-house and rip me off.** He wanted to fucking shake me down, and if I woulda given him any money he woulda just kept coming for more, and I know for a fact he fucked other people over right and left.

BD     Well that's a fact, but you don't have to go very far to find that one out.

JB     So, he got what he had coming man. Why they couldn't figure out that he had four fucking holes in him I don't know, but he did.

(RE 60d-f, emphasis added)

The tape does not reveal a specific time sequence, but even the prosecutor acknowledged that petitioner may have had his rifle with him when Taylor threatened him, and that the shooting could have occurred shortly thereafter. (Tr. 625-26, 696-97)

Similarly, in his statement to the troopers, petitioner said that Taylor "was dangerous as far as I was concerned," and someone he tried to avoid. (RE 10c)

At the close of the evidence, the parties discussed instructions with the court. (Tr. 601) The state specifically requested the trial judge conclusively to instruct the jury that petitioner could not rely on the defense of self-defense. (Tr. 602) Defense counsel objected to the charge, both as originally proposed, and as ultimately given by the court. (Tr. 602-05) The defense objections were overruled. (Tr. 603-05) The trial judge read, and provided in writing, the following "Instruction No. 21" to the jury: "The defense of self-defense is not available to the defendant in this case." ( Tr. 702, RE 129)

**B.  The Instruction Violated Due Process.**

### 1.  The trial court may not direct a verdict against the accused on any element of an offense or defense.

In criminal cases, state and federal due process indisputably "'prohibit[s the trial judge] from entering a judgment of conviction or directing the jury to come forward with such a verdict... regardless of how overwhelmingly the evidence may point in that direction.'" ***Connecticut v. Johnson***, 460 U.S. 73, 84 (1983), quoting ***U.S. v. Martin Linen Supply Co***., 430 U.S. 564, 572-73 (1977). *Accord* **Carella v. California**, 491 U.S. 263, 268 (1989). This axiom

has been recognized in America since at least the 19th Century.  In *Sparf v. U.S.*, 156 U.S. 51, 105 (1895), the Court explained that "it is not competent for the [trial c]ourt, in a criminal case, to instruct the jury peremptorily to find the accused guilty of the offense charged, or of any criminal offense less that that charged."  *Accord **Horning v. District of Columbia,*** 254 U.S. 135, 138 (1920) (Holmes, J.); 254 U.S., 139 (Brandeis, J., dissenting).

Another familiar context in which this due process principle applies is jury instructions on mandatory presumptions.  Such a presumption instructs the jury that it must infer the presumed fact if the prosecution proves specified predicate facts.  The U.S. Supreme Court has repeatedly held that such presumptions violate due process.  *See, e.g.*, ***Sandstrom v. Montana***, 442 U.S. 510, 512 (1979); ***Connecticut v. Johnson***, 460 U.S. 73, 84 (1983).  Whether described as "conclusive" or "rebuttable," mandatory presumptions are impermissible, because "they relieve the State of the burden of persuasion on an element of an offense." ***Francis v. Franklin***, 471 U.S. 307, 314 (1985).

Harmless error analysis applies to due process violations arising from improper presumption instructions.  ***Rose v. Clark***, 478 U.S. 570 (1986).  However, judicially directed verdicts on elements of offenses or defenses may **not** be similarly excused.  ***Rose v. Clark,*** 478 U.S., 580; ***Connecticut v. Johnson***, 460 U.S., 95 n.3 (Powell, J., dissenting);

### 2. The no-evidence-of-defense exception to the rule.

Also well established is the no-evidence-of-defense exception.  Thus, the trial judge has authority to refuse to instruct on a defense when there is "**no**

**evidence**" in the record to support it.  *Sparf*, 156 U.S., 99, 103 & 106 (refusal to give lesser-included offense charge affirmed) (emphasis added).

Regardless of the parties' theories, the jury may find the truth somewhere else in the evidence.  Thus, a properly instructed jury could accept the state's claim that petitioner killed Taylor, thus rejecting petitioner's testimony to the contrary, and, at the same time, credit his self-defense claim on the wire, rejecting the state's claim the killing was unlawful.

### 3.  Application of principles to present case.

#### a.  There is "some evidence" of self-defense.

Self-defense instructions are appropriate when the record contains "some evidence" to support that defense.  *Weston v. State*, 682 P.2d 1119 (Alaska 1984); *Toomey v. State*, 581 P.2d 1124, 1126 n.6 (Alaska 1978); *Lamont v. State*, 934 P.2d 774 (Alaska App. 1997).  *See* Alaska Statute 11.81.330 and AS 11.81.335.

"The burden of producing some evidence of self-defense is not, however, a heavy one."  *Paul v. State*, 655 P.2d, 772, 775 (AK Ct. of App., 1982).  "Sufficient evidence may arise from weakness in the prosecution's evidence or from impeachment of its witnesses.  Similarly, circumstantial evidence presented as part of the state's case-in-chief may give rise to some evidence of a disputed fact."  *Seibold v. State*, 959 P.2d, 780, 783 (AK Ct of App., 1998); *Nathaniel v. State*, 668 P.2d 851, 855 (Alaska App. 1983).  In applying the "some evidence" standard, "the court is not called upon to determine the credibility or strength of the evidence or the weight to be given to

testimony." ***Paul***, 655 P.2d, 776.  "Any weakness or implausibility in the evidence supporting [a defense] is not a relevant consideration... even a weak or implausible self-defense claim is a question for the jury." ***Folger v. State***, 648 P.2d, 111,113.   The appellate courts have required self-defense instructions even though   the supporting record evidence was "extremely weak." ***Folger***, @113.

Here, there was abundant, direct evidence of self-defense,   consisting   of the accused's recorded statement to "Froggy" Bob. This       statement            was introduced as the heart of the state's case-in-chief, and was  played  for  the  jury  at trial.  As the admission of the state's party-opponent, it       was introduced for the truth of the matters asserted therein.  AK Rule of Ev.        801(d)(2)(A).      And   the prosecutor proffered and argued the portions consistent       with his theory as substantive evidence.  (Tr.  625-55)

The prosecutor even argued in closing that petitioner was at Dall Bay to pick up a friend's dogs, when Taylor "came over to him, boated over to the house, and came up on him, confronted him and demanded money..."  (Tr. 625) The prosecutor further acknowledged that petitioner may well have had a rifle with him at that time, resulting in the shooting shortly thereafter.  (Tr. 626)

### b. <u>The trial court conclusively precluded self-defense</u>.

Obviously, the trial judge conclusively removed the issue of self-defense from the jury.  He read, and sent back with the jury in writing, Instruction No. 21 -- "The defense of self-defense is not available to the defendant in this case."

This instruction was given at the express request of the state, and over the firm objection of the defense.  (Tr. 602-05)  By so charging the jury, the trial judge effectively directed a verdict in favor of the state on the issue of that defense, notwithstanding the legally sufficient record evidence supporting self-defense. This is reversible error.

### c.  <u>The Instruction Violated The Accused's Right To Trial By Jury</u>.

The accused's state and federal rights to trial by jury provide an additional, and constitutionally independent, basis for disapproving the trial judge's instruction.   By conclusively precluding jury consideration of self-defense, the trial judge usurped the jury's constitutionally conferred role.   As the  Supreme Court has said, "the error in such a case is that the wrong entity judged the defendant guilty."  *Rose v. Clark*, 478 U.S. 570, 578 (1986).

For the reasons stated above, this violation  of  appellant's  right  to  jury trial requires reversal.

### d.  Additionally, And Independently, The Instruction Constituted A <u>Devastating Judicial Comment Against The Accused</u>.

Even assuming, just for argument, that there was no evidence of self-defense, Instruction No. 21 generated devastating and unfair prejudice against the accused.   To lay jurors, who were unaware of the niceties of the law of justification, it was tantamount to a binding judicial finding that petitioner had lied when he told "Froggy" Bob that he shot Taylor in "self-defense."

In light of the Alaska Supreme Court's explicit refusal to adopt proposed Evidence Rule 107 -- permitting judicial summary of, but not comment on, the evidence in jury trials -- "[t]he propriety of judicial comment on the evidence is

thus in doubt." *Nathaniel v. State*, 668 P.2d 851, 857 (Alaska App. 1983). Judicial comments on a witness's credibility are prohibited. Particularly egregious are judicial implications adverse to the accused's credibility. *Burke v. State*, 624 P.2d 1240, 1255 n.18.

### IV.

### THE ERRORS COMMITTED AT TRIAL REQUIRE REVERSAL.

Instruction No. 21 is a conclusive judicial instruction which denies the defendant's entitlement "to an instruction on his theory of the case if the theory is legally cognizable and there is evidence upon which the jury could rationally find for the defendant." *U.S. v. Morton*, 999 F.2d 435, 437 (9th Cir. 1993). In the *Morton* case the Ninth Circuit Court of Appeals reversed the District Court on the basis of the refusal to give a self-defense instruction in a prosecution for alleged assault of a federal officer.

Additionally, and independently, the improper admission of petitioner's trooper statement, the improper evidence and comment on his exercise of his rights to cut-off questioning and to silence, and the improper judicial comment on the purported unavailability of self-defense severely undermined petitioner's testimonial credibility. Whether considered individually or cumulatively, these errors cannot be found harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18 (1967).

### A. Far From Overwhelming, This Case Was Close On The Facts.

The prosecution case against petitioner rested almost entirely on the "confession" he made to "Froggy" Bob. There were no eyewitnesses to Taylor's death. Indeed, the fact of his death was not known until weeks after it occurred. Initially, it was not even ruled a homicide. Without the confession,

secretly recorded in a bar while "Froggy" Bob plied him with liquor (Tr. 588), there was no case against appellant at all.

Moreover, no independent evidence was introduced which specifically connected **petitioner** to the crime. No fingerprint evidence was presented. No trace evidence at the scene was connected to petitioner. No trace evidence on petitioner or his boat-residence was connected to the scene. Neither physical evidence nor witness testimony was introduced putting him in possession of any of the items purportedly stolen from Taylor's float-house or boat. Neither physical evidence nor witness testimony put petitioner in possession of a .30 caliber Marlin rifle capable of inflicting the wounds Taylor suffered.

These numerous, and serious, deficiencies in the state's case required it to rely on the purported corroboration of the confession by evidence of the general events in the case, none of which was specific to petitioner. (Tr. 625-55)

By contrast, the defense offered evidence to corroborate petitioner's testimonial repudiation of the confession by showing material inconsistencies between what he "confessed" and what had demonstrably occurred. Four examples should suffice. **First**, the defense offered evidence that at the same time petitioner started "confessing" to killing Ernie Taylor, Taylor was alive and well.[11]  **Second**, the defense demonstrated that petitioner "confessed" to

---

[11] See Tr. 133; 164-75 (defense argument). Compare Tr. 313, 341-42, 524-25 (witness Dotson saw Taylor alive and well between July 20-23, the end of July) and Tr. 433-34, 525 (witness Paasche told troopers on August 4 and Ms. Dotson on August 8 that he had seen Taylor alive within "a couple days") with Tr. 281, 529-30 ("Froggy" Bob says petitioner began "confessing" to him between July 1 and mid-July).

shooting Taylor with a .243 bolt-action rifle -- when, in fact, the murder weapon was a .30 caliber lever-action Marlin rifle -- and that none of the guns petitioner had could not have killed Taylor.[12]

**Third**, petitioner "confessed" to standing on a beach and shooting Taylor out of his boat, at a distance of 60-80 feet. (RE 60g) However, the evidence at trial indicated that Taylor was shot on or near his log float -- a distance of 225-300 feet from the nearest beach. (Tr. 249-51) **Fourth**, the second autopsy revealed that Taylor had been shot four times, causing at least five wounds -- four entrance and one exit wounds. (Tr. 173, 176-80) Petitioner, however, "confessed" to making only four holes, which he described in his testimony as a story of two entrance and two exit wounds. (Tr. 584)[13]

Petitioner took the stand in his own defense. He testified that he neither shot, nor killed, Taylor, and denied stealing anything from him. (Tr. 540, 557-58, 589-90, 590-91) He testified that his only rifle was an old Sears .222, which he sold before he ever met Taylor. (Tr. 547) Petitioner denied seeing       Taylor    again after he stopped staying with him in June. (Tr. 548)

Appellant explained he and "Froggy" Bob started drinking and telling stories together. He described their conversations as a "braggadocious" game of

---

[12] According to ballistics expert Shem, evidence recovered at the scene and on autopsy indicated the use of a .30 caliber Marlin lever-action rifle and Remington ammunition. (Tr. 479-92, 502-08) Neither a .243 nor a .222 rifle could possibly fire a .30 caliber cartridge. (Tr. 507) Yet, "Froggy" Bob claimed petitioner told him he used a .243 bolt-action rifle to shoot Taylor. (Tr. 273, 378, 286) Trial evidence indicated that petitioner possessed two firearms -- a .22 pistol (recovered) and a .222 rifle (ammunition recovered). (Tr. 257)

[13] On another occasion, appellant apparently told "Froggy" Bob he shot Taylor three times. (Tr. 272)

"one-upsmanship."  (Tr. 552)  "Froggy" Bob told stories of killing people in Vietnam, and of some similar adventure in Oregon.  (Tr. 553)  In turn, petitioner made up a tale about killing Taylor, expecting Bob's "jaw to drop" when Taylor strolled into town later that summer.  (Tr. 554)  Petitioner kept telling the "same stupid story" to "Froggy" Bob, including on the wired conversation, which Bob facilitated by pouring him plenty of Bailey's Irish Creme liquor.  (Tr. 556-57, 588)

The jury deliberated on April 28 - 29, 1998.  As demonstrated by the notes sent during deliberations, this jury appreciated that the case had at least two plausible sides.  (RE 251-260)  They sought more information regarding the scene at Dall Bay.  (RE 251)  They enabled themselves to replay the wire at any time.  (RE 252, 256)  They focused on the location of the .30 caliber bullet fragments found at the scene.  (RE 253)  They began their second day of deliberations by rehearing "Froggy" Bob's testimony.  (RE 255) As their final request, the jury reheard petitioner's own testimony.  (RE 257) Unfortunately for petitioner, his testimonial credibility had been undermined during trial by the series of constitutional violations discussed above.  In a case, like this -- with at least two viable positions, and the state bearing the heavy burden of proof beyond a reasonable doubt -- the prejudice from these errors was all that was needed to sap the "reasonableness" from juror doubts about petitioner's repudiation of his false confession.  Several hours after hearing these errors repeated in the replay of his testimony, the jury returned guilty verdicts.

**B.  The High Likelihood Of Prejudice From Improper Evidence
/Comment On The Exercise Of Rights Requires Reversal.**

The toxic effect of such evidence/comment is obvious.  Jurors naturally infer from an accused's assertion of his rights to cut-off questioning and to silence that he has something to hide. They make the powerful, and natural,        inference  that the accused's actions demonstrate his consciousness of guilt.  That is   exactly   why   the prosecutor saved this tactic as the grand finale for his cross-examination.    (Tr. 592-93) He hammered petitioner on the exercise of his        rights, and  invited  the  jury  to  infer that the tall-tale claim was a recent    fabrication, since he exercised his rights instead of telling the troopers about                "Froggy" Bob.  (Id.)  This was a direct, improper torpedoing of petitioner's        testimonial credibility, in a case where his credibility was crucial to the   outcome.

The  U.S.  Supreme  Court  has  recognized  that  such  evidence  and comment  are  obviously  prejudicial.   Petitioner is  entitled to  a  new  trial  on  this ground alone.  ***Doyle v. Ohio,*** 426 U.S. 610 (1976).

**C.  The Erroneous Admission Of Appellant's Statement To The
Troopers Constitutes Reversible Error.**

`The  erroneous  admission  of  petitioner's  statement  to  the  troopers undercut his credibility in two significant ways.  **First**, that statement was the vehicle for the admission of the evidence and comment on petitioner's effort to cut-off questioning and remain silent.  Accordingly, even if, arguendo, such admission did not amount to plain error, the prejudice it generated in the trial would  have  been  entirely  avoided  by  a  proper  ruling  which  excluded  the statement from evidence.  For the reasons stated in Section IV.B., *supra*,

34

admission of the statement was unfairly prejudicial, and necessitates reversal on this petition.  **Second**, the prosecutor cleverly, and effectively, used the facially exculpatory trooper statement in order to corroborate petitioner's "confession" to "Froggy" Bob.  Just before his attack on petitioner's exercise of rights, the prosecutor pressed him on the "coincidence" that his statement to the troopers turned out to be the very "false" story he earlier told "Froggy" Bob he would use if questioned about Taylor's demise.  (Tr. 590-91)  Thus, the state turned petitioner's claim to innocence into proof of guilt.  However, the state was not entitled to use this damaging technique, because the statement should have been suppressed.  *See* Section II, <u>supra</u>.

### D. The "Self-Defense Is Unavailable" Instruction Constituted A Devastating Judicial Comment Against The Accused.

On the facts of this case, the trial judge's instruction to the jury that self-defense was not available constituted a devastating judicial comment against petitioner's credibility and case.  *See* Section III.d., *supra.* Once the explicit justification statements are removed from the tape-recording by judicial fiat, all that remains is a confession of guilt.  What could possibly be more damning than a judge's direction that only the incriminating portions of the accused's statement can be considered, while all of the exculpatory claims have no effect?  Yet, that is functionally what the trial judge told the jury here.

Trial courts must scrupulously avoid even the appearance that they are communicating, let alone requiring adherence to, their own opinions about the credibility of crucial witnesses in the case. Plainly, an instruction "which disparages one witness' testimony in comparison with that of another" is

impermissible judicial comment.  Here, the prejudice is far worse -- the trial judge disparaged only the exculpatory portion of the accused's own recorded statements.

Similar problems occur when the jury can infer, from a trial judge's questions of  a testifying defendant, that the judge doubts the truth of that testimony.  In the present case, the trial judge did more than question, comment or instruct on relevant factors.  He conclusively found as a "fact" that the accused did not have available to him the very defense he explicitly claimed during his confession.  Because petitioner is guaranteed the right to testify, this was constitutional error.  ***Rock v. Arkansas***, 483 U.S. 44 (1987).  In a case, like this, where the accused's credibility is crucial, such a judicial implication of disbelief cannot be held harmless beyond a reasonable doubt.

### E.  <u>The Cumulative Effect Clearly Requires Reversal</u>.

Given the closeness of the case, petitioner believes that each of the trial errors discussed above, warrants a new trial.  *A fortiori*, the cumulative, adverse effect of these errors on petitioner's credibility, clearly requires reversal.  *See*, ***Thompson v. Keohane***<u>, 516 U.S. 99 (1995)</u>

### <u>CONCLUSION</u>

For any and/or all of the foregoing reasons, petitioner asks this Court to reverse the judgments of conviction entered against him, and to remand for a new trial.

Dated at Anchorage, Alaska, this 5th day of June, 2006.

RESPECTFULLY SUBMITTED,
JOHN W. BERGE III
HUGH W. FLEISCHER

S/ Hugh W. Fleischer
Hugh W. Fleischer
310 K. Street, Suite 200
Anchorage, AK 99501
(907) 264-6635
(907) 264-6602-Fax
hfleisch@aol.com

CERTIFICATE OF SERVICE

I certify that on the 5th day of
June, 2006, an electronic copy of the
Foregoing Brief was delivered and the
Transcript and Record were Hand Delivered
to the following counsel:

John A. Scukanec
Office of Special Prosecutions and Appeals
310 K. St., Suite 308
Anchorage, AK 99501

S/ Hugh W. Fleischer