NOTICE

*Memorandum decisions of this court do not create legal precedent. See Alaska Appellate Rule 214(d) and Paragraph 7 of the Guidelines for Publication of Court of Appeals Decisions (Court of Appeals Order No. 3). Accordingly, this memorandum decision may not be cited for any proposition of law, nor as an example of the proper resolution of any issue.*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| JOHN W. BERGE, III, | Court of Appeals No. A-7142 |
| Appellant, | Trial Court No. 1KE-S97-1085 CR |
| v. | <u>MEMORANDUM OPINION</u> |
| STATE OF ALASKA, | <u>AND JUDGMENT</u> |
| Appellee. | [No. 4254 — August 2, 2000] |

Appeal from the Superior Court, First Judicial District, Ketchikan, Thomas M. Jahnke, Judge.

Appearances: James H. McComas, Anchorage, for Appellant. Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: Coats, Chief Judge, and Mannheimer and Stewart, Judges.

STEWART, Judge.

A jury convicted John W. Berge, III, of first-degree murder,[1] second-degree theft,[2] and tampering with evidence[3] for killing Ernest R. Taylor, stealing Taylor's shotgun, and concealing the shotgun and the firearm used to kill Taylor.

In this appeal, Berge argues that he was subjected to custodial interrogation just before he was formally arrested by the Alaska State Troopers. Although the troopers warned Berge of his rights, Berge argues that the warnings were inadequate under *Miranda*[4] and, even if adequate, he claims he did not waive his rights. Alternatively, Berge argues that a right to counsel attached when he was arrested by the troopers and that he did not waive his right to counsel. Berge also argues that he invoked his right to remain silent with the troopers and admission of evidence about the exercise of that right is reversible error. Finally, Berge argues that the superior court erroneously instructed the jury that self-defense was not an issue in the case. We reject Berge's arguments and affirm his conviction.

*Facts and proceedings*

On August 8, 1997, Susan Dotson and Michael Horwath told the Alaska State Troopers that Ernest Taylor was missing. The two had last seen Taylor about July 14, 1997, at Taylor's float house in Dall Bay outside of Ketchikan. Dotson and Horwath gave Taylor some food at the time, including two loaves of bread. They expected Taylor to be back in town three days later, but he did not show up. Dotson returned to Dall Bay just before contacting the troopers and noticed that Taylor's skiff was tied up in an unusual manner and that items of property were missing. There was no sign of Taylor or his dog.

---

[1] AS 11.41.100(a)(1)(A).

[2] AS 11.46.130(a)(2).

[3] AS 11.56.610(a)(1).

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

The day after the report from Dotson and Howarth, Trooper Albert J. Charlton went to Dall Bay, confirmed that neither Taylor nor his dog were about, and that there was no sign that anyone had been at Taylor's float house recently. On August 25, Trooper Alan W. Jones of the Division of Fish & Wildlife Protection stopped in Dall Bay at Taylor's place. Trooper Jones found Taylor's decomposing body floating in the water.

On August 26, Dr. Michael Stewart, a Ketchikan pathologist, conducted an autopsy on Taylor's body. Dr. Stewart concluded that the body was in an advanced state of decomposition and had been in the water for quite a while. Dr. Stewart found a wound on Taylor's left knee, inflicted prior to death, and several other wounds that he thought were worm holes. Dr. Stewart concluded that the cause of death was accidental, an "apparent drowning."

On August 27, Trooper Randall L. McPherron met Horwath and Dotson at Dall Bay to inventory Taylor's property. Taylor's rifles, shotguns, photo albums, clothing, and crab pots were missing. McPherron found the two loaves of bread, now moldy, that Dotson and Horwath had given Taylor on July 14.

On September 8, Trooper McPherron met with Bob Dickerson because Dickerson said he had information about Taylor's death. Dickerson said that Berge told him that he had "popped" Taylor after an argument about crab pots. Dickerson said that Berge made this claim before Taylor's body was found. According to Dickerson, Berge said he shot Taylor twice while Taylor was still on his float and one to two times when Taylor was in the water. Berge thought (at the time of the conversation) that Taylor's body was still in the water. Dickerson also testified that Berge claimed that he buried some guns that he took from Taylor. Dickerson said he contacted the troopers when he realized that no one had found bullet holes in Taylor's body.

On September 9, Trooper McPherron obtained a *Glass*[5] warrant to monitor and record a conversation between Dickerson and Berge. Dickerson contacted Berge very early on the morning of September 10. In the monitored and recorded conversation, Berge admitted that he had shot and killed Taylor and Taylor's dog, and that there were "four holes" in Taylor. Berge claimed that he killed Taylor in "self-defense."

Taylor's body was exhumed and sent to the crime lab in Anchorage for another autopsy. On September 12-15, Dr. Norman Thompson re-examined and x-rayed the body, and found that it contained bullets and bullet fragments. Dr. Thompson found four entry bullet wounds: (1) at the base of Taylor's neck, (2) in the middle of Taylor's back, (3) in Taylor's left buttock, and (4) in Taylor's left knee. Dr. Thompson also found bullet fragments in Taylor's skull, neck, pelvis, right chest, and left leg. Dr. Thompson concluded that Taylor died as a result of these gunshot wounds.

On Sunday morning, September 14, Trooper McPherron filed a complaint charging Berge with first-degree murder and obtained a warrant for Berge's arrest. Berge's defense at trial was that his seemingly inculpatory statements to Dickerson were false, that he did not shoot Taylor, and that he did not know how Taylor died.

*Discussion*

*Did the Troopers violate Miranda to obtain Berge's statement?*

On the morning of September 14, after getting the arrest warrant, McPherron and Trooper Oscar Siegfried, both dressed in civilian clothes, stopped Berge on the street and identified themselves as troopers. McPherron and Siegfried told Berge they were doing some "follow up work" on Taylor's death. McPherron asked if he and Siegfried could "have a little talk with [Berge] real quick" to see where Taylor might have been and what Taylor may have been up to prior to his death. McPherron then asked Berge to enter an unmarked

---

[5] *State v. Glass*, 583 P.2d 872 (Alaska 1978).

trooper van to get out of the noise of the traffic. Before entering the van, Siegfried patted Berge down for weapons, telling Berge that the procedure was routine, and seized the folding knife that he found on Berge's person. Berge sat in the front passenger seat of the van, McPherron sat in the driver's seat, and Siegfried sat behind Berge.

Once in the van, the officers asked Berge for his name, address, and place of employment. Trooper Siegfried stated that he had been sent down to Ketchikan from Anchorage. Berge responded with a brief description of how he met Taylor fishing, drank a beer with him, and that he seemed like a "really nice guy." Berge then stated that he had visited Taylor on and off for about three weeks and that he had ultimately concluded that Taylor "had an act going, . . . was really strange," and that he "was dangerous." Berge said that as soon as he figured this out, he "got the heck out of there" — sometime in June. Trooper Siegfried next stated that Taylor's family thought some of his property was missing and that the troopers were wondering if Berge had anything to do with the missing property. The troopers told Berge they were going to advise him of his rights and told him that it was "just routine." McPherron then gave Berge these warnings:

> *McPherron*: I'll go ahead and read this to you. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questions if you wish. Do you understand everything I just read to you right?
>
> *Berge*: Read it again.
>
> *McPherron*: Read it again? You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you

cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish.

*Berge*: Okay.

The troopers then asked Berge a number of questions, which he answered. But when the troopers told Berge that they knew he shot Taylor, Berge stated "I've said all I have to say." The troopers raised the possibility that Berge killed Taylor in self-defense; they told Berge that they would "love to hear [Berge's] story." Berge again responded: "I told you all I have to say, that's all I have to say." Siegfried asked: "You want to say anything else to us?" Berge responded: "No." McPherron then said there was something he wanted Berge to listen to. McPherron played a portion of the conversation between Dickerson and Berge that McPherron had recorded pursuant to the *Glass* warrant. The troopers asked Berge a couple more questions. Berge responded: "I've got nothing more to say. If you're going to charge me, charge me. Get me a lawyer." At this time, the troopers ceased their questioning, and arrested Berge.

Berge filed a pre-trial motion to suppress his statements to the troopers. He alleged that the troopers violated the *Miranda* rule and his Sixth Amendment right to counsel. Following a hearing, Judge Jahnke issued a written decision denying the motion. Judge Jahnke found that the interrogation was non-custodial and that *Miranda* was therefore inapplicable. Thus, Judge Jahnke did not decide whether Berge waived his *Miranda* rights. Judge Jahnke did not discuss Berge's Sixth Amendment claim in the written decision.

Berge disputes Judge Jahnke's ruling that he was not in custody. However, even if we assume that Berge was in custody when he got in the van, soon after Berge and the troopers were seated in the van, the troopers gave Berge the warnings that are quoted above.

Berge argues that the warnings he was given did not satisfy *Miranda* because Berge was not told that he could "decide at any time to exercise these rights and not answer any questions or make any statement." In *Miranda*, the Supreme Court established the rule that statements obtained as a result of a custodial interrogation are inadmissible, unless the police have advised the suspect of the following: (1) his right to silence; (2) his right to the presence of retained or appointed counsel during questioning; and (3) that any statement he does make may be used as evidence against him.[6] The warnings do not have to take a particular form as long as the warnings address each of those three topics.[7] The fundamental test is whether the warnings reasonably "conve[y] to [a suspect] his rights as required by *Miranda*."[8]

The warnings conveyed to Berge were that: he had the right to silence, that he had the right to counsel before any questioning (and appointed counsel if he could not afford counsel), and that his statements could be used against him in court. Although the troopers did not expressly tell Berge that he could exercise his right to silence at any time, Berge patently understood this right because, after he answered several questions about the theft of Taylor's property, he invoked his right to silence and requested an attorney when the troopers accused him of shooting Taylor.

Even so, Berge argues that he did not waive his *Miranda* rights when he spoke with the troopers. But Berge asked that the trooper repeat his rights and after those rights were repeated, he said "Okay" and responded to the troopers questions. When the troopers'

---

[6] *Miranda*, 384 U.S. at 478.

[7] *See id.* at 479; *Duckworth v. Eagan*, 492 U.S. 195, 202-03 (1989).

[8] *See Duckworth*, 492 U.S. at 203 (*quoting California v. Prysock*, 453 U.S. 355, 361 (1981)).

- 7 -

4254

Ex. A, p. 7

questioning became pointed and accusatory, Berge said he had nothing more to say and requested an attorney.

We conclude that the record in this case shows that Berge voluntarily waived his *Miranda* rights and agreed to speak with the troopers after they warned him of his rights.[9]

### Did Berge preserve his Sixth Amendment Claim?

Berge also contends that because the troopers had filed a murder complaint and obtained an arrest warrant before they contacted him, Berge's Sixth Amendment right to counsel or his right to counsel under Alaska law had attached when the troopers spoke to him. He argues that he did not waive that right to counsel. Berge raised this issue in the same motion that he raised his *Miranda* claim. But Judge Jahnke did not address Berge's right-to-counsel claim in the written decision. The decision addressed only Berge's *Miranda* claim.

Berge concedes that the superior court did not rule on this issue, but he argues that the court implicitly denied the claim. We disagree. Judge Jahnke's written decision does not mention Berge's Sixth Amendment argument. We have held that a defendant must press the court for a ruling on an issue in order to preserve that issue for appeal.[10] Because Berge did not obtain the court's ruling on the claim, this claim is forfeited.

---

[9] *See Miranda*, 384 U.S. at 475; *Giacomazzi v. State*, 633 P.2d 218, 222 (Alaska 1981), *opinion vacated on reh'g by* 872 P.2d 778 (1994).

[10] *See Marino v. State*, 934 P.2d 1321, 1327 (Alaska App. 1997) (by proceeding without seeking a ruling on the merits of his motion, defendant could not raise the issue on appeal); *Erickson v. State*, 824 P.2d 725, 733 (Alaska App. 1991) ("[I]n order to properly preserve this issue for appeal, it was [the defendant's] duty to insist that the trial court rule on his motion[.]"); *Jonas v. State*, 773 P.2d 960, 963 (Alaska App. 1989) (by failing to seek a ruling on his motion for a psychiatric evaluation of the complaining witness, the defendant forfeited his right to argue on appeal that the trial court should have granted the motion).

> *Did the admission of Berge's invocation of his right to silence during the interview with the troopers and the prosecutor's questions about the interview create plain error?*

In the superior court, Berge moved to suppress his entire statement to the troopers, arguing that he did not waive his Sixth Amendment right to counsel or his *Miranda* rights. The State opposed the motion and noted in its opposition that Berge apparently exercised his right to remain silent and his right to counsel during the interview. The superior court denied Berge's motion and, as stated above, did not address Berge's Sixth Amendment claim.

Even after the State flagged Berge's exercise of his right to remain silent and his right to counsel, Berge did not move separately to suppress the portion of his interview where he asserted those rights. Now, however, Berge claims that this evidence should have been excluded from his trial because it constituted an adverse comment on his assertion of his right to silence.

Three days before the trial started, Berge moved for a protective order. Part of the relief requested was an order barring a portion of his statement to the troopers. The only authority Berge cited in support of this portion of the protective order was Evidence Rule 403.[11] Berge contended that the limited relevance of the portion of the interview he sought to exclude was outweighed by the prejudicial inferences "drawn from him not responding, asserting his constitutional rights, and shedding a tear."

---

[11]  Alaska Rule of Evidence 403 provides:

> Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The court considered Berge's proposed protective order during a break in jury selection. The State announced that it did not oppose Berge's protective order and suggested that the tape recording of Berge's statement that the State planned to offer could be stopped where Berge wanted it stopped. Berge's trial attorney said nothing and the court directed the State to stop the tape recording where Berge wanted it stopped.[12] When the State offered the tape recording in evidence, Berge's attorney said that "[m]y objection's the same that had been set forth in the motion to suppress and the evidentiary hearing and the argument." But he did not otherwise object to the portion of the tape that was played. Nor did defense counsel object when the prosecutor cross-examined Berge about his statement to the troopers, including Berge's declaration that he had nothing more to say about Taylor's death.

We set out below the final portion of Berge's statement with Troopers Siegfried and McPherron that Berge did not seek to exclude under the protective order and that was played to the jury. This portion begins where the troopers confront Berge with their suspicion that he killed Taylor and ends where Berge's motion for a protective order asked that it be stopped.

> *Siegfried*: Something, you know if something happened to Ernie ... I'd like to get to the bottom of the story, ... there's ... indications that he may have drowned.
>
> *McPherron*: Yeah.
>
> *Siegfried*: But there are some injuries to Ernie that didn't quite tell proof positive that he drowned.
>
> *Berge*: Huh, what happened?

---

[12] Berge's appellate counsel did not represent Berge at trial.

*Siegfried:*   I was hoping [in] asking you we would understand you were over there when ah, ... I don't know.

*Berge:*   I don't know.

*Siegfried:*   Did you shoot Ernie?

*Berge:*   No, I didn't shoot Ernie. I didn't shoot anybody. I never shot anybody.

*Siegfried:*   That's not what we hear, John.

*Berge:*   Well, I don't know what you hear but ...

*McPherron:*   If there was a self-defense situation, then we need to know about it, okay. I mean if something went wrong, if Ernie put the moves on you and you didn't like it. Or he might of threatened you or something. We need to know that.

*Siegfried:*   Now we want you to think, cuz right now could be about the most important time of your life. What happened here today. Now we know there's a little bit more behind ... I'm going to let you know a little something [about Ernie.] Some suspicions came up and Ernie was taken back in for an autopsy back in Anchorage. We found the bullet holes. We found bullet fragments and that's why we're here. Now [we] know your story doesn't match up, John, and we know that you were involved with Ernie. We know that you're the one that shot him. Shot him with a .243.

*-Berge:*   — I did not.

*Siegfried:*   A ... .243 rifle. Where's that at now?

*Berge:*   I have no idea.

*Siegfried:* Well,

*McPherron:* Where's the rifle you shot him with?

*Berge:* [Audible sigh.]

*Siegfried:* You were out there. Did he threaten you with the shotgun he had on the boat?

*Berge:* I've said all I have to say. You know, you guys are making a lot of accusations here I don't know anything about.

*McPherron:* Well, John.

*Siegfried:* Think about it John, because I figure it's the most important part of your day right here.

*McPherron:* Right now.

*Siegfried:* If it's a self-defense thing ...

*McPherron:* We should know about it. If it's ...

*Siegfried:* I mean we don't want to go off on the wrong road here and uh ...

*McPherron:* You know ...

*Siegfried:* And end up charging you and then not have our jobs [inaudible].

*McPherron:* You know ...

*Siegfried:* But if it's ...

> *McPherron*: I mean we're ...
>
> *Siegfried*: ... an accident, it's, you know, like I say, he's gay, he may have threatened you with a gun. He may have been coming on to you. We don't know all that. But you know.
>
> *McPherron*: If it was self-defense, we're all ears. We'd love to hear about it. Okay. We'd love to hear your story. But what we're finding is like Trooper Siegfried said, Ernie didn't drown. Ernie was shot. You know he was shot four times....
>
> *Berge*: [Inaudible.]
>
> *McPherron*: We know you were there. The time he was shot. We even know you've gone back there since the shooting. We know all these things, and you know what looking at our perspective, you know, what we got now it looks pretty suspicious on your part. But if something else happened out there that we should know about now is the time to tell us. Uh ... If you don't want to talk to us, it's up to you. We're being fair with you aren't we? We're trying to find out the truth, right? We're being fair, aren't we?
>
> *Berge*: I've told you what I got to say. That's all I got to say.

Berge now argues that the admission of the following statements from the above portion of the interview was reversible error because it was an adverse comment on his right to remain silent:[13] "I've said all I have to say" and "I've told you what I got to say. That's all I got to say." Berge also contends that the prosecutor's cross-examination about his statement to troopers commented on his exercise of his rights and is reversible error.

---

[13] See *Doyle v. Ohio*, 426 U.S. 610, 617-19 (1976); *Gunnerud v. State*, 611 P.2d 69, 75-76 (Alaska 1980).

Because Berge never objected on the grounds he now asserts, Berge must show plain error. A plain error is one that is so obvious that it must have been apparent to a competent judge and a competent lawyer even without an objection. The error must be so substantially prejudicial that failing to correct it on appeal would perpetuate a miscarriage of justice[14] or "undermine the fundamental fairness of the trial."[15] However, a finding of plain error is rarely appropriate unless the record rules out the possibility that trial counsel's actions were tactically motivated.[16]

Berge's defense at trial was that he did not kill Taylor — that, in fact, he had no knowledge as to how Taylor died. The above-quoted portion of the interview could reasonably be interpreted as support for this defense. The troopers made repeated efforts to get Berge to admit some knowledge of the circumstances surrounding Taylor's death. They suggested that Berge might have killed Taylor by accident, or in self-defense. They alternatively suggested that Taylor had made aggressive homosexual overtures to Berge. But despite the troopers' efforts, Berge steadfastly declared that he did not shoot Taylor and that he knew nothing about Taylor's death. After repeatedly denying the troopers' suggestions that he had killed Taylor, Berge finally stated that he had told the troopers everything, and that was all he had to say.

Given the fact that this challenged portion of the interview can reasonably be viewed as supporting Berge's defense, we conclude that the record does not rule out the possibility that Berge's attorney made a tactical decision to allow the jury to hear this evidence and to take the risk that Berge would be cross-examined regarding these statements. Thus, we find no plain error.

---

[14] See *Potts v. State*, 712 P.2d 385, 390 (Alaska App. 1985).

[15] *United States v. Young*, 470 U.S. 1, 16 (1985).

[16] See *Massey v. State*, 771 P.2d 448, 453 (Alaska App. 1989).

*Was it plain error to instruct the jury that self-defense was not available?*

Berge argues that the superior court erred by instructing the jury that "the defense of self-defense is not available to the defendant in this case." Berge did not ask for self-defense instructions in the superior court and does not argue on appeal that self-defense instructions should have been provided to the jury. In fact, Berge told Judge Jahnke that he was not presenting a self-defense case. However, Berge objected to the instruction ruling out self-defense because he said it would be "confusing and unnecessary."

Berge's trial court objection to the instruction (that it was "confusing and unnecessary") is substantially different from the objection he raises on appeal (that the instruction amounted to a directed verdict in favor of the State). Thus, Berge must show that the challenged instruction was plain error.

In *Gilbreath v. Anchorage*,[17] this court held that a trial judge is authorized to instruct a jury not to consider a possible defense when, under the facts of the case, that defense is not legally available to a defendant. *Gilbreath* is the short answer to Berge's claim of plain error — for, given our decision in *Gilbreath*, at least some reasonable judges could conclude that trial judges possess the authority to instruct a jury to disregard a defense that the parties have not raised. This being so, there was no plain error in Judge Jahnke's decision to give such an instruction.[18]

The longer answer to Berge's claim of error is our conclusion that Berge's case is analogous to *Gilbreath*. Although there was some slight evidence to support a self-defense argument (most notably, some of Berge's pre-investigation statements to Dickerson), Berge testified at trial that his statements to Dickerson were false — that he

---

[17] 773 P.2d 218, 224 (Alaska App. 1989).

[18] *See Marrone v. State*, 653 P.2d 672, 676 (Alaska App. 1982) (if an issue is fairly debatable, it is not plain error).

had been engaging in braggadocio. Berge's trial strategy was to completely deny any involvement in Taylor's death. Accordingly, Berge's attorney did not ask the court to instruct the jury on self-defense.

It is questionable whether the evidence at Berge's trial would have supported a self-defense instruction even if Berge's attorney had asked for one. But that is ultimately beside the point. Berge's attorney chose not to ask for a self-defense instruction. We have previously upheld the right of the parties to adopt a strategy of putting the jury to an all-or-nothing choice.[19] This is apparently what Berge's attorney wished to do. Because the parties decided to litigate this case without injecting the issue of self-defense, the trial judge was authorized to instruct the jury not to speculate about self-defense.

Berge also argues that Judge Jahnke's instruction to the jury was a denial of due process because it was "tantamount to a binding judicial finding that [Berge] had lied when he told [Dickerson] that he shot Taylor in 'self-defense'." We do not read Judge Jahnke's instruction as a comment on Berge's credibility. Berge himself testified that what he told Dickerson was false and that he had not shot Taylor.

*Conclusion*

The judgment of the superior court is AFFIRMED.

---

[19] *See Rollins v. State*, 757 P.2d 601, 602-03 (Alaska App. 1988).