IN THE SUPREME COURT OF THE STATE OF ALASKA

JOHN W. BERGE III,      )
        Petitioner,     )
                        )
vs.                     )      Supreme Court No. S-_____
                        )
STATE OF ALASKA,        )
        Respondent.     )      Court of Appeals No. A-8683
_____)      Superior Court No. 1KE-01-122CI

## PETITION FOR HEARING

### VRA CERTIFICATION

I certify that this document and its attachments do not contain (1) the name of a victim of a sexual offense listed in AS 12.61.140 or (2) a residence or business address or telephone number of a victim of or witness to any crime unless it is an address used to identify the place of the crime or it is an address or telephone number in a transcript of a court proceeding and disclosure of the information was ordered by the court.

### STATEMENT OF RELEVANT FACTS

The Court of Appeal[1] in it's MEMORANDUM OPINION[2] opening "Underlying Facts of the Murder Investigation" has made numerous statements as fact that are not true. Most of the statements were first made in it's MEMORANDUM OPINION AND JUDGEMENT No.4254 (Exc.156)[3] for the Direct Appeal. The State, in it's Brief of Appellee, repeated these false statements. Petitioner noted and corrected these false statements in his Reply Brief using the record. Once again petitioner will identify these false statements and correct them using the record.

_____

[1]Hereinafter Court of Appeal shall be referred to as "IAC".

[2]Hereinafter citations to MEMORANDUM OPINION will be to "[Op.___]".

[3]Hereinafter the Excerpt of Record submitted to the Court of Appeals in support of A-8683 shall be referred to as "(Exc.___)".

1 of 21

from: "Underlying Facts of the Murder Investigation"

1. [Op.2]  second to last paragraph

   "Taylor was last seen alive on July 14th."

   This is a false statement.  On August 4, 1997 Arnie Paasche
told Trooper Dennis Roe that he had drank a beer with Taylor just
a few days earlier.  (Trp. Roe's Investigation Report Exc.1,
Tr.395[1]; Arnie Paasche Tr.434; Appellant's Reply Brief p.2 #2.)

2. [Op.2]  last paragraph

   "Approximately three weeks later, Dotson returned to
   Taylor's float house and noticed that Taylor's skiff was
   tied up in an unusual manner, and that some items of his
   property were missing."

   This is a false statement.  #1  On this trip Dotson did not
check the float house (Exc.320, Interview #3).  #2  The fact that
Taylor's skiff was tied up in an unusual way and items of his
property were missing was first reported by Michael Horwath on
August 27, 1997, not by Dotson on August 8, 1997. (Exc.318,
Interview #2; Appellant's Reply Brief p.2 #3)

3. [Op.3]  third paragraph

   "A Ketchikan pathologist, Dr. Michael Stewart, conducted
   an autopsy on Taylor's body that same day.  Based on the
   body's advanced state of decomposition, Dr. Stewart conc-
   luded that Taylor had been in the water for a long time."

   Autopsy Report Date of Death: 3-4 weeks prior to August 26,
1997.  This puts Taylor's death between the last few days of July
and the first week of August.  (Exc.2)

---

[1]Hereinafter the Trial Transcript shall be referred to as "(Tr.___)".

4.   [Op.3]  fifth paragraph

> "[H]e discovered that many items of Taylor's property were
> missing: rifles and shotguns, photo albums, and **crab pots**."

Dotson found the crab pots in the woods. (Exc.319; Appellant's
Reply Brief p.3 #6)

5.   [Op.3]  last paragraph

> "In this meeting, Dickerson reported that John Berge
> had declared that he "popped" Taylor **after an argument
> about crab pots**."

This statement of an argument about crab pots is not in the
September 8 Interview (Exc.321-26), the Glass Warrant Application
(Exc.8-36), or the Glass Warrant Transcript (Exc.37-53).   There
was never a quarrel over crab pots.

> "[A]ccording to Dickerson, Berge made this claim before
> Taylor's body was found.  **Berge told Dickerson that he
> shot Taylor twice while Taylor was on his float, and then
> one or two times more when Taylor was in the water**."

This statement is not true.  It is not in the September 8
Interview (Exc.321-26), the Glass Warrant Application (Exc.8-36),
or the Glass Warrant Transcript (Exc.37-53).

6.   [Op.4]  first paragraph

> "Dickerson also reported that Berge claimed to have
> taken some guns from Taylor, and to have buried these
> guns."

This statement is not in the September 8 Interview (Exc.321-
26) or the Glass Warrant Application (Exc.8-36), or the Glass
Warrant Transcript (Exc.37-53).  In the Glass Warrant Transcript

Berge says that he took the shotgun Taylor threatened him with.
(Exc.44)

7.  [Op.4]  third paragraph

    "[B]erge claimed that he had killed Taylor in "self-defence"
    - by which Berge apparently meant that he killed Taylor
    because he feared that, some day in the future, Taylor
    would attack him (because of their quarrel over the crab
    pots)."

This statement is inventive speculation.  See the Glass
Warrant at Exc.47-48 where it is stated that Taylor was pointing
a shotgun at Berge and demanding $700 for some "imagined BS",
Berge owed him nothing.  This statement of a quarrel over crab
pots is not in the September 8 Interview (Exc.321-26), the Glass
Warrant Application (Exc.8-36), or the Glass Warrant Transcript
(Exc.37-53).  There was never a quarrel over crab pots.

8.  [Op.5]  second paragraph

    "Later that day, McPherron, accompanied by Trooper
    Oscar Siegfried, stopped Berge on the street.  Although
    the troopers were dressed in civilian clothes, they ident-
    ified themselves as troopers - **but they did not immediat-
    ely tell Berge that they had a warrant for his arrest.**" ...

This statement is misleading.  The troopers **never**, during the
entire interrogation, informed Berge that they had an arrest
warrant.  See the Police Arrest Interrogation (Exc.57-67).  Also,
they never informed Berge of the true purpose of their questioning.
When they read the MIRANDA rights the purported reason was for
theft. (Exc.59)

9.  [Op.5]  fourth paragraph

    In this paragraph the synopsis of the substance of the Police Interrogation is not correct.  See Exc.57-67.  Following is a correct synopsis:

    p.57  Start of Interrogation.

    p.59  Miranda warnings for theft are at the bottom of this page.

    p.60  Discussion of Taylor's property, how long Berge had known Taylor and his relationship with him.  The general conditions during this relationship and the presence of another man "Bob" (Robert Nelson) who had been in Dall Bay working for Taylor during this time period.

    p.63  At the bottom of the page Trooper Oscar Siegfried suddenly says: "Did you shoot Ernie"?  Berge responds: "No I didn't shoot Ernie, I didn't shoot anybody, I never shot anybody".

    p.64  Police continue accusations.  Berge makes two more denials - one of shooting, and one of knowledge of a .243 rifle.  Starting on p.64 Berge attempts to stop the interrogation.

    p.65  After the second attempt to stop the interrogation the trial presentation of the tape is stopped.

    p.66  After his fourth claim of silence Berge is arrested.

10.  [Op.5]  last paragraph

    "After hearing Berge's answers, the troopers told Berge that they knew he had shot Taylor.  **Berge responded: "I've said all I have to say"**.

    This is not true.  The response was - "I did not". (Exc.64)

I.

**FIRST ISSUE:** Assistant Public Defender David Seid was ineffective for failing to file a Motion to Suppress the Glass Warrant issued to record conversations between Mr. Berge and Robert Dickerson.

> **Hearsay** 1. Traditionally, testimony that is given by a witness who relates not what he or she knows personally, but what others have said, and that is therefore dependent on the credibility of someone other than the witness.
> - Black's Law Dictionary

Dickerson appeared before the judge, took an oath, and testified about his perceptions and recollections of his conversations with Berge concerning Taylor's death.  Dickerson had no personal knowledge of any crime.  What he was reporting was a story that he had been told by Berge - that is hearsay.

The judge had ample opportunity to observe Dickerson and conclude that Dickerson was sincere and believed his testimony. However, the judge had no way of knowing if the story Berge had told Dickerson was true or false, hence the need for corroboration.

The IAC [Op.7] cites <u>McLAUGHLIN v STATE</u> and <u>LINTON v STATE</u>[1] to justify the lack of corroborating evidence and argues that since Dickerson personally appeared in front of the judge no corroboration of his testimony was required.  However, in <u>McLAUGHLIN</u> the citizen informant testified to direct personal experience of a crime, and in <u>LINTON</u> there had been a police investigation which provided **some** corroboration.

In this particular case Taylor's death had been investigated, including an autopsy, and the cause of death had been ruled

---

[1] <u>McLAUGHLIN v STATE</u>, 818 P.2d 683, 686 (Alaska App. 1991). <u>LINTON v STATE</u>, 880 P.2d 123 (Alaska App. 1994)

Ex. D, p. 6

accidental.  During the Glass Warrant Application (Exc.8-36)
Trooper McPherron had nothing to add to change that ruling nor to
corroborate Dickerson's testimony.

There is nothing in the Glass Warrant Application other than
an uncorroborated hearsay story to provide evidence to believe
that a murder had been committed.  Is this really enough to
provide probable cause?

[1] "Probable cause to issue a search warrant exists
when 'reliable information is set forth in sufficient
detail to warrant a reasonably prudent [person] in
believing that a crime has been or was being committed.'"
LLOYD v STATE, 914 P.2d 1282, 1285 (Alaska App. 1996)
(quoting Van Buren v State, 823 P.2d 1258, 1261 (Alaska
App. 1992) (quoting BADOINO v STATE, 785 P.2d 39, 41
(Alaska App. 1990) (quoting HARRELSON v STATE, 516 P.2d
390, 396 (Alaska App. 1973)).

[5] "[T]o establish the credibility of a citizen infor-
mant, no showing of prior reliability is required; the
police need only verify "some of the details of the infor-
mation." LLOYD @ 1286 (quoting ERICKSON v STATE, 507 P.2d
508, 518 (Alaska 1973)).

Without **some** corroboration Dickerson's hearsay cannot be used for
probable cause.

Additionally, Trooper McPherron failed to produce exculpatory
evidence that disproves Berge's story telling to Dickerson.
Dickerson was adamant that Berge had first started telling his
tale in early to mid-July. (Glass Warrant Application Exc.17, 32;
Tr.281, 529-30)

The first piece of evidence McPherron failed to produce was
the autopsy report (Exc.2) which shows the date of death as 3-4
weeks prior to August 26.  That puts the date of death during the
last few days of July or the first week of August.  This is
clearly not in line with Dickerson's testimony.

The second piece of evidence McPherron failed to produce was Trooper Roe's Investigation Report of August 4 where Trooper Roe travels to Dall Bay, investigates Taylor's where about's as a missing person and determines from physical evidence **and** the personal testimony of an eye witness that Taylor is not a missing person. (Exc.1)  All of this discredit's Dickerson's testimony.

Additionally, it is stated that Berge described to Dickerson several details of how he killed Taylor. [Op.8]  This is not in the Glass Warrant Application. (Exc.8-36)  In fact, if the Glass Warrant Application is carefully read, it is apparent that although Berge had started pulling Dickerson's leg in early July the details Dickerson provided (which were reported by the Newspaper) came after the newspaper report.  The biggest claim of Dickerson, that Berge said he had shot Taylor, was disproven by the autopsy.  That alone should have required further investigation.

### Discretionary Review is Warranted

Discretionary Review is warranted by App.R. 304(a)(d).  If the IAC's decision on this issue is upheld, then in Alaska, there need be no crime committed, nor even factually verified suspicion of a crime inorder to invade a citizen's privacy.  One need only appear in front of a judge, say yes to an oath, and spin a tale - your's or someone elses.  If this is upheld then U.S.C.A. Const. Amend. 4; Const. Art. 1&14 have no meaning in Alaska.

II.

**SECOND ISSUE:** Assistant Public Defender David Seid was ineffective for failing to obtain a ruling on Berge's Sixth Amendment claim.

On this issue the IAC states:

"In Berge's ensuing petition for post-conviction relief, he argued that Seid was incompetent for failing to press the trial judge for a ruling on the Sixth Amendment claim. The Superior Court dismissed this claim, concluding that Berge's pleading failed to establish a prima facie case that Berge would have been entitled to suppression of his statements on this ground." [Op.10]

This statement does not tell the whole story. See the Superior Courts ruling on this issue. (Exc.312) The Superior Court states that in Alaska there has been no definitive position taken on whether the right to counsel attaches at the time a complaint is issued. "As such, it is impossible to conclude that the Sixth Amendment claim would have been successful and, therefore, Berge has failed to set forth a prima facie claim of ineffective assistance of counsel."

The IAC dances on the issue of whether the Sixth Amendment right to counsel attaches in Alaska with the filing of a complaint. Ultimately, however, they make this statement:

"But even assuming that Berge had a Sixth Amendment right to counsel, at that point, he waived that right. As noted earlier in this opinion, when this court decided Berge's Direct Appeal of his conviction, we held that (1) Berge received proper MIRANDA warnings before the inter-rogation, and (2) he knowingly waived his rights to silence and to assistance of counsel." [Op.15]

**First**, the MIRANDA warnings occurred during the interrogation - not before. (Exc.59) The IAC's decision ignores the fact that if the Sixth Amendment right to counsel has attached with the filing of the complaint then the troopers were obligated to inform Berge

of the true purpose of the interrogation - murder and his arrest

for murder, and obtain his knowing waiver **prior** to the onset of

questioning.  **Second**, there was no "knowing waiver".  Mr. Seid,

in his pre-trial Motion to Dismiss directly addresses this issue.

(Exc.91-92)  Mr. Seid points out that the trooper's intentionally

deceived Berge of the presence of an arrest warrant for First

Degree Murder and that Berge was functionally under arrest at the

onset of trooper contact with him.  Also, when the trooper's did

advise Berge of his MIRANDA warning it was done purportedly for

investigation of theft. (Exc.59)  However, the primary purpose of

the interrogation was murder. (Tr.44)  The trooper's **never**, during

the entire interrogation, advised Berge that their true purpose of

questioning was murder, or that they had an arrest warrant for

murder, or that a complaint had been filed for murder.  The

trooper's premeditatedly did this for the express purpose of

evading Berge's Constitutional Rights. (Tr.32-36)

This subject of no valid waiver was directly addressed by

Berge in his brief to the Superior Court for this Appeal.  Quoted

at Exc.221, PEOPLE v ENGERT, 239 Cal. Rptr. 169, 172-73 (Cal.App.

1987) "failure to inform suspect that charges have been filed

precludes valid waiver".

From: LEXSEE 239 CAL RPTR 169, PEOPLE v ENGERT, 193 Cal. App.

3d 1518,*; 239 Cal.Rptr.,**; 1987 Cal.App. LEXIS 1995,***:

Page 3 - [*1525] b) Sixth Amendment Violation

**(2b)** "Engert next contends that the police violated his
Sixth Amendment right to counsel when prior to interrog-
ation they purposely chose not to inform him that a com-
plaint had been filed against him, instead intentionally
misrepresenting to him that he was not even a suspect to

the murder they wished to question him about.  We agree
[**173] with Engert that the police ploy precludes a
knowing waiver of his Sixth Amendment right to counsel."

Page 4
  "In each case we have reviewed in which a Sixth Amend-
ment waiver was affirmed, at least the defendant was
aware that he was in custody or under arrest, or that
charges had been filed.  Relying upon the above cited
cases, we conclude that there can be no valid Sixth Amend-
ment waiver of the right to counsel unless a defendant is
informed, or it is otherwise established that he was aware
, of his arrest or that charges have been filed against
him. ..." (See Exhibit A attached to this petition.)

The State introduced the pre-arrest interrogation at trial

against objection, first in a pre-trial Motion to Dismiss claiming

Fifth and Sixth Amendment violations and again at trial.

This pre-arrest interrogation was the State's vehicle for

considerable illegal and irreversible harm to Berge at trial.

**First**, it introduced Berge's attempts to cut off questioning.

**Second**, by raising Berge's claims of silence in cross examination

and using them to impeach his credibility with the jury in viola-

tion of Alaska Rules of Evidence 403 and 512(a) and due process.

(See the Third Issue of this petition.)  **Third**, this interrogation

contained the trooper's accusations against Berge, posed as facts,

that **they knew he had shot Taylor**.  This is in violation of Alaska

Evidence Rule 602.  When these accusations were made, seperately

unopposed by Seid, the jury had no recourse except to believe them

as fact.  Thus, providing (false) corroboration for the State.

(Tenth Issue, Exc. 248-52)

Contrary to ENGERT, in BERGE there was no material evidence

or witness connecting Berge to the crime.  However, there was

evidence that repudiated Berge's confession in his Bar Room Tale.

**First**, when Berge started "confessing" to killing Taylor, Taylor was alive. (Tr.672-73)   **Second,** Berge "confessed" to killing Taylor with a .243 cal. rifle (Dickerson's testimony, Tr.278; Affidavit in Support of Complaint, Exc.56; two Police Search Warrants, Tr.255-56).   When, in fact, Taylor was killed with a Marlin 30-30 caliber 170 gr. bullet. (Tr.479-92, 502-08)   **Third**, Berge "confessed" to standing on a beach and shooting Taylor out of his boat, at a distance of 60-80 feet. (Tr.242-43, Exc.50)   However, Taylor was shot on his log float - a distance of 225-300 feet from the nearest beach. (Tr.251)   This is impossible.   See the last issue of this petition.

<u>Discretionary Review is Warranted</u>

Discretionary Review is warranted by App.R. 304(a)(c)(d). This court needs to correct this mistaken ruling and to rule decisively that the Sixth Amendment Right to Counsel attaches at the beginning of Adversarial Judicial Proceedings, which in Alaska is the filing of the complaint.   Surely, an action which is strong enough to allow a citizen to be apprehended and jailed warrants the right to counsel.   This ruling would bring Alaska in line with Federal Rulings and other state rulings and be in agreement with the U.S. Constitution Bill of Rights upholding the individual's protection from the tyranny of oppressive governmental actions.

III.

**THIRD ISSUE:** Assistant Public Defender David Seid was ineffective for allowing the admission of evidence of and not objecting to comment on defendant's exercise of his constitutional right to silence.

The IAC's claim that it is a perfectly acceptable strategy of defense to allow a jury to hear a defendant invoke his right to silence during interrogation by police flies in the face of the law, numerous legal decisions, and plain logic:

> Alaska Rule of Evidence 403 precludes prosecution evidence on a suspect's pre-arrest silence. SILVERNAIL v STATE, 777 P.2d 1169, 1174-79 (Alaska App. 1989) (murder-2 & kidnapping convictions reversed; examination/comment on pre-arrest silence is plain error).

> ALSTON v GARRISON, 720 F.2d 812 (1983) @816 (2) "[F]ew mistakes by criminal defense counsel are so grave as the failure to protest evidence that the defendant exercised his right to remain silent." See DOYLE v OHIO, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); WILLIAMS v ZAHRADNICK, 632 F.2d 353 (4th Cir. 1980) "Such evidence plants in the mind of the jury the dark suspicion that the defendant had something to hide, and that any alibi which is subsequently proffered is pure fabrication."

> @817 V. "[S]ince 1976, when DOYLE v OHIO was decided, the law has been clear that admitted evidence of post-arrest silence violates due process of law. Failure to oppose the admission of such evidence plainly falls beneath the "range of competence demanded of attorneys in criminal cases." (See Exc.228)

Mr. Seid, in his Motion for Protective Orders (Superior Court State Exhibit C, p.4; Exc.249) states: "Mr. Berge's silence and teary eyes should not be used against him." The relevant part of this reason is the constitutional claim of silence. Unfortunately Mr. Seid's stopping point left that violation intact. During the prosecutor's trial cross examination the prosecutor raises these claims of silence and uses them to denigrate Berge's jury credibility:

Prosecutor: Okay.  Do you remember them saying, quote, we'd love to hear your story?

Berge: Yes, I do.

Prosecutor: All right.  And your statement was, quote, I told you all I have to say, that's all I have to say, unquote?

Berge: That's right.

Prosecutor: Okay.  You didn't say anything about I just made up a big bunch of BS to get Dickerson, did you?

\*        \*        \*

Prosecutor: Okay.  And the troopers were saying, "We're being fair with you, aren't we?  We're trying to get the truth out, right?"  And you said, quote, I told you all I have to say; that's all I have to say?

(Tr.592-93)

By raising these claims of silence and making his adverse comments on them, the prosecutor effectively accomplishes exactly what the U.S. Supreme Court, this Court, and Alaska State Law rule against, find objectionable, break's Due Process, and result's in reversal:

"Such evidence plant's in the mind of the jury the dark suspicion that the defendant had something to hide, and that any alibi which is subsequently proffered is pure fabrication." WILLIAMS v ZAHRADNICK, 632 F.2d 353 (4th Cir. 1980)  See DOYLE v OHIO, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), quoting ALSTON v GARRISON, 720 F.2d 812, 816 (1983)

Mr. Seid's affidavit on this issue states:

"I did not object to the prosecutor's questions regarding "that's all I have to say".  There was no strategic reason behind not objecting, other than perhaps I did not believe it was an objectionable question at the time." (Exc. 198-99, 235)

The IAC attempts to justify these errors of defense by hypothe-sizing a "tactical decision".  There is, of course, no support for the IAC's "tactical" fantasy in any statement by trial counsel anywhere in the record.

14 of 21

**FIRST:** The IAC attempts to justify Seid's lack of objection to the cross examination by explaining that "the prosecutor's questions gave Berge a chance to reiterate the basic defense theme ..." [Op.20]  This is nonsense.  Berge's credibility had already been impeached by playing the tape with the claims to silence and by the prosecutor's illegal comments.

**SECOND:** All of the purported tactical advantage could be gained, and none of the prejudice suffered, by stopping the recording immediately **before** Berge's first assertion of the right to silence. By then the troopers had already "made repeated efforts to get Berge to admit" presence and participation, and "suggest that [he] might have killed Taylor by accident, or in self-defense, or in response to aggressive homosexual overtures..."  Berge's steadfast declarations of innocence in response had already occurred, and were memorialized on the tape.  There was nothing tactically to gain and only unfair prejudice to generate, by allowing admission of Berge's two assertions of silence before the jury.

**THIRD:** Seid objected to this interrogation as evidence before trial and again at trial.  He was overruled and this evidence was admitted against his objection.  He also raises his concern that Berge's silence should not be used against him in his pre-trial Motion for Protective Orders, however, his choice of a stopping point did not do this.  This was error on his part - not tactics.

> "A mistake made out of ignorance rather than from strategy cannot later be validated as being tactically defensible." KIMMELMAN v MORRISON, 477 U.S. 365, 106 S.Ct. 2574, 2588-89, 91 L.Ed.2d 305 (1986); ARNOLD v STATE, 685 P.2d 1261, 1265-67 (Alaska App. 1984); STATE v JONES, 759 P.2d 558, 569 (Alaska APP. 1988).

The present case is virtually identical to this Court's decision in GUNNERUD v STATE, 611 P.2d 69, 75-76 (Alaska 1980). In GUNNERUD the prosecution played a tape recording made of the execution of a search warrant. A portion of the tape included the accused's post-warning assertion of her right to silence. This Court observed, "It is well settled that prosecutorial comment on silence for substantive or impeachment value is constitutionally prohibited." GUNNERUD, 611 P.2d, 75. Although the evidence against her was "strong", it was "not overwhelming." 611 P.2d 76. Given that her own testimony, if believed, could exculpate her, the Court held that introduction of this evidence was reversible error. Id.

## Discretionary Review is Warranted

Discretionary review is warranted by App.R. 304 (a)(d). As has been shown, the IAC's decision on this issue flies in the face of well established precedence - both Federal and State. To allow this decision to stand will perpetuate injustice in Alaska.

IV.

**NINTH ISSUE:** Assistant Public Defender David Seid was ineffective for failing to obtain a Small Arms Ballistics Expert to prove the state's scenario of action.

Mr. West in his trial closing for the State summarizes the shooting as it is told in the Glass Warrant Tape:

> "Mr. Berge says he was on a fucking boat, you know, 60 to 80 feet away, you know, because when I shot him, I got two rounds through the motherfucker. He jumped in the fucking water, he was in the water and I was on the beach." (Tr.697)

Mr. West uses this same summary in his cross examination of Berge. (Tr.585) Trooper McPherron describes the shooting scenario similarly (Tr.244) and the location of the log float where Taylor's body and the spent 30-30 caliber 170 gr. bullet that went through Taylor were discovered (Tr.392, 453-69) as being 75-100 yds. from the nearest beach where the shooting could have occurred. (Tr.251). The Glass Warrant Tape is played at trial. (Tr.239, see the Glass Warrant Transcript at Exc.50 for the shooting scenario.) Berge was found guilty of murder based on this shooting scenario. This is a picture of that shooting scenario:



At trial Mr. Seid pointed out various inconsistencies that he had noted between the shooting scenario in Berge's Bar Room Tale[1]

---

[1] The Glass Warrant Tape was gotten in the early morning (6-7am) in the Pot Latch Bar while Dickerson plied Berge with liquor. It was described by Berge at trial as an on going braggadocious story told for fun and drinks. (Tr.552-57)

and what had demonstrably occurred. (Tr.664)  Yet, Mr. Seid is not an expert to analyze a shooting scenario to prove or disprove it's scenario of action.  Mr. West in his final closing for the State does an excellent job of rebutting each point Seid raised to the extent that though the facts were incongruous they could be accepted with the spin Mr. West put on them.  This includes Dickerson's adamantly consistent testimony that Berge first started telling Dickerson his tale in early to mid-July right after returning from Dall Bay with Skip Gist's dogs and Seid nailing this date to between 6 and 14 July with evidence and testimony. (Tr.672-73)  West, in his closing, disregards the truth of this evidence and suggest to the jury that Seid is tricking them! (Tr.687-88)  Now who is tricking whom?

Inspite of the incongruity of the facts vs the story, no one asked the **BIG** question - was Berge's shooting scenario actually possible?  This is a very basic question that should have been asked.  Obviously the State didn't.  But, Mr. Seid should have asked this question.  It was his job.

> "Duty to Investigate" STRICKLAND v WASHINGTON, 466 U.S. 668, 104 S.Ct. 2052, 2066[13] (1984); "Reasonable perfor- mance of counsel includes an adequate investigation of the facts of the case, ..." HENDERSON v SARGENT, 926 F.2d 706, 711 (8th Cir. 1991), WILLIAMSON v REYNOLDS, 904 FS 1529, 1550 (E.D. OKL. 1995), DEMAREST v PRICE, 905 FS 1432, 1448 (D. Colo. 1995), McCOY v NORRIS, 958 FS 420, 425 (E.D.Ark. 1996) ... WIGGINS v SMITH, 123 S.Ct. 2527 (2003).

Mr. Nixon of "Athena Research & Consulting LLC" was hired for this appeal as a highly qualified expert.  See Mr. Nixon's "Cirriculum Vitae". (Exc.295-300)  Using the data of a scientific ballistics penetration test which showed that a 30-30 cal. 170 gr

bullet would penetrate a jell block no more than $17\frac{1}{2}$ inches
(Exc.261, 265 at 5 References [1]) and the State's autopsy results
which showed a total bullet path through Taylor of 17 inches
(Exc.260, 277-81) Mr. Nixon came to this conclusion:

> "[I] am convinced that the incident which is the subject
> of this case could not have happened as originally assumed
> /discribed.  It is my professional opinion that a far more
> likely scenario exists; -- that the victim was shot very
> near to where the bullet was found, the bullet having
> barely sufficient residual velocity to exit the body and,
> consequently, falling within a foot or two of the victim."
> (Exc.257, repeated at 264)

This is a picture of the shooting scenario using Mr. Nixon's
findings:



This is riveting testimony for the jury, which the jury never had.
It completely disproves Berge's Bar Room Tale.

Far from simply "bolstering" Mr. Seid's defense (the IAC's
discription [Op.25]), the expert's finding, standing alone,
defeats the State's case against Berge which consisted of nothing
more than a braggadocous bar room story told for drinks.  This
expert testimony would have made Seid's case by showing the
factual impossibility of Berge's story.

In spite of the IAC's serpentine reasoning to uphold their
finding on this issue, the fact is that the State introduced the
Glass Warrant Tape as it's evidence that Berge killed Taylor and

relied upon the story in this tape to convict Berge.  "His [Berge] discription of how it occurred fits exactly with the physical evidence of the bullet wounds on Mr. Taylor, ..." (Tr.701, State's Closing).  The question of whether Berge's bar room shooting scenario was even possible was a critical question that needed to be asked - yet never was.  That is ineffective investigation, and that is ineffective assistance of counsel.  <u>RISHER's</u> two prong test is more than satisfied.

The State introduced 86 exhibits and 21 witnesses which included expert's in medicine, forensics, criminalists, etc.. Mr. Seid was a Public Defender.  Considering the inconsistencies Mr. Seid noted between the facts and the story, which further justifies the use of an expert, it is ridiculous to say that the State Public Defender Agency could not afford an expert for an adequate investigation.  The fact is, Seid did not consider the use of an expert. (Exc.206 #4)

### Discretionary Review is Warranted

Discretionary Review is warranted by App.R. 304 (a)(d).  The IAC's ruling on this issue attempts to justify injustice and flies in the face of long established federal precedence that safeguards every citizens Sixth Amendment right to effective assistance of counsel.  To convict a person on the basis of a fictional  story that could not happen is wrong.  This ruling needs to be overturned.

PRAYER for RELIEF

For any and/or all of the foregoing reasons, petitioner asks this Court to reverse the judgement of the IAC and the judgements of conviction entered against him in the trial court, and to remand his case to the trial court for a new trial.

RESPECTFULLY SUBMITTED,

Dated: May 2, 2005

*John W Berge III*

John W. Berge III, pro se
FCC/CCA
P.O. Box 6200
Florence, AZ  85232

I certify that a copy of the foregoing Petition for Hearing was served via U.S. Mail on:
John A. Scukanec, OSPA
310 K. St.  Suite 308
Anchorage, AK  99501
May 2, 2005 by: *JWB*