Hugh W. Fleischer
Law Offices of Hugh W. Fleischer
310 K. Street, Suite 200
Anchorage, AK 99501
Telephone: (907)264-6635
Facsimile: (907) 264-6602
E-Mail: hfleisch@aol.com

Attorney for Petitioner, John Berge III

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOHN BERGE III | ) |
| | ) |
|        Petitioner, | ) |
| | ) |
|    vs. | ) |
| | ) |
| MARK ANTRIM, et al. | ) |
| | ) |
|      Respondent. | ) |
| _____ | ) CASE NO: A05-0290-CI (JWS) |

**PETITIONER'S OPENING BRIEF
ON THE MERITS**

Petitioner, John Berge III, through his attorney Hugh W. Fleischer, hereby files his Opening Brief on the Merits regarding Mr. Berge's Petition for Habeas Corpus.

John Berge filed his petition for habeas corpus, citing ten separate grounds there for.

This Court has found that Mr. Berge has exhausted claims 1-6, 9 and 10.

## STATEMENT OF THE CASE

The badly decomposed body of Ernie Taylor was found floating next to his log-float in Dall Bay on August 27, 1997. (Tr. 212-15)1  The initial autopsy found the cause of death to be drowning.  (Tr. 188-89)  A later autopsy revealed bullet wounds and fragments in the decedent.  (Tr. 138, 141-57)

On September 8, 1997, Robert, aka "Froggy" Bob, Dickerson contacted the troopers through an intermediary, and ultimately reported that petitioner had been making comments to him about having killed Taylor.  (Tr. 221)  AST Inv. McPherron obtained an Alaska-Glass warrant.  On September 10, McPherron  succeeded in surreptitiously recording a conversation between "Froggy" Bob  and petitioner, in which petitioner allegedly "confessed" to killing Taylor.  (Tr. 222-29)

On September 14, 1998, Inv. McPherron filed a felony complaint charging petitioner with first-degree murder, and obtained a warrant for his arrest.  (Tr. 24, 55)  Later that morning, McPherron and Anchorage AST Inv. Seigfried stopped, frisked, questioned, and arrested petitioner.  Prior to trial, petitioner moved to suppress the results of trooper questioning.  The trial judge denied the motion to suppress.

---

1 Transcript cite appear as "(Tr. ___)."

(RE 15-18)   A tape-recording of the troopers' interrogation was admitted at trial. (Tr. 237-39)

Petitioner was indicted for first-degree murder, theft-2 of Taylor's shotgun, and tampering with evidence for disposing of "the weapon he used to shoot" Taylor and the shotgun, neither of which was recovered.  (Tr. 241)

The state's case depended on efforts to corroborate petitioner's confession.  There was no corroborative evidence specifically connecting petitioner and the crimes.  Moreover, the secretly recorded confession contained petitioner's explicit assertion that he killed Taylor in self-defense. Petitioner testified, repudiated his confession, and denied that he was the person who killed Taylor.

Over defense objection, the trial court instructed the jurors that "[t]he  defense of self-defense is not available to the defendant in this case."  (RE 129)

At the end of the second day of deliberations, the jury convicted petitioner on all   counts. (Tr.712-13)  Berge was sentenced on August 14, 1998, to a combined  sentence of 62 years imprisonment.  (Tr. 745-50; RE 275-277)

### CLAIMS ONE-THREE-MR. BERGE'S RIGHTS UNDER MIRANDA WERE VIOLATED

Claims one through three each relate to Mr. Berge's

3

claims of violation of the seminal case, *Miranda v. Arizona,* 384 U.S. 436.

The existence, validity, and voluntariness of any purported **waiver** of an accused's constitutional rights are a mixed question of law and fact, subject to this  Court's *de novo* review. *Brewer v. Williams*, 430 U.S. 387, 403-04 (1977).

This Court "must 'indulge in **every reasonable presumption against waiver**.'"  *Brewer v. Williams*, 430 U.S., 404 (emphasis added).

A.    <u>Statement Of Relevant Facts</u>

On September 14, 1997, AST Inv. McPherron swore to and filed a criminal complaint, charging petitioner with murder-1. (RE 103-105)  The   Judge accepted and signed the complaint. (<u>Id</u>.; Tr. 55)  Simultaneously, McPherron obtained a warrant for petitioner's arrest on that charge.  (RE 103-105; Tr. 24)

At about 11:35 a.m., Invs. McPerron and Siegfried stopped petitioner on the street in Ketchikan.  McPherron instructed petitioner to enter the trooper vehicle.  (Tr. 11-12)  Inv. Siegfried frisked petitioner for weapons, finding and  seizing a folding knife on petitioner's person.  (Tr. 12) Siegfried then instructed him to sit down in the trooper van.  (Tr. 13)  Petitioner sat in the   front passenger seat, while

4

Siegfried sat behind him, and Inv. McPherron sat in the driver's seat. (Tr. 12-13)

Petitioner was not told that charges had been filed against him. (Tr. 15) Nor  was he told that he was not under arrest. (<u>Id</u>.; Tr. 14) He was never told that he was free to go. (<u>Id</u>.) In truth, he was in custody. Had he refused to talk to  the troopers, they would have arrested him on the spot. (Tr. 26-27, 32) Had he attempted to defy their instructions to sit in the van, by trying to leave the scene, they would have apprehended him. (Tr. 28-32)

After obtaining petitioner's name and address, Inv. Siegfried said that he  had been "sent down" from Anchorage due to the Taylor death. (Tr. 53) Petitioner responded with a brief description of how he met Taylor, of his initial good impression of him, and of his ultimate conclusion that Taylor "had a bad reputation" and that Bob Dickerson had told him that Taylor that he, Bob, was afraid of Ernest Taylor and cautioned Berge against being around Taylor(Tr. 553) After further questioning, petitioner estimated that he stayed at Dall Bay with Taylor sometime in June. (Tr. 548)

Siegfried said Taylor's family reported some items stolen, and added, "We don't  know whether you had anything to do with that..." (RE 105c) For this purported, and false, reason, Siegfried directed Inv. McPherron to read petitioner

5

his rights.  (Id.)  McPherron falsely assured appellant, "Uh, it's just routine;" petitioner replied, "I've told you everything I know."  (Id.)    McPherron then read the *Miranda* warnings to appellant.  (Id.)  Asked if he understood his rights, petitioner replied by asking McPherron to "[r]ead it again."  (Id.)

Inv. McPherron again read the *Miranda* warnings.  (Id) This time, however, **he did not ask if petitioner understood them.  Nor did the troopers elicit any waiver of those rights.** (Tr. 43-44)  Instead, McPherron and petitioner each said "Okay," and Inv. Siegfried immediately resumed questioning. (RE 105d)2

After the warnings, the interrogation became more and more accusatory, and steadily progressed from inquiries about the possible theft of Taylor's possessions to whether

─────────────────────

2 McPherron later testified he inferred that, by "Okay," petitioner meant both that he now understood his rights and that he wanted to waive them, **even though neither trooper had yet asked him to do so.**  (Tr. 43-44) Although he routinely asks a waiver question after advising suspects of their rights, here McPherron unaccountably failed to do so.  (Tr. 37-38)

petitioner shot and killed him.  (RE 105g-h)  Petitioner tried to exercise his right to cut-off the questioning, but the troopers continued to interrogate him.  (RE 105h) Petitioner again asserted his rights to cut-off questioning and to silence, but still the troopers pressed him, and played a portion of his surreptitiously recorded conversation with "Froggy" Bob.  (RE 105i)  Again petitioner tried to cut-off questioning and remain silent. (<u>Id</u>.)  Finally, after petitioner's fourth assertion of the rights they had promised him, the troopers terminated their interrogation.  (RE 105j)

Prior to trial, petitioner moved to suppress the statements he made to the troopers, alleging *Miranda* and Sixth Amendment/right to counsel violations.  (RE 62-81)  Following hearing, (Tr. 3-101), the trial judge issued a written Order denying the motion to suppress.  (Tr. 15-18)  Remarkably, the trial judge found the interrogation to be non-custodial. (<u>Id</u>.)  Since the *Miranda* principle was therefore inapplicable, the trial judge declined to decide "whether there was a waiver of rights."  (Tr. 17)

For reasons unknown, the court ignored, and thus implicitly rejected, the Sixth Amendment/right to counsel claim.  As stated above, it was clear error on the part of petitioner's trial counsel to fail to insist that the Judge explicitly set out a basis for his denial of the Sixth

7

Amendment right.

The state introduced petitioner's statements in its case-in-chief. (Tr. 237-39)  Moreover, the prosecutor concluded his cross-examination of petitioner by  hammering him on the "coincidence" that his statement to the troopers turned out to be the very "false" story he earlier told "Froggy" Bob he would use if questioned about Taylor's demise.  (Tr. 590-91) The prosecutor also used the  statement in an improper impeachment of petitioner, repeatedly referring to his assertions of his rights to cut-off questioning and to silence.  (Tr. 592-93)3

**B.**   **The Statement Was Obtained In Violation Of Miranda.**

For 33 years, the law has been clear -- the results of custodial interrogation are inadmissible, unless the suspect is first advised of, and validly waives, his rights to silence, to counsel/court-appointed counsel, and to cut-off questioning at any time, and is told his answers can, and will, be used against him.  *Miranda v. Arizona*, 384 U.S. 436 (1966).

**1.**   **Appellant was subjected to custodial interrogation.**

---

3 See Section II, infra (introduction of evidence and comment on petitioner's exercise of rights is reversible error).

8

### a. The Stansbury Analysis.

The seminal case in the United States for determining whether a suspect is in custody for *Miranda* purposes is *Stansbury v. California,* 511 U.S. 318, 323-24 (1994). Analysis focuses on three main categories of facts, which encompass **pre-during**, and **post-questioning circumstances.** *Stansbury @* 323-24. When an **objective** assessment of these circumstances reveals that "a reasonable person would feel he was not free to leave and break off police questioning," then "custody" has been shown. Id. Application of the *Stansbury* standard here clearly establishes that petitioner was in custody when questioned by the troopers.

### i. Pre-Questioning Facts.

Prior to questioning, the troopers **filed formal charges** against, and obtained an **arrest warrant** for, petitioner. The existence of probable cause to arrest is strong evidence that the accused's interrogation is custodial. *Stansbury @* 322; *U.S. v. Bravo*, 295 F.3d 1002(9th Cir. 2002); See, *California v. Beheler*, 463 U.S. 1121, 103 S. Ct. 3517 (1982). Moreover, the **troopers**, not petitioner, **"initiated"** all the events culminating in interrogation. .4

_____

4 Courts tend to find custody lacking when suspects voluntarily initiate contact with the police, resulting in brief questioning. *See*, *e.g.*, *California v. Beheler*, *supra* ; *Beckwith*

Immediately prior to questioning, the troopers **stopped and frisked petitioner, seized** his folding knife, and **directed him to sit** in the trooper van.5  Such circumstances are indicative of "custody."  *Florida v. Royer*, 460 U.S.  491 (1983) (seizure of property pending questioning); *See*, *U.S. v. Williams*, 951 F.2d 1287 (DC 1991) (*Terry* stop escalating to arrest)

## ii.  During Questioning Facts.

During questioning, petitioner was in the close confines of the trooper van, surrounded by two armed officers, including one who had flown all the way from Anchorage for the occasion.

Here, petitioner, like any reasonable person, perceived himself to be in custody while being **questioned by two armed**

---

*v. U.S.*, 425 U.S. 341 (1976); *U.S. v. Dockery*, 736 F.2d 1232 (8th Cir.), *cert. denied*, 469 U.S. 862 (1984); *Thompson v. State*, 768 P.2d 127 (Alaska App. 1989), *vacated*, *Thompson v. Keohane*, 516 U.S. 99 (1995).

Where, as here, questioning is instigated by law enforcement, courts frequently find custody.  *See*, e.g., *Miranda v. Arizona*, *supra*; *Griffin v. U.S.*, 922 F.2d 1343 (8th Cir. 1990); *U.S. v. Longbehn*, 850 F.2d 450 (8th Cir. 1988); *U.S. v. Beraun-Panez*, 812 F.2d 578, *mod.*, 830 F.2d 127 (9th Cir. 1987).

5 The trial judge's purported finding that petitioner "entered the vehicle on his own" is not supported by the record.  Only Trooper McPherron testified at the motion hearing, and he admitted he could not witness the physical contact between Inv. Siegfried and petitioner on their side of the van.  (Tr. 50)

**troopers in their vehicle**.6  *U.S.   v.   Lee*, 699 F.2d 466 (9th Cir. 1982) (suspect questioned in police car parked in front of his house was in custody).

In the context of the trooper-initiated stop, frisk, and seizure, it is apparent petitioner was in the **equivalent... of actual physical restraint.** *Stansbury*, 511 U.S. 318 (1994). This conclusion is confirmed by Inv. McPherron, who admitted the troopers would have formally arrested petitioner had he declined to talk to them or attempted to leave.  (Tr. 26-32)  Early on, petitioner was informed that he was, and he was questioned as, a suspect -- first as a thief, and shortly thereafter as a murderer.  (RE 105i-l) Where, as here, it is communicated to the detainee, such a **suspect focus** is indicative of custody.

*Stansbury*, *supra*; Highly significant, and ignored by the court, is the fact that the **troopers** <u>**did**</u> **"Mirandize" petitioner**.  Under the "totality of circumstances" test set out in *Thompson v. Keohane*, 516 U.S. 99 (1995) to determine custody determinations under *Miranda,* it appears that there was custody present in the case at bar.  Any reasonable person, seated in a trooper  vehicle following a frisk, who is told he has rights to silence and to counsel, and that anything he says can, **and will**, be used against him, will infer he is no longer free to

---

6 Assuming their sidearms were concealed, as the trial judge found, the fact remains that any reasonable person understands that on-duty troopers bear arms.  Petitioner so testified at trial.  (Tr. 594-95)

leave and break off police questioning. **Stansbury**, *supra*.

Apparently, the trial judge only finds custody when the police are not polite -- not "even-toned" and "even-tempered." (RE 17) That is not the law. The issue is a reasonable person's perception of his freedom to defy the authorities and depart from their presence, not the professionalism of the agents. Also very significant is the troopers' "polite," but wholly improper, response to appellant's ultimate efforts expressly to assert his rights. **Only after** <u>**four**</u> **separate assertions of his desire to cut-off questioning did the troopers call it quits.** They may have been "even-toned," but they utterly failed to insure that his "'right to cut off questioning' was 'scrupulously honored'." **Michigan v. Mosley,** 423 U.S. 96, 104 (1975) (citation omitted). Continued questioning in the face of repeated assertions of the right to silence violates the **Mosley** principle. "Where[, as here,] the police fail[] to honor a [suspect's] decision to cut off questioning, [both] by refusing to discontinue the interrogation upon request [and] by persisting in repeated efforts to wear down his resistance and make him change his mind," the conclusion that he is in custody is unavoidable. **Mosley**, 423 U.S., 105-06.

### iii.   <u>Post-Questioning Facts</u>.

After questioning, the troopers **immediately, and formally, arrested** petitioner. **Stansbury**, *supra*.

12

**b. The Griffin "Particularly Significant" Factors**

**Analysis.**

In a different formulation of the same subject matter,
Federal Courts recently approved analysis of six "particularly
significant" factors in determining the existence of "custody"
for *Miranda* purposes.

> (1) whether the suspect was informed at the
> time of questioning that the questioning
> was voluntary, that the suspect was free to
> leave or request the officers to do so, or
> that the suspect was not considered under
> arrest;
>
> (2) whether the suspect possessed
> unrestrained freedom of movement during
> questioning;
>
> (3) whether the suspect initiated contact
> with authorities or voluntarily acquiesced
> to official request to respond to
> questions;
>
> (4) whether strong arm tactics or deceptive
> stratagems were employed during
> questioning;
>
> (5) whether the atmosphere of the
> questioning was police dominated; or
>
> (6) whether the suspect was placed under
> arrest at the termination of the
> questioning.

*U.S. v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). A
finding of custody does not require proof of facts in each
category. Strong evidence of one particular factor can itself
establish custodial interrogation. *Griffin,* supra.
All of the circumstances held to be "particularly significant"

13

in *Griffin* cut in favor of a conclusion of custody in the present case. **First,** petitioner was never told he was free to leave, nor that he was not under arrest; to the contrary, he was read his *Miranda* rights! **Second,** petitioner had no freedom of movement, seated in a trooper van surrounded by armed officers, and would have been physically stopped if he attempted to leave. (Tr. 26-32) *U.S. v. Lee*, 699 F.2d 466 (9th Cir. 1982). **Third,** troopers initiated the contact on a public street, by stopping and frisking petitioner, seizing his knife, and instructing him to sit in their vehicle. *Stansbury*, *supra*. **Fourth,** the troopers tried to deceive petitioner, by trying to trivialize the frisk and the giving of *Miranda* warnings, by initially telling him he was only suspected of theft, and by feigning interest in the possibility that petitioner killed Taylor in self-defense. (RE 105e-h)7 **Fifth,** from the time they initiated the stop, frisk, and seizure, through the time they read petitioner his rights and interrogated him, until the time they drove him off to jail, the "atmosphere" appellant breathed was entirely trooper-dominated. **Sixth,** petitioner was immediately

---

7 Ironically, the trial judge twisted these flimsy efforts at deception into a rationale for finding no-custody. (RE 67) Apparently, the theory is that, by deceiving a reasonable man, the troopers can enable him to feel free to leave, although, in fact, he is not. It is doubtful that the courts will approve such deliberate deceptions in lieu of simple compliance with *Miranda*. Moreover, any <u>reasonable</u> American knows that when the police stop you,

"placed under arrest at the termination of questioning." *Griffin*, *supra*.

### c. Whatever the Analysis, Petitioner Was in Custody.

By any applicable standard, then, petitioner was in custody. Federal courts are adamant about strict compliance with *Miranda* when questioning is custodial, and consistently reverse convictions where judges erroneously fail to find "custody." *See*, *Griffin*, *supra*  Plainly, petitioner -- who was never told he was free to leave, who was, instead, given *Miranda* warnings, and who was formally arrested when he explicitly asserted his rights -- was "in custody."

### 2. The Warning was Inadequate.

Although he purportedly advised petitioner of his rights twice, Inv. McPherron never advised him of his right to "decide at any time to exercise these rights and not to answer any questions or make any statement." (RE 105a- k)  The failure to advise a suspect of the substance of <u>any</u> of his rights renders statements he makes thereafter inadmissible.  *Miranda v. Arizona*, 384 U.S. 436 (1966);

### 3. Interrogation was not Preceded by a Valid Waiver.

Since petitioner was in custody, the troopers were prohibited from questioning him unless they first obtained his intelligent and voluntary waiver of constitutional rights. *Miranda,* 384 U.S., 475.

---

frisk you, tell you to get in their car, and *Mirandize* you, you are not free leave.

Here, the troopers **never even asked** petitioner if he would waive his rights.  Instead, Inv. McPherron read the rights card to petitioner, and asked him, "Do  you understand everything I just read to you?"  (RE 105c)  Apparently, petitioner  did not; he asked McPherron to "read it again."  (<u>Id</u>.)  McPherron re-read the  rights card, but this time failed even to ask if petitioner understood it.  McPherron and petitioner both said, "Okay."  (RE 105d)  **Neither trooper asked  if petitioner was willing to waive his rights.** (Tr. 43-44)  Instead, Inv. Siegfried simply resumed his interrogation.  (<u>Id</u>.)

This record cannot support a finding that petitioner made a valid waiver  of  his  rights,  and  the  trial  court  never suggested it did.  The state bears the  "heavy  burden"  of "demonstrat[ing] that the defendant knowingly and intelligently waived" his rights.  *Miranda*, 384 U.S., 475.  Moreover, this Court "must 'indulge every reasonable presumption against waiver.'"  *Brewer  v.  Williams*, 430 U.S. 387, 404 (1977). Significantly, "[p]resuming waiver from a silent record is impermissible."  *Carnley v. Cochran,* 369 U.S. 506, 516 (1962). "[A] valid waiver will not be presumed simply from the fact that a confession was in fact eventually obtained."  *Miranda*, 384 U.S., 475.

Here, there was no waiver at all.  The troopers never sought, and petitioner  never gave, any actual waiver of his

rights.  Accordingly, the statement must be  suppressed.

Additionally,  and  independently,  when  officers  seize personal belongings and retain them during questioning, or try to deceive a suspect as to the purpose of questioning, any purported waiver is rendered involuntary.  Here, the seizure and retention of petitioner's knife, the attempted trivialization of the *Miranda* warning, and the misrepresentation of the warning as pertaining only to theft invalidate any purported waiver.

**CLAIMS FOUR-SIX & NINE-TEN-SIXTH AMENDMENT VIOLATIONS**

> **Claim 4-  Petitioner's Right to Counsel Attached When the Court Accepted the Complaints and Issued the Arrest Warrant.**

In *Brewer v. Williams,* 430 U.S. 387, 398 (1977), the U.S. Supreme Court held that the Sixth Amendment "means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him, 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'"  (Citation omitted.)

The Court has yet to decide whether the right to counsel attaches with the filing of a complaint as a matter of federal law.  *Edwards v. Arizona*, 451 U.S. 477, 480 n.7 (1981).  But other courts have recognized that, in jurisdictions, like Alaska, where the complaint can, and does, serve as a charging document,  its  filing  demonstrates  that  the  state  "has committed  itself  to  prosecute,  and... the  adverse  positions of

17

government and defendant have solidified.  It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Kirby v. Illinois*, 406 U.S. 682, 689 (1972).

Accordingly, these courts hold that the Sixth Amendment attaches with the filing of a complaint. *See, e.g.*, *Felder v. McCotter*, 765 F.2d 1245, 1247-48 (5th Cir. 1985) (complaint and affidavit filed); *U.S. ex rel. Johnson v. Lane*, 573 F.Supp. 967, 969-70 (N.D. Ill. 1983) ("prosecutions begin upon the issuance and filing of a complaint, information or indictment"); *U.S. ex rel. Sanders v. Rowe*, 460 F.Supp. 1128, 1139 (N.D.Ill. 1978) (issuance of complaint).

The point at which the Sixth Amendment attaches is defined by state law and procedure. *Moore v. Illinois*, 434 U.S. 220, 227 (1977); *Felder v. McCotter*, 765 F.2d, 1247.  In Alaska, countless "judicial proceedings" are "initiated against" the accused by the filing of a criminal complaint. *Brewer*, 430 U.S., 398.  As Alaska Criminal Rule 3(a) states, "The complaint is a written statement of the essential facts constituting **the offense charged**."  Complaints **must be made "upon oath or affirmation before any judge or magistrate**," except in circumstances not applicable here.  Alaska Criminal Rule 3(a).  Alaska Criminal Rule 12(a) provides that the

18

"[p]leadings in criminal proceedings shall be the complaint, the indictment and the information, and the pleas of not guilty, guilty, and *nolo contendere*..." As a charging document, the complaint may be dismissed at any time prior to trial by the state's unilateral action. Alaska Criminal Rule 43(a). An Alaskan complaint can also be refused by the Court to whom it is presented if it fails to allege and adequately support an offense. *See*, ***State v. District Court***, 962 P.2d 895 (Alaska App. 1998).

**Claim 5-No Valid Waiver of the Right to Counsel.**

Since petitioner's right to counsel had attached, it is immaterial whether or not he was in custody when the troopers questioned him. Once the right to counsel attaches, he may not be interrogated by a state agent in the absence of counsel, unless he makes a prior, valid waiver of his right to counsel. ***Maine v. Moulton***, 474 U.S. 159 (1985); ***Massiah v. U.S***., 377 U.S. 201 (1964).

As demonstrated in section II.c.3. *supra*, here there was no waiver of rights, let alone a knowing, intelligent and valid waiver. Accordingly, it was constitutional error to admit appellant's recorded statements to the troopers.

**CLAIMS SIX, NINE AND TEN**

In ***McMann v. Richardson***, 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 25 L.Ed.2d 763 (1970), the U.S. Supreme

19

Court declared that "the right to counsel is the right to the effective assistance of counsel." Cited in *Jennings v. Woodford*, 290 F. 3rd 1006, 1012 (9th Cir. 2002).

In *Strickland v. Washington*, the Supreme Court formulated a two prong test.  A petitioner claiming ineffective assistance of counsel must demonstrate (1) that his attorney's representation "fell below an objective standard of reasonableness," (the "performance prong") and (2) the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (the "prejudice prong")    *Strickland*, 466 U.S. @ 688. 694, 104 S. Ct. 2052.

*Strickland's* two-prong test applies to ineffectiveness claims arising from the plea process. *Hill v. Lockhart*, 474 U.S. 52, 57-58, 106 S. Ct. 366, 88 L.Ed.2d 203 (1885) (holding that voluntariness of a guilty plea depends on the adequacy of counsel's legal advice).

The principal errors, which meets the *Strickland* test, is the failure to clearly and understandably object to  the prosecutor illegally commenting on Mr. Berge's right to remain silent [Docket 23 @ 20-=21, 34], not filing a motion

20

to suppress Mr. Berge's statements that were recorded under a Glass warrant. [Docket 23 @ 4 ] and not obtaining a ruling on a motion to suppress that was based on Mr. Berge's right to counsel argument. [Docket 23 @ 4].   These omissions by defense counsel clearly fall within the holding of **Strickland**, *supra*.   Such matters were crucial to petitioner's defense and easily could be seen, were essential to his right for a fair and just trial and but for such omissions, the result probably would have been different.   See **U.S. v. Blaylock**, 20 F.3d 1458 (9th Cir. 1994); **Betancourt v. Willis**, 814 F.2d 1546 (11th Cir. 1987).


## CONCLUSION

For the reasons set out above, the petitioner respectfully requests that this Court grant the relief requested by the petitioner, for reversal of the conviction and remand for a new trial.

DATED at Anchorage, Alaska, this 14th day of January, 2008.

LAW OFFICES OF HUGH W. FLEISCHER
Attorney for Petitioner

By: _____S/Hugh W. Fleischer_____
                    Hugh W. Fleischer
                    AK Bar # 7106012
                    Law Offices of Hugh W. Fleischer
                    310 K. Street, Suite 200
                    Anchorage, AK 99501
                    (907) 264-6635
                    (907) 264-6602 (fax)
                     hfleisch@aol.com


9501/529

CERTIFICATE OF SERVICE

I certify that on the 14th day of
January, 2008, a true copy of the
foregoing was delivered electronically
to the following counsel:

Terisia K. Chleborad
Office of Special Prosecutions and Appeals
310 K. St., Suite 308
Anchorage, AK 99501


S/ Hugh W. Fleischer