Hugh W. Fleischer
Law Offices of Hugh W. Fleischer
310 K. Street, Suite 200
Anchorage, AK 99501
Telephone: (907) 264-6635
Facsimile: (907) 264-6602
E-Mail: hfleisch@aol.com

RECEIVED

FEB 2 ? 2008

CLERK, U.S. DISTRICT COURT
ANCHORAGE, ALASKA

Attorney for Petitioner, John W. Berge III

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

JOHN W. BERGE III           )
                            )
            Petitioner,     )
                            )
      vs.                   )
                            )
MARK ANTRIM, et al.         )
                            )
            Respondent.     )
_____)        CASE NO: A05-0290-CI (JWS)

### ERRATA TO PETITIONER'S
### OPENING BRIEF ON THE MERITS

The following are merit briefs on **GROUNDS: 3,4 and 5;** see
PETITION FOR WRIT OF HABEAS CORPUS [28 U.S.C. § 2254].

**GROUND 3:** Trial counsel was ineffective for failing to obtain a ruling on Berge's Sixth Amendment claim.

Mr. Seid (trial counsel) filed a pre-trial Motion to Dismiss claiming a U.S.C. Fifth, Sixth and Fourteenth Amendment as well as Alaska Constitution Art. I Sec. 11 violations. (Exc. 90-91)[1]

Judge Jahnke denied the motion, but failed to specifically comment on the Sixth Amendment claim. (Exc. 135)

Mr. McComas, for petitioner, raised the Sixth Amendment issue on Direct Appeal. (Exc. 149)

The IAC refused to rule on this issue, instead holding that when Seid did not press Judge Jahnke for specific written comment on this portion of his motion that the issue had not been preserved for Direct Appeal. (Exc. 163)

Mr. McComas petitioned the Alaska Supreme Court for a Hearing on this ruling. The Hearing was not granted.

This issue was again raised in a pro se 35.1 Post Conviction Relief. Judge Thompson denied the issue stating:

> "[t]here has been no definitive position taken in this state on whether the right to counsel attaches at the time a complaint is issued. Instead, Alaska's courts have held more generally that the right to counsel attaches when the person's status changes from that of a suspect in an investigation to that of an accused in a criminal prosecution. See CARR vs STATE, 840 P.2d 1000, 1005 (Alaska App. 1992). As such, it is impossible to conclude that the Sixth Amendment claim would have been successful and, therefore, Berge has failed to set forth a prima facie claim of ineffective assistance of counsel." (Exc. 312)

This ruling was appealed.

The IAC denied the appeal claiming that it's prior ruling from the Direct Appeal finding a Fifth Amendment waiver via an

---

[1]Hereinafter reference to APPELLANT'S EXCERPT OF RECORD, Case No. 8683, appear as "Exc. __".

implied understanding of the MIRANDA warnings was sufficient to
waive the Sixth Amendment right to counsel (Exh. C, p.15)[2].
Petitioner appeals this ruling.

The issue is not whether a waiver of the MIRANDA warnings
suffice for a Sixth Amendment waiver.  Rather, it is the fact
that when the trooper's intentionally withheld the fact of his
Arrest for Murder, petitioner did not have sufficient knowledge
to knowingly, voluntarily and intelligently waive his Sixth
Amendment right to counsel.[3]

The legal question breaks down into two parts.  First is
whether the U.S.C. Sixth Amendment and/or Alaska Constitution
Art. I Sec. 11 right to counsel had attached and was improperly
denied.  The second is whether this error was harmless beyond a
reasonable doubt.[4]

### PART I

The question of whether the U.S.C. Sixth Amendment and/or the
expanded Alaska Constitution Art. I Sec. 11 right to counsel had
attached is easily settled having been ruled on time and again by
the Federal and State Courts.  Namely, once adversarial judicial
proceedings have commenced the right to counsel attaches at

[2]State Exhibit C (Memorandum Opinion No. 4982).

[3]PEOPLE v. ENGERT, 239 Cal. Rptr. 169, 172-73 (Cal. App. 87) (failure to inform
suspect that charges have been filed precludes valid waiver).  (Exc. 221).

[4]GIBSON v. STATE, 575 P.2d 782, at 785 (Alaska 1978) quoting CHAPMAN v. CALIFORNIA
386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), S.Ct. at 827 quoting FAHY v
STATE of CONNECTICUT, 375 U.S. 85, 84 S.Ct. 229 11 L.Ed.2d 171 "The question
is whether there is a reasonable possibility that the evidence complained of
might have contributed to the conviction." Id., at 86-87, 84 S.Ct. at 230.

any critical stage, either pre- or post-indictment.

Alaska Cr.R. 5.1(a) stipulates that the Sixth Amendment right to counsel is guaranteed at the pre-indictment Information Hearing.[5]

There is no doubt that the Federal Court recognizes the right of states to enhance citizen rights beyond the minimum stipulated by the United States Constitution.

> "The point at which the Sixth Amendment attaches is defined by state law and procedure." MOORE v ILLINOIS 434 U.S. 220, 227 (1977), BLUE, supra, at 641.

The "critical stage" is well defined in U.S. v PACE, 833 F.2d 1307 (9th Cir. 1987) at 1311:

> "[A]lthough we have extended an accused's right to counsel to certain "critical" pretrial proceedings, UNITED STATES v WADE, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), we have done so recognizing that at those proceedings, "the accused [is] confronted just as at trial by the procedural system, or by his expert adversary, or by both," (citation omitted), in a situation where the results of the confrontation "might well settle the accused's fate and reduce the trial itself to a mere formality." (citation omitted.)

In BERGE a Felony Complaint - **a formal charge** - (Exc. 55) had been filed with an Affidavit by Police in support of the complaint - **information** - (Exc. 56), and an Arrest Warrant charging Berge with "Murder 1st Degree" had been issued (Exc. 54).

Alaska Cr.R. 12(a) stipulates that the "[p]leadings in criminal proceedings shall be the **complaint**, the indictment and the information, and the pleas of not guilty, guilty and nolo contendere ..." (emphasis added).  Thus in Alaska the Complaint

---

[5] See BLUE v STATE, 558 P.2d 636 (Alaska 1977), GIPSON v STATE, 575 P.2d 782 (Alaska 1977).

and the Information are charging documents.  Adversarial Judicial
Proceedings had commenced.
$(Exh. C, p. 9-15)$
     Note that the IAC's decision (Op. 9-15) argues that Adversar-
ial Judicial Proceedings do not commence in Alaska until after the
Grand Jury has returned an indictment.  However, as has been shown
Alaska Cr.R. 5.1(a) and Cr.R. 12(a) clearly rule otherwise.

     According to BREWER v WILLIAMS, 430 U.S. 387, 398, 97 S.Ct.
1232, 1239, 51 L.Ed.2d 424 (1977) adversarial judicial proceedings
had been initiated.  "[t]he right to counsel granted by the Sixth
and Fourteenth Amendments means at least that a person is entitled
to the help of a lawyer at or after the time that judicial proce-
edings have been initiated against him - 'whether by way of formal
charge, preliminary hearing, indictment, information, or
arraignment'."

     There was no Preliminary Examination held or waived,
Cr.R. 5.1.  Nor was Berge afforded legal counsel until minutes
before his appearance at Arraignment when Mr. Seid introduced
himself and Berge accepted his services.

     The information provided to the Grand Jury was no different
than that provided by the police affidavit in support of the
complaint (Exc. 56) - albeit expanded and expounded upon.

     After submitting his complaint and affidavit in support
thereof, and receiving the arrest warrant, Trooper McPherron in
company with Trooper Siegfried tracked Berge down (Tr. 9-10).
Prior to confronting Berge the trooper's conspired to interrogate
Berge before informing him of his arrest (Tr. 8&9) inorder to
deny Berge of his constitutional rights (Tr. 35-36).  The reason

BERGE, A05-0290 CI
ERRATA BRIEF OF MERIT                    -5-

for this was "[i]f we told the person that a warrant was in effect they may not speak with us." :Trooper McPherron (Tr. 15).  From Tr. 8, Trooper McPherron says: "I just wanted to interview him (Berge) about the shooting, see what he would tell us about his involvement in it.  I also wanted to find out if he would reveal the location of the murder weapon".

From this statement there is no doubt of the trooper's preconceived intention of interrogation.  Also, from the onset of the trooper's contact with Berge, Berge's liberty had ended.  He was functionally under arrest and headed for jail (Tr. 26-27).

This interrogation was a "critical stage".  As stated in U.S. v PACE, supra, at 1311 (infra p. ~~14~~ 4), a critical stage exist's when:

> "[t]he accused [is] confronted just as at trial by the procedural system, or by his expert adversary, or by both, (citation omitted) in a situation where the results of the confrontation "might well settle the accused's fate and reduce the trial itself to a mere formality." (citation omitted.)

This ruling from PACE is echoed in COLEMAN v ALABAMA, 90 S.Ct. 1999 (1970) at 2002.  The Alaska Supreme Court upholds these rulings, stating in PINKERTON v STATE, 784 P.2d 671 (Alaska App. 1989) at 676:

> "It would seem that a witness who is unaware that he is a target of a grand jury investigation could not intelligently determine whether or not he needed counsel unless he was fully advised of the charges being considered against him; and until he has full knowledge regarding that matter, he will not know when to assert his constitutional claim of privilege against self-incrimination.  It would also be difficult to believe that he could intelligently waive the right to counsel under such circumstances. STATE v RUGGERI, 19 Utah 2d 216, 429 P.2d 969, 975 (1967)."

The trooper's plan of withholding the fact of arrest until after the interrogation was a blatant attempt to coerce a confession from Berge. This is further supported by the trooper's minimization of their reason for reading Berge the Miranda warnings:

> Trooper Siegfried: "Due to the circumstances, he does have some property over there, uh his sister thinks that some of his property may be stolen. We don't know whether you had anything to do with that but, uh, we'll have Randy go ahead and advise you of your rights. Uh, it's just routine." (Exc. 59 - Police Arrest Interrogation.)

When the trooper's withheld the fact of Berge's arrest for murder and complaint thereof, they deprived Berge of essential knowledge necessary for a knowing, intelligent waiver. Not only that, their actions, their choice of clothing (casual civilian - Tr. 10), choice of vehicle (unmarked van - Tr. 10), and choice of location for the interrogation (in the van at Berge's work site - Tr. 30-31), all of this was a deliberate deception to trivialize the encounter in their attempt to coerce a confession.

Additionally, on p.9 of the Arrest Interrogation, four lines after the tape is stopped for the jury, Trooper McPherron says:

> "**Well, before you go John**, there's something I'd like you to listen to, okay ... Right here is a tape recording of a conversation that we recorded a couple of days ago." (Exc, 65 - emphasis added.)

That this was a planned deception to coerce a confession there can be no doubt.

Considering the totality of the circumstances, the trooper's preplanned conduct in this interrogation designed to mislead Berge by concealing the fact of arrest, down playing the seriousness of

the situation, and misstating the purpose of the interrogation

during Miranda warnings, the totality was no less egrarious than

that of the trooper in SMITH v STATE, 787 P.2d 1038 (Alaska App.

1990) where at 1039 it is stated:

> "[A] confession is involuntary when an examination of
> all the circumstances discloses that the conduct of
> law enforcement was such as to overbear [the defendant's]
> will to resist and bring about confessions not freely
> self determined." THOMPSON v STATE, 768 P.2d 127, 131
> (Alaska App. 1989) (quoting U.S. v FERRARA, 377 F.2d
> 16, 17 (2nd Cir. 1967).

Actions such as this clearly invalidate any Miranda waiver.

MORAN v BURBINE, 106 S.Ct. 1135 (1986) at 1140-41:

> "Echoing the standard first articulated in JOHNSON v
> ZERBEST, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82
> L.Ed. 1461 (1938), MIRANDA, holds that "[t]he defendant
> may waive effectuation" of the rights conveyed in the
> warnings "provided the waiver is made voluntarily,
> knowingly, and intelligently." 384 U.S. at 444, 475,
> 86 S.Ct. at 1612, 1628.  The inquiry has two distinct
> dimensions.  EDWARDS v ARIZONA, supra, 451 U.S. at 482,
> 101 S.Ct. at 1883; BREWER v WILLIAMS, 430 U.S. 387, 404,
> 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977).  First, the
> relinqishment of the right must have been voluntary in
> the sense that it was the product of a free and delib-
> erate choice rather than intimidation, coercion, or
> deception.  Second, the waiver must have been made with
> a full awareness of both the nature of the right being
> abandoned and the consequences of the decision to aban-
> don it.  Only if the "totality of the circumstances
> surrounding the interrogation" reveal both an uncoerced
> choice and the requiste level of comprehension may a
> court properly conclude that the MIRANDA rights have
> been waived.  FARE v MICHAEL C., 442 U.S. 707, 725, 99
> S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979).  See also
> NORTH CAROLINA v BUTLER, 441 U.S. 369, 374-75, 99 S.Ct.
> 1755, 1758, 60 L.Ed.2d 286 (1979).

From the foregoing it has been shown that the U.S.C. Sixth

Amendment and Alaska's Constitution Art. I sec. 11 right to

counsel had attached and that the trooper's intentional with-

holding of the fact of arrest for murder, aggrevated by their

under playing of the situation to minimize it's seriousness in order to coerce a confession, invalidate's any purported waiver of the right to counsel.[6]   As such, the interrogation was illegal and should not have been allowed at trial.  Mr. Seid was ineffective not to have pressed Judge Jahnke for a ruling on this issue.

## PART II

The second part of this issue is whether the error was harmless beyond a reasonable doubt.[7]

This pre-arrest interrogation was the State's vehicle for considerable illegal and irreversible harm to Berge at trial. **FIRST**, it introduced Berge's attempts to cut off questioning. When Berge says "I've said all I have to say." (Exc. 64)  Then says "I told you all I have to say, that's all I have to say." (Exc. 65) (The last line of the interrogation played to the jury.) This is a definitive and clear statement to end the interrogation by claiming silence.  Introduction of these statements is in

---

[6] See PEOPLE v ENGERT, supra, (Failure to inform suspect that charges have been filed precludes valid waiver.)  See at Exc. 353.

[7] GIPSON v STATE, 575 P.2d 782 (1978) at 785 quotes CHAPMAN v CALIFORNIA, 386 U.S. 18, 87 S.Ct. 824, at 827, 17 L.Ed.2d 705 (1967) quotes FAHY v STATE OF CONNECTICUT, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963) "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Id., at 86-87, 84 S.Ct. at 230.

87 S.Ct. at 828 "[C]ertainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless.  It is for that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgement.

BERGE, A05-0290 CI
ERRATA BRIEF OF MERIT                    -9-

violation of Alaska Rule of Evidence 403 which precludes

prosecution evidence on a suspect's pre-arrest silence.  The

introduction at trial of a defendant's claim of silence during an

interrogation by police has been found to be highly prejudicial

against the defendant.  As is stated in <u>WILLIAMS v ZAHRADNICK</u>,

632 F.2d 353 (4th Cir. 1980) and quoted in <u>ALSTON v GARRISON</u>, 720

F.2d 812, 816 (1983):

> "Such evidence plants in the mind of the jury the
> dark suspicion that the defendant had something to
> hide, and that any alibi which is subsequently
> proffered is pure fabrication."

Note, when this police interrogation was introduced as

evidence at trial by the state prosecutor, Mr. Seid objected to

it's introduction:

> "My objection's the same that had been set forth
> in the Motion to Supress and the Evidentiary
> Hearing and the argument." (Tr. 239)

Mr. Seid had raised this Sixth Amendment issue in his pre-trial

Motion to Suppress (specifically Exc. 90-92 and 131-32) and the

Evidentiary Hearing held thereon (Tr. 2-101).  The motion had been

pre-trial denied (Memorandum and Order, Exc. 135-38).  That Mr.

Seid had considered the Sixth Amendment portion of his motion

ruled upon and denied is evident in his affidavit statement for

this issue:

> "I do not recall insisting on a specific ruling
> regarding the Sixth Amendment issue of the Motion to
> Suppress statements.  If I did not ask for this
> ruling, there is no strategic reason for doing so."
> (Exc. 198)

Mr. McComas considered this issue ripe for the Direct Appeal and

raised it therein (Exc. 149-55).  The IAC refused to rule on this

issue by extending the Exclusionary Rule to an unprecedented extreme (MOJ, Exc. 163) stating that although the Motion had been denied, that since Judge Jahnke had failed to specifically address the Sixth Amendment claim in his written decision, Seid had forfeited the issue.  Until this ruling, Berge and his attorney's had considered the Sixth Amendment issue ripe and it was inclusive to Mr. Seid's trial objection.  Thus, Judge Jahnke did deny this Sixth Amendment issue when it was raised again at trial by Seid.

**SECOND**, by raising Berge's claims of silence in cross examination and using them to impeach his credibility with the jury in violation of Alaska Rules of Evidence 403, 512(a) and due process (Tr. 592-93).

Since <u>DOYLE v OHIO</u>, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) was decided the law has been clear that admitted evidence of post-MIRANDA silence violates due process of law and that comment on a defendant's claim of silence by prosecution to impeach defendant's credibility with the jury is strictly verboten.  See GROUND 4.

**THIRD**, this interrogation contained the trooper's accusations against Berge posed as facts:

> "[w]e know you're the one that shot him (Taylor).
> Shot him with a .243." (Exc. 64)

> "Ernie was shot.  We know he was shot four times, we
> know you were there.  The time he was shot.  We even
> know you've gone back since the shooting." (Exc. 65)

In fact, the trooper's knew no such thing.  This is what they had gleaned from the Glass Warrant Tape (described by Berge as a braggidocios story told under the influence of liquor for fun and

drinks - Tr. 552) and the second autopsy (Tr. 173, 176-80; Exc. 277-81).

When the Arrest Interrogation Tape was played for the jury where these accusations were made, in violation of Alaska Evidence Rule 602 and separately unopposed by Seid, the jury had no recourse except to believe them as fact. Thus, providing (false) corroboration for the State. (See the Tenth Issue, Exc. 248-52.)

\*　　\*　　\*

If the trooper's had informed Berge of the fact of his arrest **PRIOR** to reading the MIRANDA warnings and conducting their inter-rogation, it is not hard to extrapolate from Berge's final state-ment prior to his actual arrest that Berge would have claimed his Fifth Amendment right to silence and Sixth Amendment right to counsel:

"I've got nothing more to say, if your going to charge me, charge me, get me a lawyer". (Exc. 66)

It is most likely that if a lawyer had been provided he would have counseled Berge to remain silent, the interrogation would not have happened and the violations would not have occured.

Further, from Berge's final statement it is interesting to note that there is no reference to the MIRANDA warnings he had been read. Nor is there a demonstrated comprehension of those rights. Here Berge's statement that he must be charged inorder to have legal counsel certainly does not demonstrate comprehension of his right to counsel as was offered in the MIRANDA warning. Thus, the IAC's finding of an implied waiver is in error.

*       *       *

In <u>BERGE</u>, without the highly prejudicial errors described, there is absolutely no certainty that the jury would have returned a guilty verdict.

While the Glass Warrant story is an awful and offending story, as the state's case-in-chief, when the story is compared to the facts of the case the story fails.

In <u>BERGE</u> there was no material evidence or witness connecting Berge to the crime.

When Berge first started "confessing" to killing Taylor, Taylor was alive. (Tr. 672-73)

Berge "confessed" to killing Taylor with a .243 caliber rifle (Dickerson's testimony, Tr. 278; Affidavit in Support of Complaint, Exc. 56; two Police Search Warrants, Tr. 255-56). When, in fact, Taylor was killed with a Marlin 30-30 caliber 170 grain bullet (Tr. 479-92, 502-08).

Berge "confessed" to standing on a beach and shooting Taylor out of his boat at a distance of 60-80 feet (Tr. 242-43, 585, 697; Exc. 50). However, Taylor was shot on his log equipment float at a distance of 225-300 feet from the nearest beach (Tr. 251). Berge's story is impossible. See GROUND 5.

Further, at trial, Berge, testifying in his own behalf, gave an exculpatory explanation that what had been caught on the Glass Warrant Tape was merely an on going braggadocious story told for fun and drinks while under the influence of alcohol (Tr. 552-54).

BERGE, A05-0290 CI
ERRATA BRIEF OF MERIT

-13-

The prosecutor, inorder to overcome the weight of the exculpatory evidence, found it necessary to muster all of the prejudicial opinion he could gather and use it, without respect to the propriety of the law, to improperly sway the jury. That is what he did.

Thus, there is no way to say that the errors introduced in the trial of Berge, gotten through the violation of the Sixth Amendment, were harmless beyond a reasonable doubt and the verdict must be reversed and the case remanded for retrial.

**GROUND 4:**  Trial Counsel was ineffective for allowing the admission of and not objecting to comment on defendant's exercise of his constitutional right to silence.

The IAC's claim that it is a perfectly acceptable strategy of defense to allow a jury to hear a defendant invoke his right to silence during interrogation by police (Exh. C, p.17-18) flies in the face of the law and numerous legal decisions.

> Alaska Rule of Evidence 403 precludes prosecution evidence on a suspect's pre-arrest silence.  SILVERNAIL v. STATE, 777 P.2d 1169, 1174-79 (Alaska App. 1989) Murder 2 & Kidnapping convictions reversed.  Examination/comment on pre-arrest silence is plain error.

> ALSTON v GARRISON, 720 F.2d 812 (1983) at 816 (2) "[F]ew mistakes by criminal defense counsel are so grave as the failure to protest evidence that the defendant exercised his right to remain silent."  See DOYLE v OHIO, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); WILLIAMS v ZAHRADNICK, 632 F.2d 353 (4th Cir. 1980) "Such evidence plants in the mind of the jury the dark suspicion that the defendant had something to hide, and that any alibi which is subsequently proffered is pure fabrication."

> @817 V. "[S]ince 1976, when DOYLE v OHIO (id.) was decided, the law has been clear that admitted evidence of post-arrest silence violates due process of law.  Failure to oppose the admission of such evidence plainly falls beneath the "range of competence demanded of attorneys in criminal cases." (see Exc. 228)

Further, the IAC has constructed a tactical decision for Mr. Seid that is not supported by the record. (Exh. C, p.20)

Mr. Seid, in his Motion for Protective Orders (Superior Court Case No. 1KE-01-122 CI, State Exhibit C @ p.4) states: "Mr. Berge's silence and teary eyes should not be used against him." The relevant part of this

is the constitutional claim of silence.  Unfortunately, Mr. Seid's

BERGE, A05-0290 CI
ERRATA BRIEF OF MERIT          -15-

stopping point left Berge's first two claim's of silence in the arrest interrogation played for the jury.  That this was error on Mr. Seid's part is plainly demonstrated by the fact that **NO WHERE** in the trial record did Mr. Seid refer to these claims of silence inorder to extract any tactical advantage from them.

During the prosecutor's trial cross examination the prosecutor raises these claims of silence and uses them to denigrate Berge's jury credibility:

> Prosecutor:  "Okay.  Do you remember them saying, quote, we'd love to hear your story?"
>
> Berge:  "Yes, I do."
>
> Prosecutor:  "All right.  And your statement was, quote, I told you all I have to say, that's all I have to say, unquote?"
>
> Berge:  "That's right."
>
> Prosecutor:  "Okay.  You didn't say anything about I just made up a big bunch of BS to get Dickerson, did you?"
>
> *        *        *
>
> Prosecutor:  "Okay.  And the troopers were saying, "We're being fair with you, aren't we?  We're trying to get the truth out, right?"  And you said, quote, I told you all I have to say; that's all I have to say?"
> (Tr. 592-93)

By raising these claims of silence and making his adverse comments on them, the prosecutor effectively accomplishes exactly what the U.S. Supreme Court, this Court, and Alaska State Law rule against, find objectionable, break's Due Process, and result's in reversal:

> "Such evidence plant's in the mind of the jury the dark suspicion that the defendant had something to hide, and that any alibi which is subsequently proffered is pure fabrication." WILLIAMS v ZAHRADNICK, 632 F.2d 353 (4th Cir. 1980); citations omitted.

> <u>DOYLE v OHIO</u>, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91
> (1976)  [1] A state prosecutor may not seek to impeach a
> defendant's exculpatory story, told for the first time
> at trial, by cross-examining the defendant about his
> failure to have told the story after receiving Miranda
> warnings at time of his arrest; use of a defendant's
> post-arrest silence in such a manner violates due
> process. U.S.C.A. Const. Amends. 5, 14 (citations omitted).

Mr. Seid, in his affidavit on this issue says:

> "I did not object to the prosecutor's questions regarding
> 'that's all I have to say'.  There was no strategic reason
> behind not objecting, other than perhaps I did not believe
> it was an objectionable question at the time." (Exc. 198-
> 199)

Mr. Seid is being very candid with this statement.  He committed

error.  Through his ignorance Mr. Seid allowed the prosecutor to

unjustly and wrongly prejudice the jury against accepting any

exculpatory statement Berge could offer.  This same ingorance -

oversight? - must be accepted in his ineffective choice of a

stopping point for the Arrest Interrogation.  It should be noted

that Mr. Seid **NEVER** has claimed a tactical justification for his

error.

The IAC attempts to justify these errors of defense by

hypothesizing a "tactical decision".  There is no support for the

IAC's "tactical construction" demonstrated anywhere in the trial

record.

**FIRST:**  The IAC attempts to justify Seid's lack of objection to

the prosecutor's cross examination of Berge's claims of silence

and the prosecutor's denigrating comments by explaining that

"the prosecutor's questions gave Berge a chance to reiterate the

basic defense theme ..."[8]  This is nonsense.  Berge's

credibility had already been impeached by playing the tape with

[8]Exh. C, p.20

the claims to silence and by the prosecutor's illegal comments.

Further, this totally ignores Mr. Seid's affidavit statement where

Mr. Seid states:

> "I did not object to the prosecutor's questions regarding
> 'that's all I have to say'. **There was no strategic reason
> behind not objecting, other than perhaps I did not believe
> it was an objectionable question at the time.**" (Exc. 198-
> 199) (Emphasis added.)

This "tactical construction" of the IAC should not be allowed.  As

is pointed out in HARRIS v REED, 894 F.2d 871 (7th Cir. 1990) at

878:

> [1]  "[H]owever, the court went on to construct a trial
> strategy supporting counsel's decision.  This court finds
> that the district court's factual findings on this score
> are clearly erroneous.  Just as a reviewing court should
> not second guess the strategic decisions of counsel with
> the benefit of hindsight, it should also not construct
> strategic defenses which counsel does not offer.
> KIMMELMAN, 477 U.S. at 386, 106 S.Ct. at 2588."

**SECOND:** All of the purported tactical advantage could be gained,

and none of the prejudice suffered, by stopping the recording

immediately **before** Berge's first assertion of the right to

silence.  By then the troopers had already made repeated efforts

to get Berge to admit presence and participation, and suggest that

he might have killed Taylor by accident, or in self-defense, or in

response to aggressive homosexual overtures.  Berge's steadfast

declarations of innocence in response had already occurred, and

were memorialized on the tape.  There was nothing tactically to

gain and only unfair prejudice to generate, by allowing admission

of Berge's two assertions of silence before the jury.

**THIRD:** Mr. Seid objected to this interrogation as evidence before

trial (Motion to Suppress, Exc. 76) and again at trial (Tr. 239).

He was overruled and this evidence was admitted against his objection.  He also raises his concern that Berge's silence should not be used against him in his pre-trial Motion for Protective Orders, however, his choice of a stopping point did not do this.  This was error on his part - not tactics.

> "A mistake made out of ignorance rather than from strategy cannot later be validated as being tactic-ally defensible." KIMMELMAN v MORRISON, 477 U.S. 365, 106 S.Ct. 2574, 2588-89, 91 L.Ed.2d 305 (1986); ARNOLD v STATE, 685 P.2d 1261, 1265-67 (Alaska App. 1984); STATE v JONES, 759 P.2d 558, 569 (Alaska App. 1988).

\*          \*          \*

The present case is virtually identical to the Court's decision in GUNNERUD v STATE, 611 P.2d 69, 75-76 (Alaska 1980). In GUNNERUD the prosecution played a tape recording made of the execution of a search warrant.  A portion of the tape included the accused's post-warning assertion of her right to silence. This Court observed, "It is well settled that prosecutorial comment on silence for substantive or impeachment value is constitutionally prohibited." GUNNERUD, 611 P.2d, 75 (citations omitted).  Although the evidence against her was "strong", it was "not overwhelming." 611 P.2d 76.  Given that her own testimony, if believed, could exculpate her, the Court held that introduction of this evidence was reversible error. Id.

\*          \*          \*

BERGE, A05-0290 CI
ERRATA BRIEF OF MERIT
                              -19-

As has been shown, Mr. Seid was clearly ineffective to allow the state's introduction of Berge's claims of silence and not to object to the state's examination and prejudicial comment on this claim of privilege.  The state's illegal use of this tactic right at the end of Berge's testimony (Tr. 592-93, Berge's testimony spanned from Tr. 540 to 599.) resulted in a complete torpedoing of Berge's credibility.

The jury's decision was improperly prejudiced.  The verdict was unjustly gained.  The only cure is a fair re-trial.

**GROUND 5:**  Trial counsel was ineffective for failing to conduct an adequate investigation.

The Glass Warrant Tape (Exc. 37-53, Glass Warrant Tape Transcript) captured Berge's Bar Room story of shooting Taylor. The State based it's case on this story.  The Glass Warrant Tape is played at trial. (Tr. 239)  From the Glass Warrant Transcript (Exc. 50):

> Berge:  "He was on a fuckin' boat, you know, 60 feet away, 80 feet away."

*     *     *

> Berge:  "Cause when I shot him, I got two rounds through the mother-fucker, and he jumped in the fuckin' water.  He was in the water.  I was on the beach."

Trooper McPherron describes the shooting scenario at trial:

> Trp. McPherron:  "He said he was on the beach when he fired, and Ernie Taylor was in a boat.  In a skiff when he shot at him."

> Prosecutor:  "And about how far?"

> Trp. McPherron:  "Oh, he estimated the range from 60 to 80 feet."
> (Tr. 243-244)

Trooper McPherron describes the location of the log float where Taylor's body and the spent 30-30 caliber 170 grain bullet that went through Taylor (Tr. 392, 453-69) as being 75-100 yards from the nearest beach where the shooting could have occured. (Tr. 249-251)

Mr. West (prosecutor) in his trial cross examination of Berge summarizes the shooting as Berge tells it in the Glass Warrant Tape:

BERGE, A05-0290 CI
ERRATA BRIEF OF MERIT                    -21-

> Prosecutor:  "Okay. And do you remember saying, quote,
> he was on a fucking boat, you know, 60 feet away, 80
> feet away, you know. Because when I shot him, I got
> two rounds through the mother-fucker and he jumped in
> the fucking water. He was in the water and I was on
> the beach. ..." (Tr. 585)

Again, Mr West, in his trial closing for the State summarizes

the shooting as told in the Glass Warrant Tape:

> Prosecutor:  "Mr. Berge says he was on a fucking boat,
> you know, 60 to 80 feet away, you know, because when I
> shot him, I got two rounds through the mother-fucker.
> He jumped in the fucking water, he was in the water
> and I was on the beach." (Tr. 697)

Berge was found guilty of murder based on this shooting scenario.

This is a picture of that shooting scenario as it necessarily

would have had to have happened. Note that the bullet entered

Taylor's left buttock, traveled through his body and exited his

right front chest. (Exc. 277-81, State autopsy results) Hence,

Taylor would have been bent over at the waist for this shot to

have happened.



At trial Mr. Seid (defense counsel) pointed out various

inconsistencies that he had noted between the shooting scenario

in Berge's Bar Room Tale and what had demonstrably occured.

(Tr. 664) Yet, Mr. Seid is not an expert to analyze a shooting

scenario to prove or disprove it's scenario of action.

Mr. West in his final closing for the State does an excellent job of rebutting each point Seid raised to the extent that although the facts were incongruous they could be accepted with the spin Mr. West put on them. This includes Dickerson's adamantly consistent testimony that Berge first started telling Dickerson his tale in early to mid-July right after returning from Dall Bay with Skip Gist's dogs and Seid nailing this date to between 6 and 14 July with evidence and testimony. (Tr. 672-673) Taylor most likely died the first week of August. (Tr. 665-666, 672-675; Appellant's Opening Brief, Alaska Court of Appeals No. A-8683, p.2) West, in his closing, disregards the truth of this evidence and suggest to the jury that Seid is tricking them. (Tr. 687-688)

In spite of the incongruity of the facts vs. the story, no one asked the **BIG** question - was Berge's shooting scenario actually possible? This is a very basic question that should have been asked. Obviously the State didn't. But, Mr. Seid should have. It was his job..

> "Duty to Investigate" STRICKLAND v WASHINGTON, 466 U.S. 668, 104 S.Ct. 2052, 2066[13] (1984); "Reasonable performance of counsel includes an adequate investigation of the facts of the case, ..." HENDERSON v SARGENT, 926 F.2d 706, 711 (8th Cir. 1991), WILLIAMSON v REYNOLDS, 904 FS 1529, 1550 (E.D. OKL. 1995), DEMAREST v PRICE, 905 FS 1432, 1448 (D.Colo. 1995), McCOY v NORRIS, 958 FS 420, 425 (E.D.Ark. 1996) ... WIGGINS v SMITH, 123 S.Ct. 2527 (2003).

Mr. Nixon, in his "Report on the Modeling of 30-30 Bullet Ricochet from Water" (Exc. 254-300) states:@ p.4 (Exc. 257):

> "After reviewing and considering all the scientific evidence relating to ballistic performance, bullet penetration, and bullet ricochet, I am convinced that

the incident which is the subject of this case could not
have happened as originally assumed/described.  It is my
professional opinion that a far more likely scenario
exists; - that the victim was shot very near to where
the bullet was found, the bullet having barely sufficient
residual velocity to exit the body and consquently,
falling within a foot or two of the victim.  This pheno-
menon is quite a common occurrence, and has been
documented in many shooting incidents." (Exc. 257)

Id., p.8 (Exc. 261), Mr. Nixon gives a detailed analysis which

explains this opinion:

"The picture of the bullet furnished in the
supplied documentation indicated that the bullet had
fully mushroomed during its path through the victim, and
this would indicate that most of the energy and velocity
of the bullet had been consumed as it traversed the
victim.  Published tests [1] performed using Winchester
30-30 170 grain soft point ammunition (similar to that
used in this case) revealed that such a projectile would
penetrate 17.5 inches of ballistic gelatin when impact
occurred at a velocity of 2,020 feet per second and a
muzzle energy of 1, 540 foot pounds.  These performance
data are presented in Table 3.1."

"Experience has demonstrated that bullet penetra-
tion in animal tissue (including humans) may be as low
as two thirds of that obtained in ballistic gelatin tests.
These discrepancies are due to the non-homogenous nature
of the human body, and the fact that humans have a
resilient skin, whereas blocks of ballistic gelatin do
not."

"The outcome of the above research and analysis
indicates that the 30-30 170gr soft point bullet in this
case would have barely had sufficient penetrative
capability to exit the body, and any residual velocity
would have been very low.  It should be noted at this
point that it is not unusual to find bullets lodged
under the skin of murder victims (i.e. shot in front,
and bullet lodges under the skin of the back) or on the
ground near to the exit wound.  This is because the skin
provides significant resistance to penetration, particu-
larly when a bullet is fully mushroomed and the cross
sectional area is consequently, greatly increased."

(Note: The reference data for table 3.1, p.8, is found
on p.12 (Exc. 265) under 5 References.)

Id., p.11 (Exc. 264), Mr. Nixon again states his opinion:

> "After reviewing and considering all the scientific
> evidence relating to ballistic performance, bullet
> penetration, and bullet ricochet, I am convinced that
> the incident which is the subject of this case could not
> have happened as originally assumed/described.  It is my
> professional opinion that a far more likely scenario
> exists; - that the victim was shot very near to where
> the bullet was found, the bullet having barely sufficient
> residual velocity to exit the body and, consequently,
> falling within a foot or two of the victim.  This
> phenomenon is a quite common occurrence, and has been
> documented in many shooting incidents."

This is a picture of the shooting using Mr. Nixon's findings:



This is riveting testimony for the jury, which the jury never had.

It completely disproves Berge's Bar Room Tale.

Far from simply "bolstering' Mr. Seid's defense (Exh C, p.25

Memorandum Opinion #4982) Mr. Nixon's finding, standing alone,

defeats the State's case against Berge which consisted of nothing

more than a braggadocious bar room story told for drinks.  This

expert testimony would have made Seid's case by showing the

factual impossibility of Berge's story.

The fact is that the State introduced the Glass Warrant Tape

as it's evidence that Berge killed Taylor and relied upon the

story in this tape to convict Berge.  There was no other evidence

or witness testimony connecting Berge to the crime.  The question of whether Berge's bar room shooting scenario was even possible was a critical question that needed to be asked - yet never was. That is ineffective investigation, and that is ineffective assistance of counsel.

> LAWRENCE v ARMONTROUT, 900 F.2d 127, 130 (8th Cir. 1990) ... Reasonable performance of counsel includes an adequate investigation of the facts of the case, consideration of viable theories, and development of evidence to support those theories.

> STRICKLAND v WASHINGTON, 466 U.S. 690; 104 S.Ct., at 2065 (1984)  Counsel ... has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.  See POWELL v ALABAMA, 287 U.S., at 68-69, 53 S.Ct., at 63-64.

According to the parameters of this case law Mr. Seid was clearly ineffective not to obtain an expert's opinion which would show the impossibility of the shooting scenario thus defeating the State's case.

The State introduced 86 exhibits and 21 witnesses which included expert's in medicine, forensics, criminalists, etc.. Mr. Seid was a Public Defender.  Considering the inconsistencies Mr. Seid noted between the facts and the story, which further justifies the use of an expert, it is ridiculous to say that the State Public Defender Agency could not afford an expert for an adequate investigation. (Exh. C, p.26)  The fact is, Seid did not consider the use of an expert.  Mr. Seid in his affidavit states:

> "I did not attempt to get an expert regarding the bullet trajectories and related topics.  I did not consider this kind of expert during trial preparation." (Exc. 206 #4)

If the expert's results showing the impossibility of this shooting scenario had been obtained prior to trial, a Motion to Dismiss all charges for lack of evidence should have been granted.

### CONCLUSION

For the reasons set out above, the petitioner respectfully requests that this Court grant the relief requested by the petitioner, for reversal of the conviction, dismissal of charges, and unconditional release with retrial barred as a matter of law and constitutional right.

Dated: February _____ , 2008
at Anchorage, Alaska.

_____

Hugh W. Fleischer
AK Bar # 7106012
Law Offices of Hugh W. Fleischer
310 K. Street, Suite 200
Anchorage, AK  99501
(907) 264-6635
(907) 264-6602 (fax)
hfleisch@aol.com

CERTIFICATE OF SERVICE
I certify that on this day:

February _____ , 2008

a true copy of the foregoing
was delivered:

by _____

to the following counsel:

Terisia K. Chleborad
Office of Special Prosecutions and Appeals
310 K. St., Suite 308
Anchorage, AK  99501

_____

Hugh W. Fleischer

BERGE, A05-0290 CI
ERRATA BRIEF OF MERIT             -27-