Terisia K. Chleborad
Assistant Attorney General
Office of Special Prosecutions
and Appeals
310 K Street, Suite 308
Anchorage, Alaska 99501
Telephone: (907) 269-6250
Facsimile: (907) 269-6270
Email: Terisia.Chleborad@Alaska.gov

Attorney for Respondent Marc Antrim

### IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF ALASKA

| | | |
|---|---|---|
| JOHN W. BERGE, III, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 3:05-CV-00290-TMB-DMS |
| | ) | |
| MARC ANTRIM, et al., | ) | |
| | ) | RESPONDENT'S MEMORANDUM |
| | ) | ON THE MERITS |
| Respondent. | ) | |
| | ) | |

I.    INTRODUCTION

        In his petition seeking federal habeas relief, Berge  challenges his

convictions for first-degree murder, second-degree theft, and tampering with

evidence.  Each of Berge's claims should be denied based on the standards set

out in the Antiterrorism and Effective Death Penalty Act (AEDPA).

The parties and the court have referred to Berge's claims by the following numbers (Berge withdrew claims 7 and 8 as unexhausted):

(1)    that he was in custody when the troopers talked to him and therefore he should have been read his *Miranda* rights, and based on this purported violation his statement should have been suppressed (document 23, at 9),

(2)    that he received an inadequate *Miranda* warning (document 23, at 14),

(3)    that he did not waive his *Miranda* rights (document 23, at 15),

(4)    that his Sixth Amendment right to counsel arose when the complaint was filed against him and precluded the police from talking with him without counsel (document 23, at 9, 16),

(5)    that he had not waived his right to counsel before he talked to the police (document 23, at 18),

(6)    that the prosecutor illegally commented on his (Berge's) right to remain silent in Berge's criminal trial (document 23, at 20-21, 34),

(9)    that his trial counsel was ineffective for not filing a motion to suppress his (Berge's) statements to his friend that were recorded under a warrant (document 23, at 4), and

(10)    that his trial counsel was ineffective for not obtaining a ruling on a motion to suppress that was based on Berge's right-to-counsel argument (document 23, at 4).

II.     FACTS

A.     <u>Berge's Convictions</u>

A jury convicted Berge of first-degree murder for the killing of Ernie Taylor. Berge was also convicted of second-degree theft for stealing Taylor's guns and of tampering with evidence for concealing the shotgun used to kill Taylor. The facts of Berge's crimes are set forth in the following documents, which the respondent is filing in conjunction with this memorandum: *Berge v. State*, Nos. A-7142, 4254, 2000 WL 1058955 (Alaska App. August 2, 2000) (*Berge I*, attached as exhibit A), *Berge v. State*, No. A-8683, 2005 WL 901779 (Alaska App. April 20, 2005) (*Berge II*, attached as exhibit B), the transcript of Trooper Randall McPherron's audiotape of Berge's interview (exhibit C), the transcript of Trooper Oscar Siegfried's audiotape of Berge's interview (exhibit D), and the Memorandum and Order from *State v. Berge*, 1KE-97-1085 Cr. (exhibit E). The facts are also set out in the transcript from the state-court criminal trial proceedings, which the respondent separately lodges with this court (citing to that transcript as "Tr."). In this memorandum, all of the citations to exhibits are to the respondent's exhibits identified above.

B.     The Discovery of Ernie Taylor's Body

In August 1997, two of Ernie Taylor's friends reported that Taylor was missing. *Berge I*, exhibit A at 1. Taylor's friends had last seen him the previous month, on July 14, at his float house in Dall Bay outside of Ketchikan. *Berge II*, exhibit B at 1. On August 25, a trooper stopped at the float house and found Taylor's body floating in the water. *Berge I*, exhibit A at 1. The body was in an advanced state of decomposition. Tr. 185.

C.     Berge's First Admission That He Killed Taylor

Two or three weeks before the discovery of Taylor's body, Berge and Robert Dickerson were on Dickerson's boat, which was docked at Ketchikan. Tr. 270-71. Berge asked Dickerson whether he had ever killed anyone and Dickerson replied that he had. Tr. 269-71. Berge then said that nobody would have to worry about Taylor anymore because he had "popped" him. Tr. 270-71. Dickerson understood Berge to mean that he had killed Taylor. Tr. 271.

Berge told Dickerson that he and Taylor had a dispute about crab pots so he shot Taylor twice, then again when Taylor tried to get back into his skiff, and again when Taylor was in the water. Tr. 270-72. Berge also told Dickerson that he had buried Taylor's guns. Tr. 272-74.

Dickerson later heard from someone else that Taylor had been found dead. Tr. 274. Although Dickerson previously had not believed that Berge had

killed Taylor, he now did and he told the Alaska State Troopers that Berge had confessed to killing Taylor. Tr. 221, 271-76.

D.    Berge's Second Admission That He Killed Taylor

The troopers obtained a warrant to allow them to monitor and record a conversation between Dickerson and Berge. *Berge I,* exhibit A at 2; Tr. 222. The troopers recorded Dickerson and Berge talking in the Potlatch Bar on the morning of September 10, 1997. *Berge I*, exhibit A at 2; Tr. 223-27, 270.

In the recorded conversation, Berge told Dickerson that he and Taylor had argued on the day of the murder and that Taylor had pulled a shotgun on him. *Berge II*, exhibit B at 11. Berge then decided to kill Taylor so that Taylor could not attack him later:

> I could have gone to the law and told them what happened . . . [But Taylor was] a vindictive son of a bitch. I'll be damned if I'm going to walk out [of] the bar some fucking dark night [and] get a knife stuck in me.

*Id*. (alteration by court of appeals).

Berge also said that he could not figure out how the doctor who conducted the autopsy failed to find holes in Taylor's body because he had put four "holes in him." *Berge II*, exhibit B at 12. Berge described how he had shot Taylor and said that he regretted shooting Taylor in the water because he had been unable to retrieve the body:

He was on a fucking boat, you know – 60 feet away, 80 feet away . . . I shot him . . . I got two rounds in the motherfucker, and [then] he jumped in the fucking water. He was in the water, and I was up on the beach . . . He was in the water. He tried to pull himself out. I should have let him pull himself out, but he had a gun on the boat, and the boat was [only] 10 feet away. I wasn't sure just how good I had him. You know, he was still kicking, you know . . . [Indiscernible speech away from microphone. Berge apparently told Dickerson that he fired more shots at Taylor.] He slid down. He went down, bubbles came up . . .

*Id.* (alteration by court of appeals)  Berge said that he had hoped that Taylor's body would come to the surface so that he could cut it open to prevent it from later floating to the surface and being discovered.  *Berge II*, exhibit B at 12.

The recorded conversation between Dickerson and Berge was later admitted into evidence and played for the jury.  Tr. 227-29.

E.      Two Autopsies

Taylor's body was autopsied twice.  *Berge I*, exhibit A at 2.  A Ketchikan pathologist, Dr. Michael Stewart, conducted the first autopsy on August 26, 1997, the day after Taylor's body was found.  *Id.* at 1.  Dr. Stewart concluded from the advanced state of decomposition that Taylor's body had been in the water for quite a while.  *Id.*  Dr. Stewart found that Taylor's left knee had been injured before death.  *Id.*  Dr. Stewart also found several holes in the body that he believed to be worm holes.  *Id.*  Dr. Stewart determined that Taylor's death had been accidental, caused by an apparent drowning.  *Id.*

Based on Berge's statements to Dickerson (the recorded conversation of September 10), Taylor's body was autopsied again. Tr. 138-39. Dr. Norman Thompson conducted the second autopsy at the crime lab in Anchorage between September 12 and September 15. *Berge I*, exhibit A at 2; Tr. 138, 236. X-rays showed that Taylor's body contained bullets and bullet fragments in the skull, neck, pelvis, chest, and left leg. *Berge I*, exhibit A at 2. Dr. Thompson found four entry bullet wounds in Taylor's body – at the base of the neck, in the middle back, in the left buttock, and in the left knee. *Id*. Dr. Thompson concluded that the gunshot wounds caused Taylor's death. *Id.*

F.    The Troopers' Interview of Berge

On the morning of September 14, 1997, the troopers filed a complaint in the state district court charging Berge with first-degree murder. *Berge II*, exhibit B at 2. Based on the complaint, the state district court issued a warrant for Berge's arrest. *Id.*

Later that morning, Trooper Randall McPherron and Trooper Oscar Siegfried walked up to Berge on the street outside the building where Berge was doing carpentry work in Ketchikan. *Berge II,* exhibit B at 2; Tr. 9. Trooper McPherron and Trooper Siegfried both wore civilian clothing and they identified themselves as troopers. *Berge II*, exhibit B at 2. They did not tell Berge that they had a warrant for his arrest. *Id.* Trooper McPherron told Berge that they

were doing "follow-up work" on Taylor's death because Taylor's family wanted to know more about what had happened to him. Exhibit C at 1. Trooper McPherron asked if they could speak to Berge about Taylor's activities. *Id.* Because of the traffic noise outside, Trooper McPherron said, "Let's get in my car and we'll get out of the noise here." Exhibit C at 1; Exhibit D at 1; Tr. 11. (The troopers had an unmarked van. Tr. 10) Trooper Siegfried did a quick pat-down of Berge for weapons and told Berge that it was routine. Exhibit D at 1-2; Tr. 12. Trooper Siegfried found a folding knife on Berge and said "just your knife here?" and then said that he would just put it in the back seat. *Id.* Trooper Siegfried then looked in a bag that Berge had, stating, "[S]orry, they just train us to do this all the time." *Id.* Berge then opened the front passenger door to the van, stepped in, and sat in the front passenger seat. Tr. 12-13.

Berge told the troopers that he had met Taylor in June while fishing and that at first Taylor had seemed like a nice guy. Exhibit D at 3. Berge said that as he got to know Taylor over the next three weeks, he concluded that Taylor was dangerous so he "got the heck out of there." *Id.*

Shortly thereafter Trooper McPherron twice read Berge his *Miranda* rights:

> Trooper McPherron:    I'll go ahead and read this to you. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the

right to talk to a lawyer and have him present with you while you are being questioned.  If you cannot afford to a hire a lawyer, one will be appointed to represent you before any questions if you wish.  Do you understand everything I just read to you right?

Berge:          Read it again.

Trooper McPherron:      Read it again? You have the right to remain silent.  Anything you say can and will be used against you in a court of law.  You have the right to talk to a lawyer and have him present with you while you are being questioned.  If you cannot afford to hire a lawyer one will be appointed to represent you before any questioning if you wish.

Berge:          Okay.

Trooper McPherron:      Okay.

Trooper Siegfried:        Uh, uh, did he own some boats over there?  I don't know, I know he had a floathouse, I'm not certain of all the property, she wasn't quite clear with me . . .

Berge:      What I saw when I was last out there, he had a big white schooner and I understood that that sank since the last time I saw him.

Trooper McPherron:      Mm hmm.

Berge:      He had, there was an old wooden boat there, I don't know maybe 40 feet long, he had it tied up and he was working on it, and he had a couple of skiffs there, um, a real old Lund skiff with a I was thinking [*sic*] Honda on it.

Exhibit C at 3-4.

The troopers then asked Berge questions about Taylor's property.

Exhibit C at 4-5.  Berge talked with the troopers until the troopers asserted that

Berge v. Antrim                                                Page 9
3:05-cv-00290-TMB-DMS

he had shot Taylor.  *Id.* at 6-8.  Berge then said, "I've said all I have to say.  You know, you guys are making a lot of accusations here I don't know anything about."  *Id.* at 8.

The troopers raised the possibility that Berge had shot Taylor in self defense, and if that was the case, they "would love to hear about it."  Exhibit C at 9.  Berge replied, "I told you all I have to say, that's all I have to say."  *Id.*  Trooper Siegfried asked Berge if there was anything else he wanted to say, and Berge responded, "No."  *Id.*  Trooper McPherron then told Berge that there was something he wanted Berge to listen to, and then he played a portion of the audiotape of Berge's conversation with Dickerson.  *Id.*  The troopers asked a few more questions, to which Berge responded, "I've got nothing more to say.  If you're going to charge me, charge me.  Get me a lawyer."  *Id.* at 10.  The troopers then asked Berge to step out of the van and they arrested him.  *Id.*

At trial, a portion of the audiotape of Berge's conversation with the troopers was admitted into evidence and played for the jury.  *Berge II*, exhibit B at 10.

III.    STANDARDS APPLICABLE TO BERGE'S CLAIMS FOR
        *HABEAS CORPUS* RELIEF

The Antiterrorism and Effective Death Penalty Act (AEDPA) sets out the standards for this court's review of Berge's claims.  *See* 28 U.S.C. §

2254(d). In enacting AEDPA, Congress intended to restrict the availability of habeas corpus relief. *Greenawalt v. Stewart*, 105 F.3d 1268, 1271 (9th Cir. 1997). AEDPA modified the role of federal habeas courts in reviewing state prisoner claims to ensure that state court convictions are given effect to the fullest extent possible under law. *Bell v. Cone*, 535 U.S. 685, 693, 122 S.Ct. 1843, 1849 (2002).

Under AEDPA, where the state court has already adjudicated the merits of a prisoner's federal claim, the habeas application must be denied unless the state court's handling of a claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). *See Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 1522 (2000).

In reviewing habeas claims, the factual findings of the state court are entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *See Thompson v. Keohane*, 516 U.S. 99, 107-09, 116 S.Ct. 457, 464-65 (1995) (presumption of correctness applies to factual findings of state trial court). The applicant "has the burden of rebutting the presumption of correctness by clear

and convincing evidence." *See* 28 U.S.C. § 2254(e)(1). This standard of deference to state fact-finding applies to both trial court and appellate court findings. *See Sumner v. Mata*, 449 U.S. 539, 547, 101 S.Ct. 764, 769 (1981) (presumption of correctness applies to factual findings of state appellate court); *Williams v. Rhoades*, 354 F.3d 1101, 1108 (9th Cir. 2004) (stating that, on habeas review, state appellate court findings "are entitled to the same presumption of correctness that this court affords trial court findings").

IV.     ARGUMENT

   A.     Berge's *Miranda* Claims (claims 1, 2, and 3)

    *1.     The Litigation of Berge's Miranda Claims in the Trial Court*

Berge filed a motion in the state trial court to suppress the statements that he made to the police immediately before his arrest. Exhibit E at 1. Berge argued that the troopers did not timely advise him of his constitutional rights under *Miranda*, that the *Miranda* warning he received was insufficient, and that he did not make a valid waiver. *Id.*

An evidentiary hearing was held on Berge's suppression motion. Tr. 1-101. Alaska Superior Court Judge Thomas Jahnke listened to testimony from Trooper McPherron and he reviewed the audiotapes and written transcripts of

the conversation between the troopers and Berge (Trooper McPherron and Trooper Siegfried had each recorded the conversation separately). Tr. 5, 22-23.

Judge Jahnke denied Berge's suppression motion in a written four-page order. Exhibit E. Judge Jahnke found that a *Miranda* warning had not been required because the "encounter between the Alaska State Troopers and Berge was clearly non-custodial as that term is defined in the cases." *Id.* at 2. Judge Jahnke acknowledged that several facts might be indicative of an in-custody situation, but that those facts were "common to virtually every police interrogation," including the fact that the interviewers had been police, that Berge had been separated from the general population, and that Berge had been checked for weapons before entering the van. *Id.*

Judge Jahnke found that many more facts countered against a finding that Berge had been in custody: (1) the troopers had worn civilian sport clothes; (2) the troopers' guns were concealed and they were not exposed to or seen by Berge; (3) the troopers drove an unmarked van; (4) the troopers approached Berge on a semi-residential street; (5) the traffic noise was reason for the troopers to ask Berge to talk with them in the van; (6) the troopers minimized any significance to the weapons' pat-down by explaining that it was "routine"; (7) Berge and the troopers simultaneously entered the van through different doors – the troopers did not assist Berge; (8) Berge sat in the front

passenger seat; and (9) the tone of the interview was initially friendly and always informal and courteous.  Exhibit E at 2-3.  Judge Jahnke found that the two audiotapes of the interview were "remarkable in their relaxed, informal tone" throughout the conversation.  *Id.*

In his decision Judge Jahnke stated that because no *Miranda* warning had been required, it was unnecessary to determine whether Berge had waived his *Miranda* rights.  Exhibit E at 3.

2.    *Berge's Direct Appeal of His Miranda Claims*

Berge appealed Judge Jahnke's denial of his suppression motion to the Alaska Court of Appeals.  *Berge I*, exhibit A at 1.  Berge argued that he had been in custody when he talked to the troopers, that he had received an inadequate *Miranda* warning, and that even if the warning had been adequate, he had not waived his rights.  *Berge I*, exhibit A at 1, 3.

The court of appeals did not overrule Judge Jahnke's finding that Berge had been out of custody.  *Berge I*, exhibit A at 3.  The court of appeals stated that even if it assumed that Berge had been in custody when he got into the van, the troopers gave Berge an adequate *Miranda* warning.  *Id.* at 3-4.  The court found that the warning that Berge was given conveyed to him that (1) he had the right to remain silent, (2) he had the right to counsel before any

questioning (including appointed counsel if he could not afford counsel himself), and (3) his statements could be used against him.  *Id.* at 3.

The court also found that Berge had understood from the trooper's warning that he could exercise his *Miranda* rights at any time.  *Berge I,* exhibit A at 4.  The court based its finding on the fact that Berge answered questions about Taylor's property and then invoked his right to silence and requested a lawyer when the troopers accused him of shooting Taylor.  *Id.*

The court also found that Berge had waived his *Miranda* rights. *Berge I,* exhibit A at 4.  After Trooper McPherron first read Berge his *Miranda* rights, Berge asked the trooper to read them again.  *Id.*  After Trooper McPherron read Berge his rights a second time, Berge immediately said "okay" and responded to the troopers' questions.  *Id.*  When the troopers became accusatory, Berge said that he did not want to talk anymore and he requested an attorney.  *Id.*  Based on these facts, the court of appeals found that Berge had waived his *Miranda* rights and agreed to speak with the troopers until he declined to speak further.  *Id.*

3.    *This Court Does Not Need to Consider the State Court's Application of Federal Law When It Found That Berge Was Out of Custody*

Berge's waiver of his *Miranda* rights makes it unnecessary for this court to address Judge Jahnke's finding that Berge was out of custody when the

Berge v. Antrim                                                    Page 15
3:05-cv-00290-TMB-DMS

troopers started asking him questions. Because Berge was read and then waived his *Miranda* rights, whether Berge was in custody or out of custody is ultimately not a basis for habeas relief, unless this court were to also include that the court of appeals' findings regarding the *Miranda* advisement and waiver were separately a basis for habeas relief.

4.     *Judge Jahnke's Finding That Berge Was Not in* Miranda *Custody Is Not Contrary to or an Unreasonable Application of Clearly Established Supreme Court Precedent*

Berge argues that based on the Supreme Court's decision in *Stansbury v. California*, 511 U.S. 318, 324, 114 S.Ct. 1526, 1529 (1994), that he was in custody for *Miranda* purposes and should have been read his *Miranda* rights sooner. Petitioner's Opening Brief on the Merits at 8-11 (document 72). Berge apparently relies on *Stansbury* as the Supreme Court precedent that entitles him to habeas relief. *Id.* Berge has misconstrued *Stansbury*. *Stansbury* supports that Berge was not in *Miranda* custody when the troopers questioned him. In *Stansbury*, the Court further clarified when a person is in custody for *Miranda* purposes. Understanding the applicability of *Stansbury* to *Miranda* custody first requires consideration of the Court's concerns about custody in *Miranda*.

When the Supreme Court issued its landmark decision of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), the Court's primary concern was

Berge v. Antrim                                                         Page 16
3:05-cv-00290-TMB-DMS

about custodial situations which convey the message that the person has no choice but to confess and, perhaps without knowledge, forgo the Fifth Amendment right to not incriminate oneself and the Sixth Amendment right to counsel. 384 U.S. at 456-57, 86 S.Ct. at 1618.

The Court stated that custodial interrogation is inherently coercive such that "incommunicado" questioning in a "police-dominated atmosphere" work to undermine an individual's free will and compel him to speak when he would not otherwise freely choose to do so. *Miranda*, 384 U.S. at 445, 467, 86 S.Ct. at 1613. The Court referred at length to now outdated police training manuals and to the facts of *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758 (1964), to describe the kind of custodial interrogation that requires what has become known as *Miranda* warnings. *Id*. at 440, 86 S.Ct. at 1610.

In *Escobedo*, the police had Escobedo's accomplice confront Escobedo at the police station and accuse him of being the perpetrator. *Miranda*, 384 U.S. at 440, 467, 86 S.Ct. at 1610. When Escobedo denied culpability, the police handcuffed him and put him in an interrogation room. Escobedo remained handcuffed and standing for four hours while the police questioned him; he then confessed. *Id*. During that time Escobedo asked to speak to his attorney but the police denied his requests. *Id*.

Based on facts like these, the *Miranda* Court explained that its decision was directed at a defendant who was "in custody at the station or otherwise deprived of his freedom of action in any *significant* way."  384 U.S. at 477, 86 S.Ct. at 1629 (emphasis added).  The Court stated that it did not intend for its decision to hamper the police's traditional function of gathering evidence in the field, which included making inquiries of individuals who were not under restraint.  *Id*.

Two decades later, the Court further explained that a person is in custody for *Miranda* purposes if the person is formally arrested or his freedom of movement is restrained to the degree associated with formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520 (1983).  Two distinct inquiries are necessary to this determination: first, what were the circumstances of the questioning and second, under those circumstances would a reasonable person feel free to terminate police questioning and leave? *Thompson*, 516 U.S. at 112, 116 S.Ct. at 457.

In *Stansbury*, the Court further clarified that *Miranda* custody is dependent on the objective circumstances of the situation and not the subjective views harbored by either the police or the person being questioned.  *Stansbury*, 511 U.S. at 323, 114 S.Ct. at 1529.  Berge is incorrect in arguing that in *Stansbury*, the Court's analysis of *Miranda* custody focused on pre-, during-, and

Berge v. Antrim                                                                 Page 18
3:05-cv-00290-TMB-DMS

post-questioning facts.    Petitioner's Opening Brief on the Merits at 9-13 (document 72).

In *Stansbury* the Court specifically considered whether the fact that the police eventually focused on Stansbury as the suspect should have bearing on whether Stansbury was in custody for *Miranda* purposes.  The Court held that the fact that the police have focused on a person for having committed a crime weighs in favor of *Miranda* custody only when the police have conveyed to the person that he is suspected of the crime they are investigating.  511 U.S. at 324, 114 S.Ct. at 1529 (officer's subjective and undisclosed view concerning whether the person being interrogated is a suspect has no bearing on a *Miranda* custody determination).  A reasonable person who is unaware of the suspicions of the police does not have cause to feel the "compulsive aspect" of custodial interrogation that the Court was concerned about in *Miranda.  Id.*

Also, while the totality of the circumstances are considered in determining *Miranda* custody, categorizing the facts into categories of pre-, during-, and post-questioning facts is not particularly helpful here if the categorization does not distinguish between those facts that were known to Berge and those that were not. Petitioner's Opening Brief on the Merits at 9-13 (document 72).  For instance, and contrary to Berge's argument, the fact that the troopers had a warrant for Berge's arrest before they spoke to him did not weigh

in favor of an in-custody determination because there is no evidence that Berge had knowledge of the arrest warrant when the troopers questioned him. *Id.* at 9.

Berge is also incorrect in arguing that the troopers "trivialized" the pat-down and that that action weighed in favor of an in-custody finding. Petitioner's Opening Brief on the Merits at 14 & n.7 (document 72). In keeping with the concerns of the Court in *Miranda*, an officer's "ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda's* concerns." *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S.Ct. 2394, 2397 (1990).

Berge is also incorrect in asserting that he was in custody as if he were appealing the merits of his suppression motion to this court. Petitioner's Opening Brief on the Merits at 9-15 (document 72). A claim for habeas corpus relief is not an appeal on the merits. In a habeas action, the federal court instead looks to whether the state court reasonably applied law that has been clearly established by the Supreme Court. 28 U.S.C. § 2254(d)(1). In this action, this court does not directly decide the suppression motion or make factual findings. Rather, this court considers whether Judge Jahnke's and the Alaska Court of Appeals' decisions represent a reasonable application of Supreme Court case law.

In considering Berge's suppression motion, Judge Jahnke correctly identified the facts relevant to determining Berge's custody status. Judge Jahnke acknowledged that three facts suggested an in-custody determination, but found they were generic to nearly every situation that involves police questioning. Exhibit E at 3. Judge Jahnke found that those facts were outweighed by nine other facts that showed that Berge had been out of custody when the police questioned him. *Id.*

In finding that Berge was not in *Miranda* custody, Judge Jahnke considered the presence – and absence – of facts that the Supreme Court considered in *Miranda* and its progeny. Judge Jahnke considered whether Berge's freedom of movement was limited and whether the troopers had placed Berge in a heavily dominated police atmosphere akin to formal arrest. Exhibit E. Judge Jahnke noted that Trooper McPherron had asked Berge to talk with them in the van. Exhibit E at 2. Judge Jahnke reasoned that being in the van did not weigh in favor of an in-custody determination because Trooper McPherron had indicated to Berge that he wanted to talk in the van due to the noise on the street. *Id.* Judge Jahnke also noted that the van was unmarked. *Id.* Compared to a police station interrogation room or even a marked police car, the van was not suggestive of a police-controlled space. Also, the troopers did not wait on Berge to get into the van, they opened the other doors to the van and

Berge v. Antrim                                                    Page 21
3:05-cv-00290-TMB-DMS

stepped inside while Berge did likewise. *Id*. at 3. Also, Berge sat in the front passenger seat. *Id*. at 2-3.

Judge Jahnke also looked to whether any fact indicated that the troopers had been heavy-handed or had mentally coerced Berge. Judge Jahnke noted that both troopers had worn civilian sport clothes and their guns were concealed and not exposed to or seen by Berge. Exhibit E at 2-3. Also, they had approached Berge on a semi-residential street. *Id*. They talked with Berge in a place that was familiar to Berge – near the building where he was doing carpentry work. Tr. 9. Also, by explaining to Berge that the pat-down for weapons was just routine, Judge Jahnke found that Trooper Siegfried had diminished any feeling of intimidation that Berge might have otherwise felt. Exhibit E at 2. Indeed, Trooper Siegfriend similarly treated finding Berge's knife and placing it in the back seat as routine. Exhibit D at 2. Judge Jahnke also found that the troopers talked to Berge in a low-key, informal, and courteous manner. Exhibit E at 3. Judge Jahnke's findings support the conclusion that the troopers did not act in an overbearing or threatening way.

Case law supports Judge Jahnke's finding that Berge was not in custody. Even when the police question an individual in a patrol car, which carries more an indicia of custody than the troopers' unmarked van, the situation does not mean the individual is in *Miranda* custody. *See, e.g, United*

*States v. Thomas*, 142 Fed. Appx. 896, 900 (6th Cir. 2005) (defendant was not in custody for *Miranda* purposes where he was questioned in a patrol car that was parked on a public street, and he was not handcuffed and the questioning was brief); *United States v. $433,980 in United States Currency*, 473 F. Supp.2d 672, 682 (E.D.N.C. 2006) (defendant was not in custody for *Miranda* purposes where the police questioning in patrol car lasted less than 30 minutes); *State v. Smith*, 38 P.3d 1149, 1156 (Alaska 2002) (fact that suspect is questioned in a police car is not itself determinative of *Miranda* custody and any custodial atmosphere from being in the police car is diluted when the questioning is objectively reasonable); *State v. Elreavy*, 595 A.2d 1332, 1335-36 (Vt. 1991) (defendant, the owner of a restaurant destroyed by arson, was not in custody for *Miranda* purposes when he voluntarily accompanied officer to a patrol vehicle for brief questioning at the scene of the fire).

In this case Trooper McPherron read Berge his *Miranda* rights and later told Berge that he knew that Berge had shot Taylor. Exhibit C at 3; Exhibit D at 4. Both before and even after the troopers read Berge his *Miranda* rights, there was little that was confrontational about the circumstances. Judge Jahnke's finding that the troopers were friendly, courteous, and nonthreatening is presumed to be correct. Exhibit E at 2. Berge has failed to point to any evidence that would overcome the presumption of correctness.

Berge incorrectly argues that his statements to the troopers about declining to talk further are relevant to whether he was in custody for *Miranda* purposes. Petitioner's Opening Brief on the Merits at 12 (document 72). Berge's invocation of his right to remain silent has no bearing on whether he was in custody and thus, whether the police should have advised him of his *Miranda* rights. At that juncture of their conversation, Trooper McPherron had already read Berge his *Miranda* rights. Exhibit C at 3, 7-8.

Berge also suggests that the fact that he was read his *Miranda* rights meant that he was in custody. Petitioner's Opening Brief on the Merits at 14 (docket 72). While the giving of a *Miranda* warning is a factor in assessing whether there was custody, it does not automatically convert an out-of-custody situation to an in-custody situation. *See, e.g., United States v. Bautista,* 145 F.3d 1140, 1148 (10th Cir.1998); *Booker v. Ward,* 94 F.3d 1052, 1058 (7th Cir.1996).

Based on the totality of the circumstances, Judge Jahnke's finding that Berge was not in *Miranda* custody cannot be said to have "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

5.     *The State Appellate Court's Finding That the Trooper Correctly Stated the <u>Miranda</u> Rights Is Not an Unreasonable Application of Clearly Established Federal Law to the Facts*

Berge argues without authority that the *Miranda* warning he received was inadequate because he was not advised that he could exercise his *Miranda* rights at any time. Petitioner's Opening Brief on the Merits at 15 (document 72). Berge has not identified any "clearly established" Supreme Court authority in support of his argument.

Although the Court recognized in *Miranda* that it is a defendant's right to stop answering questions at any time, the Court did not make this one of the mandated warnings. *See United States v. Lares-Valdez*, 939 F.2d 688, 689-90 (9th Cir. 1991) (stating that the Supreme Court had contemplated, but declined, to include with the warnings the right to cease questioning at anytime, and citing cases that hold the same); 2 Wayne R. LaFave, *et al, Criminal Procedure* § 6.8(d) at 811 (3d ed. 2007).

Because Berge has not, and cannot, identify a Supreme Court decision that clearly requires the police to expressly include in a *Miranda* warning the right to stop answering questions at any time, he has failed to satisfy his burden under 28 U.S.C. § 2254(d)(1) for seeking habeas relief based on this argument.

6.      *The State Appellate Court's Finding That Berge Waived His* <u>*Miranda*</u> *Rights Is Not an Unreasonable Application of Clearly Established Federal Law to the Facts*

A state court's determination that a defendant knowingly and intelligently waived his *Miranda* rights is entitled to the presumption of correctness. *See Callazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991). The state court of appeals found that Berge both understood his *Miranda* rights and that he voluntarily waived them. Exhibit A at 4. The court based its findings on the fact that Berge had asked Trooper McPherron to read the *Miranda* warning a second time and when Trooper McPherron concluded with the second reading, Berge immediately said "okay." Exhibit A, at 4; Exhibit C at 3. Berge then answered the troopers' questions until the troopers started asking pointed questions that suggested that Berge had shot Taylor. Exhibit A, at 4, Exhibit D, at 7-8.

Berge argues that Trooper McPherron did not expressly ask Berge if he waived his *Miranda* rights, and therefore the troopers allegedly did not obtain a valid waiver. Petitioner's Opening Brief on the Merits at 16 (document 72). But the Ninth Circuit has affirmed the waiver of *Miranda* rights where the police did not expressly ask the defendant if he wanted to waive his rights and the defendant did not expressly state that he desired to waive his rights. *See Terrovona v. Kincheloe*, 912 F.2d 1176, 1180 (9th Cir. 1990). In affirming in

*Terrovona* that the defendant knowingly and voluntarily waived his *Miranda* rights, the Ninth Circuit applied the Supreme Court's decision in *North Carolina v. Butler*, 441 U.S. 369, 99 Ct. 1755 (1979). *Id.* at 1179.

In *Butler*, the Court stated that mere silence cannot constitute a waiver, but the waiver of *Miranda* rights can be inferred from the actions and words of the person who is being questioned. *Butler*, 441 U.S. at 373, 99 S.Ct. at 1757. A shrug or a nod can constitute a knowing and voluntary waiver. *See United States v. Chapa-Garza*, 62 F.3d 118, 122 (5th Cir. 1995) (defendant indicated that he would talk but that he did not want to sign waiver form when, in response to the request that he sign the form and talk to the police, the defendant nodded his head and moved his hands as if to convey "get that away from me" and then answered questions). The question of waiver is determined by looking at the totality of the circumstances, including the defendant's background, conduct, and experience. *Butler,* 441 U.S. at 374-75, 99 S.Ct. at 1757-59.

Berge's verbal statements and actions can be fairly interpreted to mean that Berge both understood his *Miranda* rights and voluntarily waived them. Berge incorrectly argues that the court of appeals presumed waiver from a "silent record." Petitioner's Opening Brief on the Merits at 16 (document 72). When Berge first heard Trooper Berge read the *Miranda* warnings, Berge said

"read it again." Exhibit A at 4. After Trooper McPherron read the warnings a second time, Berge said "okay" and then responded to the troopers' questions. Exhibit A at 4. That Berge understood that he had the right to remain silent and the right to counsel, and that he could exercise those rights at any time, can reasonably be concluded from the fact that Berge answered the troopers' questions until the questions became accusatory. *Id.* Berge then steadfastly invoked his right to silence and requested counsel. *Id.*

Based on the totality of the circumstances, the court of appeals' decision that Berge understood his *Miranda* rights and waived them is not contrary to or an unreasonable application of *Butler*. *See Williams*, 529 U.S. 410-11, 120 S.Ct. at 1522.

B.    Berge's Sixth Amendment Claim (claims 4 and 5)

1.    *The Litigation of Berge's Sixth Amendment Claim in His State-Court Criminal case*

As part of the suppression motion that he filed in the state trial court, Berge sought to exclude the evidence of the troopers' interview with him based not only on his *Miranda* claims, but also on the Sixth Amendment. *Berge I*, exhibit A at 4. Berge argued that his Sixth Amendment right to counsel attached when the troopers filed the complaint against him and obtained the warrant for his arrest (which was before the troopers contacted him), and that he

had not waived his right to counsel. *Id.* Having ruled that Berge was not in *Miranda* custody, Judge Jahnke did not discuss Berge's Sixth Amendment claim in his written decision. Exhibit E at 1-4.

In appealing the denial of his suppression motion to the court of appeals, Berge argued that his Sixth Amendment right to counsel attached when the troopers filed the murder complaint and obtained the warrant for his arrest. *Berge I*, exhibit A at 4. The court of appeals ruled that Berge had failed to preserve his Sixth Amendment claim for appeal because he had not pressed Judge Jahnke for a ruling on this additional ground for his suppression motion. *Id.* Because Berge had failed to preserve this claim, the court of appeals did not consider his claim further. *Id.*

b.  *The litigation of Berge's Sixth Amendment claim in his action for post-conviction relief*

Berge subsequently brought an application for post conviction relief in state court, and in that application he claimed that the lawyer in his criminal case had provided ineffective assistance by failing to press Judge Jahnke to rule on his Sixth Amendment claim. *Berge II*, exhibit B at 4-5. The superior court deciding the application dismissed Berge's claim, finding that Berge had failed to state a prima facie case that he would have been entitled to suppression of his statements to the troopers based on the Sixth Amendment. *Id.* at 5.

Berge appealed the dismissal of his post-conviction relief action, arguing that his petition had established reason to believe that his Sixth Amendment claim would have been successful if his trial attorney had pursued it. *Berge II*, exhibit B at 5.

The Alaska Court of Appeals rejected Berge's Sixth Amendment argument, noting that the authorities are split on when the right to counsel attaches and that in Alaska the law on the subject is unsettled. *Berge II*, exhibit B at 6-8. The court stated that in Alaska the filing of a complaint is insufficient to require a person to stand trial on a felony charge. *Id*. at 6. In Alaska a person is not formally charged with a felony until they are indicted or expressly waive indictment. *Id*. at 6. Given these considerations, explained the court, one would expect that in a felony case in Alaska, the Sixth Amendment right to counsel does not attach simply by the filing of a complaint. *Id*. at 7. The court of appeals then found that regardless of when Berge's Sixth Amendment right to counsel arose, Berge's petition for post conviction relief failed to state a valid claim because, as the court of appeals had found in Berge's merit appeal, Berge had waived his right to counsel (through his *Miranda* waiver). *Id*. at 8. For that reason, even if Berge's right to counsel had attached before the troopers interviewed him, Berge's trial attorney could not have successfully sought

suppression of Berge's statements because Berge had waived his right to counsel. *Id*.

2.       *Berge Forfeited His Sixth Amendment Claim, and Even If He Had Not, His Particular Argument Is Not Proper For Habeas Review*

Berge's failure to press Judge Jahnke to rule on his (Berge's) Sixth Amendment claim in Berge's criminal case means that Berge is procedurally defaulted from directly litigating the merits of that claim in this forum. Because Judge Jahnke did not rule on the Sixth Amendment claim that Berge included in his suppression motion, there was no decision for the state appellate court to review. The Alaksa Court of Appeals applied its long-standing rule that a party who has declined to press the trial court judge for a ruling has forfeited the right to pursue his claim on appeal. *Berge I*, exhibit A at 4 & n.10 (citing cases).

The Alaska Court of Appeals' finding that Berge forfeited his Sixth Amendment claim constitutes an independent and adequate ground for the dismissal of Berge Sixth Amendment claim. A state court is entitled to treat as forfeited a proposition that was not properly pursued or preserved under state law. *See Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506 (1977). Forfeiture of a claim under state law is an independent and adequate basis for blocking federal *habeas corpus* review when the state court, as a matter of state procedure, has clearly determined that a defendant waived a claim. *See Stewart*

*v. Smith,* 536 U.S. 857, 861, 122 S.Ct. 2578, 2582 (2002); *Harris v. Reed*, 489 U.S. 255, 265-66, 109 S.Ct. 1038, 1044-45 (1989).

Because the court of appeals decided Berge's Sixth Amendment claim on an independent state law ground, the state court did not unreasonably apply clearly established federal law to Berge's Sixth Amendment claim. There is no state court decision regarding a Supreme Court decision for this court to review. Therefore, this court should deny Berge's Sixth Amendment claim.

Should this court somehow determine that Berge did not forfeit his Sixth Amendment claim, the claim still would not constitute grounds for habeas review. Berge bases his Sixth Amendment claim on the argument that his right to counsel attached when the troopers filed a complaint against him and obtained a warrant for his arrest. Petitioner's Opening Brief on the Merits at 17 (document 72). But Berge's opening brief acknowledges that the Supreme Court "has yet to decide whether the right to counsel attaches with the filing of a complaint as a matter of federal law." *Id.*

AEDPA requires that a petitioner argue that his conviction violate "clearly established Federal law." *See* 28 U.S.C. § 2254(d)(1). The applicable federal law must be "clearly established" not by lower federal courts, but by the Supreme Court. *Id.* Although the Court need not have addressed a factually identical case, it must have clearly determined the relevant law. *Houston v. Roe*,

Berge v. Antrim                                                         Page 32
3:05-cv-00290-TMB-DMS

177 F.3d 901, 906 (9th Cir. 1999). Because the Court has not determined whether the right o counsel attaches with the filing of a complaint as a matter of federal law, Berge's Sixth Amendment claim is not proper for habeas relief. And in any event, Berge waived his Sixth Amendment rights.

C.        Berge's Claims of Ineffective Assistance (claims 6, 9, and 10)

1.        *Applicable Law on Effective Assistance of Counsel*

The right to effective assistance of counsel is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by article I, section 11 of the Alaska Constitution. Alaska has developed a two-pronged test, the "*Risher* test," for determining the adequacy of representation in a criminal case. Under this test, an applicant has to show both that his former attorney's performance fell below the *minimum* level of competency, *i.e.*, the attorney took actions or made omissions that no reasonably competent attorney would have taken or made, and that he was prejudiced as a result of his attorney's incompetence (that is, that the lack of competency possibly contributed to the applicant's conviction). *Risher v. State*, 523 P.2d 421, 424-25 (Alaska 1974).

Alaska's test is very similar to the *Strickland* test, the test used to evaluate claims of ineffective assistance under the federal constitution. *See*

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The competency prong of both tests are essentially the same; the prejudice prong of the Alaska test, however, is less demanding (or is more favorable to the defendant). *See, e.g., State v. Steffensen*, 902 P.2d 340, 342 (Alaska App. 1995) (*Strickland* test requires a reasonable *probability* that outcome would have been different, while *Risher* test requires only a reasonable *possibility* that outcome would have been different). Nonetheless, even though Alaska law and federal law are virtually the same, under federal law there is a presumption that state courts know and follow federal law. *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357, 360 (2002). Where a state court's application of federal law is challenged, the party challenging the application must show that the application was not only erroneous but objectively unreasonable. *Yarborough v. Gentry*, 540 U.S. 1, 5, 124 S.Ct. 1, 5 (2003).

"Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. If it appears that counsel's actions were done for tactical reasons, then they will be virtually immune from subsequent challenge, even if in hindsight the tactic appears to have been mistaken. *Wiggins v. Smith*, 539 U.S. 510, 522, 123 S.Ct. 2527, 2535 (2003). When a tactical choice has in fact

been made, even if it was made by an attorney who was not fully informed as to available options, the choice will be subject to challenge only if the tactic itself is shown to be unreasonable. *Strickland*, 466 U.S. at 689-91, 104 S.Ct. at 2065-66. When a defendant cannot rule out the possibility that his counsel had a sound tactical reason for the action or omission, the presumption of competence is unrebutted and precludes a finding of ineffective assistance. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065-66; *see also Darden v. Wainright*, 477 U.S. 168 at 186-87, 186 S.Ct. 2464 at 2474 (1986) (holding petitioner had not overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy). To overcome the presumption of competency, a defendant is required to present "evidence ruling out the possibility of a tactical reason to explain counsel's conduct." *Massaro v. United States*, 538 U.S. 500, 505, 123 S.Ct. 1690, 1694 (2003).

Furthermore, because the constitutional guarantee of effective assistance does not require error-free representation, it is not enough to prove that counsel made a mistake. *Strickland*, 466 U.S. at 690-91, 104 S.Ct. at 2066-67. "Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial." *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067. "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."

*Yarborough v. Gentry*, 540 U.S. at 8, 124 S.Ct. at 9.  Moreover, "under the rule of contemporary assessment, an attorney's actions must be examined according to what was known and reasonable at the time the attorney made his choices." *Hendricks v. Calderon*, 70 F.3d 1032, 1036 (9th Cir. 1995).  "An error by counsel, even if unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066.

"It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.  Virtually every act or omission of counsel would meet that test." *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067.  In order to show prejudice, a defendant must prove "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694, 2068.  The United States Supreme Court has defined reasonable probability to mean "a probability sufficient to undermine confidence in the outcome."  *Id*.  Like the assignment of the burden of proof on competency, *Strickland* assigns the burden of proof on prejudice to the accused, who must show that there is "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id*. at 695, 2068-69.

2.    *The State Court Decision That Berge Received Effective Assistance of Counsel Is Reasonable Because Berge Cannot Establish That His Counsel's Omissions Prejudiced Him*

Berge argues that his trial counsel was ineffective for failing to file a motion to suppress his statements to Dickerson that were recorded under a *Glass* warrant (claim 9), failing to obtain a ruling on the Sixth Amendment right-to-counsel argument that was part of his suppression motion (claim 10), and failing to object when the prosecutor played part of the recording in which Berge had told the troopers that he did not want to talk to them anymore and then cross-examining Berge about what he had told the troopers (claim 6). Petitioner's Opening Brief on the Merits at 21 (document 72); *Berge II*, exhibit B at 9-11.

Berge's claims fail for several reasons. First, as to each of his three claims of ineffective assistance, Berge has made no more than a conclusory statement that his trial counsel's omissions "clearly fall within the holding of *Strickland*" and that if his counsel had not omitted to act, "the result probably would have been different." *Id.* Berge's claims are inadequately briefed and should be rejected for that reason alone.

Second, Berge's claims ignore his heavy burden under the second *Strickland* element. Berge has not shown how the results at trial would have resulted in his acquittal in light of the fact that before the discovery of Taylor's

Berge v. Antrim                                                          Page 37
3:05-cv-00290-TMB-DMS

body Berge told Dickerson that he (Berge) had killed Taylor.  *See Casimiro-Benitez*, 533 F.2d at 1124-25 (9th Cir. 1976) (placing the defendant in custody without advising him of his constitutional rights made his statements inadmissible but the error in admitting the statements was harmless due to the overwhelming evidence of the defendant's guilt).  Even if Berge's lawyer had successfully taken the actions that Berge now argues he should have taken, at most the jury would not have heard the audio recording of the discussion between Berge and the troopers.  The jury still would have heard the other audio recording in which Berge told Dickerson in detail how and why he shot Taylor.  Berge's statement to Dickerson was strong and compelling evidence and its persuasive value could not have been overcome by Berge's counsel successfully pursuing Berge's Sixth Amendment claim and ensuring that Berge's invocation of the right to remain silent was not played to the jury.

> 3.    *The Alaska Court of Appeals' Decision That Berge Received Effective Assistance of Counsel Is Reasonable*

> a.    *Berge's counsel was not incompetent regarding Berge's Sixth Amendment claim*

Berge also fails to show that the Alaska Court of Appeals applied the *Strickland* rule in an objectively unreasonable manner regarding the quality representation by Berge's trial counsel.  As to Berge's claim that his counsel should have pressed for a ruling on his Sixth Amendment claim, the court

explained that although Alaska law on the subject is unsettled, one would expect that in Alaska the right to counsel does not attach with the filing of a felony complaint because a defendant cannot be required to answer for a felony crime with the mere filing of a complaint. *Berge II*, exhibit B at 6-7. Also, as the court of appeals found, there was no reason for Berge's counsel to pursue the Sixth Amendment claim because Berge had waived his *Miranda* rights and spoke with the troopers. *Id*. at 8. When a suspect is read his *Miranda* rights and waives them, his waiver constitutes the waiver of his right to counsel that arises under the Fifth and Sixth Amendments. *Patterson v. Illinois*, 487 U.S. 285, 297-300, 108 S.Ct. 2389 2397-98 (1988).

     b.     *Berge's counsel was not incompetent regarding the <u>Glass</u> warrant*

     Berge has not demonstrated that an unreasonable application of *Strickland* arose regarding the troopers recording of Berge's conversation with Dickenson under a *Glass* warrant.[1] In alleging this claim, Berge has not argued let alone shown that a motion to suppress the recorded statements that Berge made to Dickerson could have been successful. Petitioner's Opening Brief on the

---

[1] In Alaska, absent exigent circumstances, the police must obtain a warrant before recording a conversation between two other parties. *State v. Glass*, 583 P.2d 872 (Alaska 1978). Based on Dickerson's testimony to a magistrate, the troopers obtained what has become known in Alaska as a "*Glass* warrant" and then recorded the conversation between Dickerson and Berge. *Berge II*, exhibit B at 3-4.

Berge v. Antrim                                                    Page 39
3:05-cv-00290-TMB-DMS

Merits at 20-21 (document 72). The court of appeals determined that probable cause existed to issue the *Glass* warrant and Berge does not now argue otherwise. *Id.*

      c.      *Berge's counsel was not incompetent regarding the playing of the audio recording and the prosecutor's cross-examination of Berge*

      Berge has not demonstrated that an unreasonable application of *Strickland* arose from the court of appeals holding that Berge's trial counsel was not incompetent for allowing the jury to hear the recording of Berge invoking his right to silence when he spoke with the troopers. *Berge II*, exhibit B at 8-9. Before the prosecutor played the audio recording to the jury, he agreed to stop the recording wherever Berge's counsel wanted it stopped, which was where Berge told the troopers, "I told you all I have to say. That is all I have to say." *Id.* at 9. The prosecutor then played the recording through that statement without objection from Berge's counsel. *Id.* The state trial court in Berge's post-conviction relief action and the court of appeals reasonably concluded Berge's counsel apparently made a tactical decision to let the jury hear this portion of the recording. *Berge II,* exhibit B at 9. The court of appeals explained that because Berge exercised his right to remain silent when the troopers made it clear that they believed he shot Taylor, Berge had acted consistent with his trial strategy – that Berge was an innocent man who had fallen under the troopers'

suspicion and that he stopped talking when he realized he would be unable to convince the troopers of his innocence. *Id.* at 10. In short, the state court reasonably concluded that Berge's defense counsel made a tactical decision to not object to the playing of that portion of the recording to the jury. For that reason, Berge cannot establish that his claim regarding his counsel's failure to object to the playing of this portion of the recording entitles him to habeas corpus relief. *See Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065-66 (when a defendant cannot rule out the possibility that his counsel had a sound tactical reason for the action or omission, the presumption of competence is unrebutted and precludes a finding of ineffective assistance).

Similarly, Berge cannot establish that his counsel's failure to object to the prosecutor's cross-examination questions entitles him to habeas corpus relief. The court of appeals ruled that once the jury heard the recording of Berge invoking the right to remain silent, without Berge's objection, the prosecutor could properly question Berge about what he had told the troopers, including his statement that he no longer wanted to talk to them. *Berge II*, exhibit B at 11. The court also found that, by not objecting to the prosecutor's questions, defense counsel was able to reiterate Berge's defense theme that Berge was innocent and he had been willing to the talk to the troopers until he realized that he could not

convince them of his innocence. *Id.* Berge offers nothing to dispute these reasonable conclusions.

D.    All of Berge's Claims Can Be Dismissed Under the Harmless Error Standard

Even if Berge's claims had merit, however, Berge would not be entitled to habeas corpus relief. Berge's claims are made harmless by the fact that prior to the time anyone knew that Ernie Taylor was dead, Berge told Dickerson that he had killed Taylor. Tr. 270-72. *See United States v. Casimiro-Benitez*, 533 F.2d 1121, 1124-25 (9th Cir. 1976) (placing the defendant in custody without advising him of his constitutional rights made his statements inadmissible but the error in admitting the statements was harmless due to the overwhelming evidence of the defendant's guilt).

The majority of Berge's claims are also made harmless by the fact that Berge again told Dickerson, in a recorded conversation, that he disliked Taylor, and how and why he killed Taylor. *Berge II*, exhibit B at 11-12. Berge said that he shot Taylor a total of four times, including when Taylor had been out of the water and when Taylor fell in the water. Berge said that Taylor sank and "bubbles came" up. *Id.*

Berge's statements were too consistent with the physical evidence for Berge to not be the killer. Taylor's body was found after it had been in the

Berge v. Antrim                                          Page 42
3:05-cv-00290-TMB-DMS

water a long while, after it floated to the top of the water just as Berge feared it would. *Berge I*, exhibit A at 1; Tr. 185. Taylor's body contained bullets and bullet fragments, and four entry wounds from the bullets. *Berge I*, exhibit A at 2. The timing and substance of Berge's statements, together with the fact that the physical evidence corroborated his statements, was overwhelming evidence that Berge killed Taylor. Even if Berge's statements to the troopers had been excluded based on his claims under *Miranda*, the Sixth Amendment right to counsel, and the right to effective assistance of counsel, the jury would have convicted Berge based on the statements that he made to Dickerson. Thus, even if Berge's claims had merit, which the respondent does not concede, any error would have been harmless.

<u>CONCLUSION</u>

Berge has not met his burden of showing that the state courts and applied federal law in an unreasonable manner or made an unreasonable determination of the facts. Therefore, this court should deny Berge's petition for writ of habeas corpus.

DATED July 25, 2008, at Anchorage, Alaska.

TALIS J. COLBERG
ATTORNEY GENERAL

<u>s/ Terisia K. Chleborad</u>
    Assistant Attorney General

State of Alaska, Dept. of Law
Office of Special Prosecutions
   and Appeals
310 K St., Suite 308
Anchorage, Alaska 99501
Telephone: (907) 269-6250
Facsimile: (907) 269-6270
e-mail: terisia.chleborad@law.state.ak.us
Alaska Bar. No. 8912091

### Certificate of Service

I certify that on July 25, 2008, a copy of the foregoing Respondent's Memorandum on the Merits was served electronically on Hugh Fleischer.

<u>s/ Terisia K. Chleborad</u>