NOTICE

*Memorandum decisions of this court do not create legal precedent. See Alaska Appellate Rule 214(d) and Paragraph 7 of the Guidelines for Publication of Court of Appeals Decisions (Court of Appeals Order No. 3). Accordingly, this memorandum decision may not be cited as binding authority for any proposition of law.*

# IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JOHN W. BERGE III, | ) | |
| | ) | Court of Appeals No. A-8683 |
| Appellant, | ) | Trial Court No. 1KE-01-122 Civ |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, | ) | As Revised on Rehearing |
| | ) | |
| Appellee. | ) | [No. 4982 — April 20, 2005] |
| | ) | |

Appeal from the Superior Court, First Judicial District, Ketchikan, Michael A. Thompson, Judge.

Appearances: John W. Berge III, *in propria persona*, Florence, Arizona, for the Appellant. John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the Appellee.

Before: Coats, Chief Judge, and Mannheimer and Stewart, Judges.

MANNHEIMER, Judge.

John W. Berge III was convicted of first-degree murder for shooting and killing Ernest Taylor. We affirmed Berge's conviction on direct appeal. *See Berge v. State*, Alaska App. Memorandum Opinion No. 4254 (August 2, 2000), 2000 WL 1058955.

Following our decision on appeal, Berge filed a petition for post-conviction relief, asserting that he had received ineffective assistance from his trial attorney, Assistant Public Defender David Seid, in ten different respects. The superior court ultimately concluded that none of Berge's allegations stated a prima facie case of ineffective representation, and the court therefore dismissed Berge's petition.

Berge now appeals the superior court's decision. He asserts that, with respect to four of his allegations of ineffective assistance, his pleadings were sufficient to state a prima facie case, and he accordingly should have been allowed to pursue further litigation of those four claims.

For the reasons explained here, we agree with the superior court that Berge failed to establish a prima facie case of ineffective assistance with regard to these four allegations. We therefore affirm the superior court's dismissal of Berge's petition for post-conviction relief.

*Underlying facts of the murder investigation*

Ernest Taylor, who lived on a float house in Dall Bay (outside of Ketchikan) was reported missing on August 8, 1997. Taylor was last seen alive on July 14th, when he was visited by two friends, Susan Dotson and Michael Horwath. During that visit, Dotson and Horwath gave Taylor some food, including two loaves of bread.

Approximately three weeks later, Dotson returned to Taylor's float house and noticed that Taylor's skiff was tied up in an unusual manner, and that some items of his property were missing. There was no sign of Taylor or his dog. Shortly afterwards, Dotson and Horwath decided to contact the troopers to report Taylor's disappearance.

4982

**EXHIBIT B**
PAGE 2 OF 27

The next day (August 9th), an Alaska state trooper traveled to Dall Bay. He confirmed that neither Taylor nor his dog were about. The trooper could see no indication that anyone had been at Taylor's float house recently.

Two weeks later (on August 25th), another trooper stopped at Dall Bay and visited Taylor's home. He found Taylor's body floating in the water, visibly decomposing.

A Ketchikan pathologist, Dr. Michael Stewart, conducted an autopsy on Taylor's body that same day. Based on the body's advanced state of decomposition, Dr. Stewart concluded that Taylor had been in the water for a long time.

Dr. Stewart found a wound in Taylor's left knee, inflicted prior to death. Stewart also observed other holes in Taylor's body, but he thought that these were worm holes. Stewart concluded that Taylor had died accidentally, an "apparent drowning".

The next day (August 27th), Trooper Randall L. McPherron traveled to Dall Bay. Aided by Dotson and Horwath, Trooper McPherron inventoried Taylor's property. He discovered that many items of Taylor's property were missing: rifles and shotguns, photo albums, clothing, and crab pots.

McPherron also found the two loaves of bread that Dotson and Horwath had given Taylor on July 14th. The loaves were still there, but they were now moldy.

Two weeks later, on September 8th, Trooper McPherron met with another local resident, Bob Dickerson, because Dickerson said that he had information concerning Taylor's death.

In this meeting, Dickerson reported that John Berge had declared that he "popped" Taylor after an argument about crab pots. According to Dickerson, Berge made this claim before Taylor's body was found. Berge told Dickerson that he shot Taylor twice while Taylor was on his float, and then one to two times more when Taylor

– 3 –

was in the water. At the time of his conversation with Dickerson, Berge thought that Taylor's body was still in the water.

Dickerson also reported that Berge claimed to have taken some guns from Taylor, and to have buried these guns.

The next day (September 9th), Trooper McPherron applied for a *Glass* warrant to monitor and record a conversation between Dickerson and Berge concerning what had happened to Taylor. [1] Dickerson personally appeared before the magistrate and testified in support of the warrant application. The warrant was granted.

Pursuant to the warrant, Dickerson contacted Berge early on the morning of September 10th. In the ensuing conversation, Berge admitted that he had shot and killed Taylor (and had shot and killed Taylor's dog). Berge told Dickerson that there were "four holes" in Taylor. Berge claimed that he had killed Taylor in "self-defense" — by which Berge apparently meant that he killed Taylor because he feared that, some day in the future, Taylor would attack him (because of their quarrel over the crab pots).

Based on the content of this recorded conversation, Taylor's body was exhumed and sent to the crime lab in Anchorage for a second autopsy. Dr. Norman Thompson re-examined Taylor's body and found that it contained bullets and bullet fragments.

Dr. Thompson discovered four entry bullet wounds: (1) at the base of Taylor's neck, (2) in the middle of Taylor's back, (3) in Taylor's left buttock, and (4) in Taylor's left knee. He also found bullet fragments in Taylor's skull, neck, pelvis, right chest, and left leg. Based on these discoveries, Dr. Thompson concluded that Taylor had died, not from drowning, but as a result of gunshot wounds.

---

[1]    *See State v. Glass*, 583 P.2d 872 (Alaska 1978).

On the morning of September 14th, Trooper McPherron filed a complaint in the district court charging Berge with first-degree murder. Based on this complaint, the district court issued a warrant for Berge's arrest.

Later that day, McPherron, accompanied by Trooper Oscar Siegfried, stopped Berge on the street. Although the troopers were dressed in civilian clothes, they identified themselves as troopers — but they did not immediately tell Berge that they had a warrant for his arrest. Instead, they told Berge that they were doing "follow-up work" on Taylor's death, and they wanted to speak to Berge about Taylor's activities and whereabouts prior to his death.

Berge responded with a brief description of how he had met Taylor while fishing. Berge told the troopers that, at first, Taylor had seemed like a "really nice guy". But Berge claimed that, as he got to know Taylor over the next several weeks, he concluded that Taylor was "really strange" and "dangerous". Berge stated that, after he realized what kind of person Taylor was, he "got the heck out of there" and did not see Taylor again. According to Berge, this happened sometime in June.

Shortly after Berge gave this explanation, Trooper McPherron gave *Miranda* warnings to Berge. (In fact, he read all of the warnings twice, at Berge's request.) Following these warnings, the troopers asked Berge a number of questions suggesting that Berge knew more about Taylor's death than he was telling. The troopers made repeated efforts to get Berge to admit some knowledge of the circumstances surrounding Taylor's death. But in the face of this questioning, Berge insisted that he did not know how Taylor died, and that he was not involved in Taylor's death.

After hearing Berge's answers, the troopers told Berge that they knew he had shot Taylor. Berge responded, "I've said all I have to say." The troopers then suggested that Berge had shot Taylor in self-defense, and they told Berge that they

4982
**EXHIBIT B**
PAGE 5 OF 27

wanted to hear his side of the story. Berge again answered, "I told you all I have to say. That's all I have to say."

At this point, the troopers played Berge a portion of Berge's recorded conversation with Dickerson, and then the troopers resumed their questioning. After a couple more questions, Berge told them, "I've got nothing more to say. If you're going to charge me, [then] charge me. Get me a lawyer." The troopers then arrested Berge.

At trial, Berge continued to assert that he had had no part in Taylor's death, and that he had no personal knowledge of how Taylor had died. Berge contended that his statements to Dickerson were not true — that his description of the homicide was simply a story that he concocted in a misguided effort to impress Dickerson. The jury rejected this suggestion and convicted Berge of murder.

### Berge's claim that his trial attorney was ineffective for failing to challenge the <u>Glass</u> warrant

Berge argues that his petition for post-conviction relief did set out a prima facie case that his trial attorney was incompetent for failing to challenge the *Glass* warrant that authorized the recording of his conversation with Bob Dickerson.

Berge first asserts that the State's warrant application failed to satisfy the *Aguilar-Spinelli* rule. [2] In particular, Berge argues that even though Dickerson may have been a citizen informant, Alaska law still required the troopers to independently corroborate at least some details of Dickerson's tip before the magistrate could properly

---

[2]    *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). *See State v. Jones*, 706 P.2d 317, 324-25 (Alaska 1985) (holding that, as a matter of state law, the *Aguilar-Spinelli* test continues to govern the evaluation of hearsay information offered to support a search or seizure).

– 6 –

4982

issue the warrant. [3] Berge contends that there was no independent corroboration of any kind, and that this deficiency in the State's *Glass* warrant application would have been apparent to any competent defense attorney. Thus, Berge concludes, his trial attorney was ineffective when he failed to seek suppression of the recording obtained pursuant to the warrant.

But the *Aguilar-Spinelli* test applies only when a search warrant application rests on hearsay. In Berge's case, the troopers did not present Dickerson's information in a hearsay form. Rather, they brought Dickerson to the warrant application hearing, and Dickerson personally testified at that hearing. In these circumstances, as we said in *McLaughlin v. State*, Dickerson's "willingness to submit to an oath, and his personal presence and availability for questioning by the magistrate[,] provided adequate procedural safeguards to assure a sound basis for [the magistrate's assessment of his] veracity and reliability". [4]

In a second argument relating to the *Glass* warrant, Berge asserts that the troopers misled the magistrate by failing to reveal facts that tended to undercut Dickerson's account of Berge's statements regarding Taylor's death. In particular, Berge argues that the troopers failed to tell the magistrate (1) that there was at least some evidence that Taylor had still been alive in late July or perhaps early August, and (2) that a young man was seen living at Taylor's float house toward the end of July. Berge contends that any competent defense attorney would have attacked the *Glass* warrant on this ground.

---

[3]    *See Erickson v. State*, 507 P.2d 508, 518 (Alaska 1973) (holding that when an arrest warrant application relies on hearsay from a citizen informant, "some of the details of the [citizen informant's] information must be verified").

[4]    *McLaughlin*, 818 P.2d 683, 686 (Alaska App. 1991). *Accord, Linton v. State*, 880 P.2d 123, 126 (Alaska App. 1994).

4982

**EXHIBIT B**
PAGE 7 OF 27

The first omitted piece of information — a report from an unidentified man that Taylor was alive until the end of July, or perhaps early August — may suggest that Berge was not completely accurate when he described the timing of the homicide to Dickerson. Or, taken in the light most favorable to Berge, this information may even support Berge's assertion that his story to Dickerson was a complete fabrication. But it is undisputed that Taylor had been dead for some time when his body was retrieved from the water on August 25th. It is further undisputed that, before Taylor's body was found, Berge claimed that he had shot and killed Taylor, and that he described to Dickerson several details of how he killed Taylor, and why.

Even if the disputed information — the report that Taylor was alive until late July or early August — is added to the warrant application, there was ample probable cause for issuing the *Glass* warrant.

The second omitted piece of information (a report that a young man was living at Taylor's float house toward the end of July) does not provide any reason to disbelieve Dickerson's report that Berge had confessed to killing Taylor, nor does it provide any reason to disbelieve Berge's confession.

When a petitioner for post-conviction relief challenges their trial attorney's failure to file a motion seeking suppression of evidence, one of the petitioner's burdens is to show that this motion (if filed and litigated) would ultimately have been granted. [5] Berge's petition for post-conviction relief fails to demonstrate any reasonable possibility that the *Glass* warrant could have been attacked successfully.

---

[5] *See Steffensen v. State*, 902 P.2d 340, 342 (Alaska App. 1995) ("courts unan.. 1ously agree that when a defendant asserts ineffective assistance of counsel based on h , or her attorney's failure to challenge the government's evidence, the defendant must show that the proposed challenge would have been successful").

4982

**EXHIBIT B**
PAGE 8 OF 27

*Berge's claim that his trial attorney was incompetent for failing to pursue a Sixth Amendment attack on the admissibility of the statements that Berge made to the troopers just prior to his arrest on September 14th*

After Berge was indicted, his attorney (Assistant Public Defender David Seid) filed a motion to suppress the statements that Berge made to the troopers during the interrogation that preceded his arrest on September 14th. In this suppression motion, Seid contended that the troopers violated Berge's rights under both the Fifth and Sixth Amendments to the United States Constitution by engaging in custodial interrogation of Berge without first obtaining a valid waiver of his rights to silence and to the assistance of an attorney.

The trial judge ruled that Berge's Fifth Amendment rights were not violated because Berge had not been in custody during this questioning. Having reached this conclusion, the trial judge decided that it was unnecessary to resolve the issue of whether Berge validly waived his rights to silence and to the assistance of counsel when, following the administration of *Miranda* warnings, Berge said "Okay" and then began answering the troopers' questions. And the trial judge denied the suppression motion without expressly reaching the issue of whether the troopers violated Berge's Sixth Amendment right to counsel.

Later, when Berge appealed his conviction to this Court, he challenged the trial judge's ruling that he had not been in custody during his interview with the troopers. Berge contended that he *had* been in custody. He further contended that, even though the troopers advised him of his rights under *Miranda*, that advisement of rights was deficient. In the alternative, Berge argued that even if the advisement of rights was

4982

**EXHIBIT B**
PAGE 9 OF 27

sufficient, the troopers violated the law by proceeding to interrogate him without obtaining his *waiver* of those rights. [6]

When we decided Berge's appeal, we did not reach the issue of whether Berge had been in custody during the troopers' questioning. Instead, we held that it made no difference whether Berge had been in custody — because, even if he was in custody, (1) he received an adequate warning of his rights under *Miranda* and (2) he waived those rights. [7]

We then held that Berge had waived the claim that this interrogation was conducted in violation of his Sixth Amendment right to counsel, because Berge's attorney had not pressed the trial judge for a ruling on this claim. [8]

In Berge's ensuing petition for post-conviction relief, he argued that Seid was incompetent for failing to press the trial judge for a ruling on the Sixth Amendment claim. The superior court dismissed this claim, concluding that Berge's pleadings failed to establish a prima facie case that Berge would have been entitled to suppression of his statements on this ground. In this appeal, Berge contends that the superior court was wrong — that his petition did establish good reason to believe that the Sixth Amendment claim would have been successful if Seid had pursued it.

The right to counsel under the Sixth Amendment to the United States Constitution is triggered when a person becomes an "accused" — that is, when the government initiates formal judicial proceedings against the person. [9]

---

[6]   *Berge v. State*, Memorandum Opinion No. 4254 at 7-8, 2000 WL 105  ⁵5 at *3-4.

[7]   *Id.*

[8]   *Id.* at 8-9, 2000 WL 1058955 at *4.

[9]   *See Moran v. Burbine*, 475 U.S. 412, 428-432; 106 S.Ct. 1135, 1144-47; 39 L.Ed.2d 410 (1986); *Brewer v. Williams*, 430 U.S. 387, 401-03; 97 S.Ct. 1232, 1240-41; 51 L.Ed.2d

4982

EXHIBIT B
PAGE 10 OF 27

At the time that the troopers interviewed Berge, they had already filed a criminal complaint in the district court, charging Berge with first-degree murder. And, based on this complaint, they had obtained a warrant for his arrest. Berge argues that these actions were sufficient to trigger his Sixth Amendment right to counsel.

But as Professor LaFave explains in his treatise on criminal procedure, there is a split among American jurisdictions as to whether the filing of a complaint constitutes the initiation of formal proceedings for purposes of the Sixth Amendment right to counsel. The division on this issue hinges on the differing role that a complaint plays in the criminal process of the various states. [10]

In jurisdictions where the complaint functions as a charging document, courts hold that the filing of a complaint constitutes the initiation of criminal proceedings for purposes of the Sixth Amendment. [11] However, in jurisdictions where the filing of a complaint is simply a means to obtain an arrest warrant or a summons — that is, a way to secure judicial control over the person until a formal charge can be brought against them — courts hold that the filing of a complaint does not trigger the Sixth Amendment right to counsel. [12]

In Alaska, the complaint serves a hybrid function. In misdemeanor prosecutions, the complaint serves as a charging document. That is, based on a

---

424 (1977); *see also Carr v. State*, 840 P.2d 1000, 1005 (Alaska App. 1992); *Thiel v. State*, 762 P.2d 478, 482-83 (Alaska App. 1988).

[10]    *See* Wayne R. LaFave, Jerold H. Israel, and Nancy J. King, *Criminal Procedure* (2nd ed. 1999), § 6.4(e), Vol. 2, p. 486.

[11]    *Id.*

[12]    *Id.*

4982
**EXHIBIT B**
PAGE 11 OF 27

complaint alone, the government can force a person to stand trial for a misdemeanor criminal offense.

But Article I, Section 8 of the Alaska Constitution guarantees felony defendants the right of grand jury indictment:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the armed forces in time of war or public danger. Indictment may be waived by the accused. In that case the prosecution shall be by information.

In other words, under Alaska law, a complaint is not sufficient to force a person to stand trial on a felony charge. Rather, a person is not formally charged with a felony until they are indicted, or until they expressly waive indictment and consent to be charged by information (a charging document drawn up by the district attorney's office).

The first two subsections of Alaska Criminal Rule 7 mirror this constitutional requirement. Criminal Rule 7(a) and (b), read in conjunction, state that "[a]n offense [punishable] by imprisonment for a term exceeding one year shall be prosecuted by indictment unless indictment is waived [, in which case the] offense ... may be prosecuted by information". Only after a defendant is indicted (or after a defendant waives indictment in favor of an information) can the defendant be arraigned in the superior court on a felony charge, pursuant to Alaska Criminal Rule 10, and called upon to enter a plea.

The police may file a felony complaint in the district court, but this complaint merely allows the district court to issue process against the person. *See* Alaska Criminal Rule 4 ("Warrant or Summons Upon Complaint").

– 12 –

Under Alaska Criminal Rule 5(e)(1), when a defendant is brought to court on a felony complaint, the defendant is not asked to enter a plea — because they have not yet been formally charged. Rather, the defendant is advised of their right to a preliminary examination — a court hearing at which the State is obliged to present evidence establishing that there is probable cause to believe that the defendant is guilty of an offense. *See* Alaska Criminal Rules 5(e)(2) and 5.1.

If this preliminary examination is not held within 10 days (for defendants in custody) or 20 days (for defendants free on bond), or if the preliminary examination is held but the State fails to establish probable cause, the defendant must be released and the complaint against the defendant must be dismissed. *See* Criminal Rules 5(e)(4) and 5.1(h). However, dismissal of the complaint under this rule is not an adjudication of the felony charge in the defendant's favor. Instead, it simply means that the defendant can no longer be held in custody or under conditions of bail. Criminal Rule 5.1(h) specifically states that "[t]he discharge of the defendant shall not preclude the state from instituting a subsequent proceeding for the same offense."

Given the law in Alaska concerning the role of a complaint in felony prosecutions, one would expect that Alaska would ally itself with those jurisdictions which hold that the filing of a felony complaint does not trigger the Sixth Amendment right to counsel. And this appears to be the case. In *Merrill v. State*, 423 P.2d 686 (Alaska 1967), the Alaska Supreme Court held that a felony defendant had no Sixth Amendment right to counsel at their preliminary examination in the district court. [13]

(The supreme court subsequently enacted a court rule that grants a right to counsel at preliminary examinations. *See* Criminal Rule 5.1(a).)

---

[13]    *Merrill*, 423 P.2d at 690-91.

4982

**EXHIBIT B**
PAGE 13 OF 27

Based on the supreme court's decision in *Merrill*, it would appear that Berge had no Sixth Amendment right to counsel during the interrogation that preceded his arrest on the felony complaint in this case. However, in *Gipson v. State*, 575 P.2d 782 (Alaska 1978), a case decided eleven years after *Merrill*, the supreme court took a different approach to this Sixth Amendment issue.

In *Gipson*, the State conceded that the trial court had violated the defendant's right to counsel at his preliminary examination. The remaining question was to determine the proper standard for deciding whether this procedural error required reversal of Gipson's conviction. [14] The supreme court noted that a felony defendant's right to counsel at a preliminary examination was guaranteed by Criminal Rule 5.1(a). But the supreme court then declared that a felony defendant's right to counsel at the preliminary examination was "more than a matter of ... procedure"; rather, this right was "also ... guaranteed by the Sixth Amendment to the United States Constitution." [15] Based on this reasoning, the court concluded that "harmless beyond a reasonable doubt" was the proper standard for assessing whether the denial of counsel required reversal of Gipson's conviction. [16]

The *Gipson* opinion does not mention *Merrill*; the supreme court did not acknowledge that it had previously decided this issue the other way. Moreover, the State's brief in *Gipson* explicitly conceded that defendants have a Sixth Amendment right to counsel at preliminary hearings. [17] Neither the State's brief nor the supreme

---

[14]   *Gipson*, 575 P.2d at 784-85.

[15]   *Gipson*, 575 P.2d at 785.

[16]   *Id.*

[17]   *See Gipson v. State*, Supreme Court File No. 2674, Brief of Appellee, p. 10, citing *Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970).

4982

EXHIBIT B
PAGE 14 OF 27

court's ensuing opinion in *Gipson* acknowledged the split among the jurisdictions on this Sixth Amendment issue, and the supreme court did not engage in the type of Sixth Amendment analysis explained in *LaFave*.

For these reasons, we do not read *Gipson* as a repudiation of *Merrill*. Rather, *Gipson* merely unsettles Alaska law on this issue.

But even assuming that Berge had a Sixth Amendment right to counsel at that point, he waived that right. As noted earlier in this opinion, when this Court decided Berge's direct appeal of his conviction, we held that (1) Berge received proper *Miranda* warnings before the interrogation, and (2) he knowingly waived his rights to silence and to the assistance of counsel.

In *Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988), the United States Supreme Court held that a suspect's waiver of the right to counsel and agreement to be questioned after receiving *Miranda* warnings was sufficient to waive the suspect's right to counsel under the Sixth Amendment as well as the Fifth Amendment. [18] Thus, our decision in Berge's prior appeal — our ruling that Berge knowingly waived his right to counsel and consented to be interviewed after receiving proper *Miranda* warnings — is fatal to Berge's current claim that this interview violated his Sixth Amendment right to counsel.

In other words, even if we assume that Berge had a Sixth Amendment right to counsel at this interview, his trial attorney could not have obtained suppression of Berge's statements on the theory that this interview constituted a violation of Berge's Sixth Amendment rights. Accordingly, Berge's petition for post-conviction relief failed to set out a prima facie case that he was harmed by his trial attorney's failure to demand a trial court ruling on the Sixth Amendment claim.

---

[18]    *Patterson*, 487 U.S. at 296-300, 108 S.Ct. at 2397-99.

4982

*Berge's claim that his trial attorney was incompetent for allowing the jury to hear that Berge had invoked his right to silence at the end of the interrogation on September 14th*

As explained earlier in this opinion, during the pre-arrest interrogation on September 14th, the troopers repeatedly tried to get Berge to admit his knowledge of, and his involvement in, the Taylor homicide. But throughout this questioning, Berge maintained that he knew nothing about Taylor's death.

After hearing Berge's denials, the troopers told Berge that they knew he had shot Taylor. Berge responded, "I've said all I have to say." The troopers then suggested that Berge had shot Taylor in self-defense, and they told Berge that they wanted to hear his side of the story. Berge again answered, "I told you all I have to say. That's all I have to say."

The troopers tape recorded this interview, and the prosecutor wished to play this tape at Berge's trial.

As already explained, Berge's trial attorney, David Seid, filed a motion seeking suppression of the entire interview — a motion that was denied. However, in the alternative, Seid asked for a protective order barring the prosecutor from playing any portion of the interview after Berge declared that he had nothing more to say. At a hearing on this motion for a protective order, the prosecutor declared that he did not oppose Seid's request, and that he was willing to stop the tape where Seid wanted it stopped: at the point where Berge declared, "I told you all I have to say. That's all I have to say."

Later, when the prosecutor offered the tape into evidence at Berge's trial, the judge expressly directed the prosecutor to stop the tape at the point where Seid wanted it stopped. Without further objection, the prosecutor played the tape up to (that is, through) the statements quoted in the previous paragraph.

– 16 –



When Berge brought his direct appeal to this Court, he argued that the jury should not have heard the part of the tape where Berge told the troopers that he had nothing more to say. Berge contended that he was exercising his constitutional right to remain silent — and that the prosecutor, by playing this portion of the tape, was in effect making an improper adverse comment on Berge's assertion of his right to silence. [19]

Since Berge's trial counsel had not objected to the jury's hearing this portion of the tape (other than his earlier motion seeking suppression of the entire tape on *Miranda* grounds), this Court reviewed Berge's claim for plain error. [20]   We concluded that there was no plain error — because Seid had apparently made a tactical decision to let the jury hear this portion of the tape. [21]

In his ensuing petition for post-conviction relief, Berge argued that Seid was incompetent for choosing to allow the jury to hear this portion of the tape. Berge renewed his claim that the playing of the tape constituted an adverse comment on Berge's exercise of his constitutional right to silence, and he argued that any competent defense attorney would have objected to — rather than expressly agreeing to — the jury's hearing this portion of the tape. The superior court ruled that Berge had failed to set forth a prima facie case of attorney incompetence on this issue.

The question on appeal is whether Berge's petition presented a prima facie case that no competent defense attorney would have chosen to let the jury hear Berge telling the troopers that he had nothing more to say. We agree with the superior court that Berge failed to meet this burden.

---

[19]   *Berge,* Memorandum Opinion No. 4254, at 9, 2000 WL 1058955 at *4.

[20]   *Id.* at 14, 2000 WL 1058955 at *6.

[21]   *Id.* at 15, 2000 WL 1058955 at *7.

4982
**EXHIBIT B**
PAGE 17 OF 27

As already explained, Berge's defense at trial was that he had no involvement in, and no knowledge of, Taylor's death. Berge's statements to the troopers during the questioning of September 14th were consistent with this defense. The tape of the interview showed that Berge was willing to talk to the troopers about Taylor, and that he did answer several of their questions. Berge did not end the interview until the troopers made it clear that they thought Berge had shot Taylor, and that they were not willing to accept Berge's statements to the contrary. Only at that point did Berge announce, "I [have] told you all I have to say. That's all I have to say."

In other words, the taped interview did not show Berge acting guilty by immediately asserting his right to silence when the troopers asked to speak to him about Taylor. Rather, the tape showed Berge acting in a manner that was arguably consistent with the defense claim that Berge was an innocent man who had fallen under official suspicion, and who stopped speaking only when he realized that he would be unable to convince the two troopers of his innocence.

A competent defense attorney could conclude that this portion of the taped interview would bolster or corroborate Berge's assertion of innocence. Thus, Berge's petition failed to establish a prima facie case of attorney incompetence — *i.e.*, a prima facie case that no competent attorney would have dealt with this issue the way Seid did.

Berge also argues that Seid was incompetent for failing to object to a related portion of the State's cross-examination of Berge. During this cross-examination, the prosecutor asked Berge why he had told the troopers that he had nothin  more to say, when he might have taken that opportunity to explain to the troopers that  ad merely been bragging to Dickerson when he claimed to have murdered Taylor:

> *Prosecutor*: Do you remember [the troopers] saying,
> ... "We'd love to hear your story?" ...

4982

*Berge*: Yes, I do.

*Prosecutor*: All right. And your [response] was, ... "I told you all I have to say. That's all I have to say." ...

*Berge*: That's right.

*Prosecutor*: Okay. You didn't say anything about, "I just made up a big bunch of BS to get Dickerson," did you?

*Berge*: At that point in time, I had no idea why they were accusing me of killing Ernie Taylor. I'd never — I didn't kill Ernie Taylor. I didn't know that the *Glass* warrant had been on tape, and that that's the information they were basing this on. I was confused, and I was flabbergasted that I was being arrested for a murder I had not committed.

*Prosecutor*: Okay. And the troopers were saying, "We're being fair with you, aren't we? We're trying to get the truth out, right?" ... And you said, quote, "I told you all I have to say. That's all I have to say."?

*Berge*: That's right. ... They accused me of killing Ernie Taylor, and they accused me of stealing his stuff. I said I hadn't done it, and they kept badgering me ...

*Prosecutor*: Yeah.

*Berge*: ... and they kept badgering me, and they wouldn't let it go. I didn't know what to say. What are you going to say when you have two men there that look like they're going to shoot you if you ... twitch? ... They said they wanted to talk to me. I says okay. And the first thing they do is search me. ... That seems kind of unusual, but okay. So they put me in the car, and they're talking to me, and they're pretty intense, yes. And when one [officer] has

– 19 –

4982

**EXHIBIT B**
PAGE 19 OF 27

his hands like this, and he's looking at you, and you know [that] he's a policeman and you know he's armed, you might have a pretty good idea of what he's got his hand on. ... And it was not a congenial atmosphere.

In his petition for post-conviction relief, Berge contended that the prosecutor's questions were a blatantly improper adverse comment on Berge's invocation of his right to silence, and that any competent defense attorney would have objected to these questions.

We have already concluded that a competent defense attorney could have decided to let the jury hear the tape of the interview up through the portion where Berge told the troopers that he had nothing more to say. Once this evidence of Berge's statement was admitted (at the defense attorney's request), it was proper for the prosecutor to ask Berge to explain his statement. A competent defense attorney could conclude that any objection to the prosecutor's questions would be overruled.

Moreover, as can be seen from the excerpt quoted above, the prosecutor's questions gave Berge a chance to reiterate the basic defense theme that Berge was an innocent man who had been willing to talk to the troopers initially, but who stopped talking when he realized that he would be unable to convince the troopers of his innocence. Thus, a competent defense attorney could conclude that it was better for the defense case if the jury heard Berge's answers to the prosecutor's questions.

For both of these reasons, Berge's petition did not set out a prima facie case that Seid acted incompetently when he failed to object to the prosecutor's questions.



*Berge's claim that his trial attorney was incompetent for not hiring a ballistics expert to show that Berge's description of the shooting was implausible*

The State's case against Berge was built mainly on Berge's several statements to Dickerson describing how and why he killed Taylor, coupled with the circumstances surrounding Taylor's disappearance and the later discovery of Taylor's body, plus the results of the first and second autopsies.

As already explained, Berge's defense at trial was that he had had nothing to do with Taylor's death, and that his various statements to Dickerson had been sheer inventions.

In his petition for post-conviction relief, Berge claimed that his trial attorney, Seid, was incompetent because he failed to hire a ballistics expert to show that Berge's account of the shooting was irreconcilable with the physical evidence in the case. Berge argues that if ballistics testimony could have shown that Berge's description of the shooting could not possibly be accurate, this would have proved that Berge was telling the truth when he testified that he made up the whole thing, and that he really had nothing to do with Taylor's death.

In order to understand Berge's claim, it is necessary to describe some of the evidence presented at Berge's trial, and to describe the way in which the parties argued the case to the jury.

*(a)  The evidence and arguments at Berge's trial*

In the conversation that was recorded pursuant to the *Glass* warrant, Berge told Dickerson that he and Taylor got into an argument on the day of the murder. During this argument, according to Berge, Taylor pulled a 12-gauge pump shotgun on him.

– 21 –                                                4982

Berge told Dickerson, because of Taylor's action, he decided to kill Taylor so that Taylor would not try to attack him later: "I could have gone to the law and told them what happened. ... [But Taylor was] a vindictive son of a bitch. I'll be damned if I'm going to walk out [of] the bar some fucking dark night [and] get a knife stuck in me."

Berge then commented on the fact that the doctor who conducted the first autopsy failed to find any bullet holes in Taylor's body: "[Taylor] got what he had coming, man. And why they couldn't figure out that he had four fucking holes in him, I don't know. But he did."

Berge remarked that there was no evidence tying him to Taylor's death: "I mean, there ain't no proof. If somebody walked up and said anything, ... all they got is back in fucking June."

Berge then described how he shot Taylor, and he lamented that he had been forced to kill Taylor in the water, where his body sank and could not be retrieved:

> *Berge*: He was on a fucking boat, you know — 60 feet away, 80 feet away. ... I shot him ... . I got two rounds in the motherfucker, and [then] he jumped in the fucking water. He was in the water, and I was up on the beach. ... He was in the water. He tried to pull himself out. I should have let him pull himself out, but he had a gun on the boat, and the boat was [only] 10 feet away. I wasn't sure just how good I had him. You know, he was still kicking, you know. .. [Indiscernible speech away from the microphone. Berge apparently told Dickerson that he fired more shots at Taylor.] He slid down. He went down, bubbles came up ... .

Berge added that he had hoped that Taylor's body would come back to the surface, so that he could cut it open and thus prevent the body from later floating and being discovered. Berge told Dickerson that he returned to Taylor's boat three weeks later, looking for Taylor's body. Berge also mentioned that he continued to feed



Taylor's cats, but that he shot Taylor's dog so that the dog would not draw attention to him.

During the second autopsy of Taylor's body, the pathologist retrieved several bullet fragments. In addition, during a later examination of Taylor's float, the troopers recovered a spent bullet. This spent bullet had debris attached to it: clothing and bone fragments, as well as plant-like debris and paint particles. It appeared that this bullet had passed through a human or animal body, and through clothing similar to what Taylor was wearing.

When David Seid delivered Berge's summation to the jury, he presented two main contentions: that (1) Berge's descriptions to Dickerson of how he killed Taylor were at odds with the physical evidence, and that (2) the evidence also showed that Taylor was still alive when Berge was telling Dickerson that he had killed Taylor. This evidence, Seid declared, showed that Berge had concocted his story to Dickerson — that Berge "was making it up as he [went] along."

Seid told the jurors that, in order for the State to prove its case, the State had to show that Berge's account of the killing fit the facts. And Seid argued that Berge's account did not fit the facts. Based on these two arguments, Seid urged the jury to accept Berge's testimony that he invented his story about killing Taylor.

In particular, Seid argued that the evidence showed that Taylor was alive until late July or early August 1997. But Robert Dickerson testified that it was mid-July when Berge first told him that he had killed Taylor. Thus, Seid contended, Taylor was still alive at the time when Berge was recounting to Dickerson how he had killed Taylor. And if Taylor was alive, then Berge's confession to Taylor's murder could not possibly be true.

4982

**EXHIBIT B**
PAGE 23 OF 27

Seid also pointed out that the State's ballistics expert had identified one of the retrieved bullet fragments as being the remnant of a .30 caliber bullet. But when Berge spoke to Dickerson, he claimed to have shot Taylor with a .243 caliber rifle.

In addition, the spent bullet found on Taylor's log float appeared to have passed through Taylor's body and clothing. The distance from Taylor's float to the beach was about 100 yards. But when Berge spoke to Dickerson, he claimed to have shot Taylor from a distance of 60 to 80 feet (*i.e.*, 20 to 27 yards), while standing on the beach. Seid argued that the discovery of the spent bullet on the float, so far from shore, indicated that Berge's story of standing on the beach and shooting Taylor from a distance of 60 to 80 feet could not be true. In fact, Seid argued, the discovery of the bullet on the float suggested that the shots must have been fired from a different direction entirely.

In conclusion, Seid told the jury that Berge's stories to Dickerson were hopelessly in conflict with the physical evidence, and that Berge was telling these stories at a time when Taylor was still alive. This meant that Berge was telling the truth when he testified at trial that he made the whole thing up.

In rebuttal, the prosecutor admitted that the State could not prove the exact date of Taylor's death, nor could the State prove the range or distance at which Taylor was shot. But the prosecutor pointed out that, after the troopers heard about Berge's statements that he had killed Taylor by shooting him four times, the State obtained a second autopsy of Taylor's body. In this second autopsy, it was determined that Taylor had not died from drowning (as previously thought). Rather, Taylor had died from gunshot wounds, and he had been shot four times. This was too great a coincidence, the prosecutor contended. He urged the jurors to conclude that Berge must have been speaking from personal knowledge.

4982

**EXHIBIT B**
PAGE 24 OF 27

*(b)  Berge's argument concerning the purported necessity for ballistics testimony*

As noted above, Berge now asserts that Seid demonstrated incompetence by failing to hire a ballistics expert to analyze the plausibility of Berge's description to Dickerson of how he shot Taylor.  As an attachment to his petition, Berge offered the analysis of a ballistics expert who concluded that if Berge was standing on the beach, and if Taylor was in his skiff at a distance of 60 to 80 feet (20 to 27 yards) from shore, and if Taylor's float was 100 yards from shore, it would have been physically impossible for a bullet from Berge's rifle to have penetrated Taylor's body, then traveled an additional 70 to 80 yards and landed on Taylor's float.

Berge argues that any competent defense attorney would have presented this kind of ballistics analysis to the jury — because, if this evidence had been presented, the jury would have seen that Berge's story about killing Taylor could not possibly be true.

But as we explained in the preceding section, Seid did in fact perceive the potential exculpatory significance of the expended bullet found on Taylor's float.  Seid argued to the jury that the presence of this bullet on the float showed that Berge's account of the shooting could not be true — *i.e.*, that Berge could not have shot Taylor from the shore while Taylor was in his boat at a distance of 60 to 80 feet from shore.  Seid further argued that the presence of this bullet on the float showed that the shots that killed Taylor came from a completely different direction.

It is possible that Berge's proposed expert testimony would have bolstered Seid's argument to some degree.  But, as we also explained in the preceding section, the State's case did not turn on ballistics analysis, nor did the State contend that Berge had

4982

**EXHIBIT B**
PAGE 25 OF 27

accurately described these aspects of the homicide.  Instead, the prosecutor conceded that the State could not prove the range or distance at which Taylor was shot.

Rather than attempting to prove that Berge's description of the killing was accurate in all respects, the prosecutor focused on the evidence (1) that, before Taylor's body was discovered, Berge told Dickerson that he had shot and killed Taylor, and (2) that after Taylor's body was discovered and the first pathologist failed to identify any bullet wounds in the body, Berge expressed bewilderment and declared that he had shot Taylor four times — a statement that was later confirmed by the results of the second autopsy.  The prosecutor argued that, no matter what caliber rifle Berge used, or what distance he shot from, it was simply not credible that Berge could have been making all of this up.

We conclude that, given the evidence in Berge's case and the litigation strategies of the parties, Berge's proposed ballistic analysis evidence was not sufficient to rebut the presumption that Seid competently presented Berge's defense — in particular, that Seid competently argued the potential exculpatory significance of the spent bullet found on Taylor's float — even though he did not pursue the additional step of hiring a ballistics expert.  As we noted in *State v. Jones*,

> [G]iven an unrestricted budget and freed of any constraints as to probable materiality or accountability, a lawyer might ... cheerfully log[] in many hours looking for the legal equivalent of a needle in a haystack.  ...  However, a defendant is not entitled to perfection[,] but to basic fairness. In the real world, expenditure of time and effort is dependent on a reasonable indication of materiality.

4982



*Jones*, 759 P.2d 558, 572 (Alaska App. 1988). [22]

We note that the discovery of the bullet on Taylor's float was only one of the factors that Seid relied on when he argued that the evidence showed that Berge's confession could not be true. As we pointed out above, Seid also relied heavily on the evidence suggesting that Taylor was still alive at the time that Berge was claiming to have murdered him. In terms of a successful defense, this second category of evidence was more important. As the prosecutor's rebuttal argument shows, the State's case did not hinge on proof that Berge had accurately described the physical circumstances of the shooting. But if the jury believed it likely that Taylor was still alive at the time when Berge was claiming to have shot and killed him, this would seemingly have been fatal to the State's case.

It is possible that some attorneys might have chosen to pursue the type of ballistics testimony that Berge included in his petition for post-conviction relief. But the question is whether, taking Berge's petition in the light most favorable to him, he presented a prima facie case that Seid's handling of this issue was below the minimum level of competence expected of criminal law practitioners. For the reasons explained here, we conclude that he did not meet this burden.

### Conclusion

We agree with the superior court that Berge's petition failed to set out a prima facie case for post-conviction relief. Accordingly, the judgement of the superior court is AFFIRMED.

---

[22]  Quoting *United States v. DeCoster*, 624 F.2d 196, 211 (D.C. Cir. 1976) (*en banc*) (footnote omitted).

4982

**EXHIBIT B**
PAGE 27 OF 27