RLM9
9-20-97

CASE #97-58269

STATEMENT OF _____ JOHN W. BERGE _____

ADDRESS _____

I, _____ ,make the following voluntary signed statement

at _____ time _____ date _____

I was born on _____ at _____ . I have completed _____ of school.

RM - Inv. Randel McPherron
OS - Inv. Oscar Siegfried
JB - John W. Berge

RM: Today's date is 9/14/97 this will be contact with suspect John Berge. (inaudible) The back door (inaudible). Hi John. How ya doing?

JB: Good.

RM: I'm Trooper McPherron, this is Trooper Siegfried. How ya doing today?

JB: Okay.

RM: We're doing some follow up work on Ernie Taylor. His family's asked us to try and figure out a little bit more about what happened to him.

JB: I heard he drowned.

RM: Yeah, I understand that you may have had some contact with him this summer.

JB: (inaudible)

RM: Wonder if we could have a little talk with you real quick just to see if we can figure out what he was up to or where he might have been prior to it happening.

JB: Last time I saw him (inaudible)

RM: Let's get in my car and we'll get out of the noise here.

(inaudible)

OS: (inaudible) do this all the time. Go ahead and have a seat (inaudible)

RM: Okay, first of all can I get, make sure I got your name and everything right, it's John, what's your middle initial?

JB: W.

**EXHIBIT C**
PAGE 1 OF 12

STATEMENT OF: JOHN W. BERGE

CASE #97-58269

RM: B E R G?

JB: E.

RM: And as I understand it you live in Thomas Basin now.

JB: Yeah I stay on my skiff, I have a floathouse over in Thorne Bay (inaudible) working.

RM: That's your permanent address?

JB: Yeah.

RM: What's the address over there?

JB: P.O. Box 19405

RM: 19405 Thorne Bay. Okay, and that's a floathouse, do you have a phone over there.

JB: No I have a local message phone though.

RM: Okay.

JB: 247-5000 box 440.

RM: Box 440. Okay and you're working temporary here or how, I understand you're working for Stone.

JB: Yeah, Roger Stone, yeah, I'm doing maintenance for him.

RM: Are you going to be working with him for long?

JB: I hope so. (inaudible) says he's got work for me all winter and I've been working darn near seven days a week since I started with him, and that was somewhere mid July.

RM: Okay, well awful nice day to be working though, isn't it?

JB: It's nice to have sun.

RM: Guy's gotta do what you gotta do. Well, um.....

JB: I was broke over in Thorne Bay it was really tough getting some work here in town.

RM: Mm hmm.

2

EXHIBIT C
PAGE 2 OF 12

STATEMENT OF: JOHN W. BERGE
CASE #97-58269

OS: You know Randy was talking here (inaudible) that's why they sent me down, I'm out of Anchorage.

JB: Well I'll tell ya, my whole thing with Ernie Taylor was, I was out fishing out there at Dall Head and um, I ran into him out there and you know, I had a little beer in the boat and I offered him a beer and he drank it and he seemed like a really nice guy and he invited me over there in Dall Bay and I'd never been in there and you know he just seemed like a really nice guy and you know I visited him off and on there for I don't know about three weeks, you know I'd go out fishing and stuff and see him he had an act going and that guy was really strange.

RM: Uh huh.

JB: You know he was dangerous as far as I was concerned, soon as I figured it out I got the heck out of there, stayed out of there.

OS: Do you remember when that was?

JB: Yeah, that was in June sometime.

OS: First of June, end of June?

JB: I don't have track of the dates, but I remember that I was back here looking for work almost constantly, uh, towards the end of June, (inaudible) some jobs you know, but there was time in between, and then I got started with Roger, (inaudible)

OS: Due to the circumstances, he does have some property over there, uh his sister thinks that some of his property may be stolen. We don't know whether you had anything to do with that but, uh, we'll have Randy go ahead and advise you of your rights (inaudible)

RM: Uh, it's just routine.

JB: I've told you everything I know.

RM: I'll go ahead and read this to you. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questions if you wish. Do you understand everything I just read to you right?

JB: Read it again.

RM: Read it again? You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned,. If you cannot afford to hire a lawyer one will be appointed to represent you before any questioning if you wish.

3

EXHIBIT C
PAGE 3 OF 12

STATEMENT OF: JOHN W. BERGE

CASE #97-58269

JB: Okay.

RM: Okay.

SO: Uh, uh, did he own some boats over there? I don't know, I know he had a floathouse, I'm not certain of all the property, she wasn't quite clear with me...

JB: What I saw when I was out there, he had a big white schooner and I understood that that sank since the last time I saw him.

RM: Mm hmm.

JB: He had, there was an old wooden boat there, I don't know, maybe 40 feet long, he had it tied up and he was working on it, and he had a couple of skiffs there, um, a real old Lund skiff with a I was thinking Honda on it.

RM: Mm hmm.

JB: And he had a fiberglass boat there, maybe 16 feet long, 17 feet long, he was running an old outboard on that.

RM: Okay.

OS: How long had you known him prior to that?

JB: I didn't know him, like I said, I was out there fishing and I met him and um, my total association with him was for about three weeks and he had this other guy out there named Bob that he'd hired that he was going use for a deckhand, he was going to go crabbing, and...

OS: Do you know Bob's last name?

JB: No I don't, I've seen him in town once in awhile, a real scruffy character, I don't like him either, he's, he's crazy too.

RM: What's he look like?

JB: Heavyset, tall, wears bib coveralls, got a gray beard and pretty dirty guy, I think, I don't know where he's living or where he's working, I don't talk to him.

OS: Does he hang out at anyplace in particular or?

JB: I don't know, I've seen him walk by and I don't even make eye contact with him, I don't....

RM: How old is he?

JB: I guess he's probably in his fifties.

4

**EXHIBIT C**
PAGE 4 OF 12

STATEMENT OF: JOHN W. BERGE

CASE #97-58269

RM: Fifties. A white guy right?

JB: Yeah.

RM: Okay.

OS: Uh, did you get, other than his boats, was he living on his boat or was he living in the floathouse?

JB: When I was out there he was living on his schooner, he was getting it fixed up...

RM: The one that sank?

JB: Yeah, and he was going to go crabbing and that's the last I knew of him.

OS: Did he own any chainsaws or anything like that?

JB: There was a bunch of junk around there, all kinds of junk, machinery, a bunch of chainsaws....

RM: Mm hmm.

JB: It was all junk.

OS: Okay, yeah, his relatives were just, they were just trying to, they knew he had some stuff, you know how relatives are, to them everything's (inaudible), (laughing).

JB: Every, everything that man had was junk and he, he was just a real strange character, that was for sure, he not the person I wanted to be around and talk to. He's, well he was homosexual, I didn't, understood that and you know.

OS: Yeah, we heard that.

RM: That's what we're hearing, is we look into this for a (inaudible)

OS: Did he ever try to hit on you at all?

JB: Well, I'll put it to you like this, um, I was taking a bath in his floathouse and he came in, he never hit on me, he never tried to touch me or anything, but he sure put his eye on me.

RM: Mm hmm.

JB: You know, I just, I just got out of there and never went back.

RM: Okay.

5

EXHIBIT C
PAGE 5 OF 12

STATEMENT OF: JOHN W. BERGE                                    CASE #97-58269

JB:  Yeah, that was the last I saw him.

RM:  This is end of June sometime?

JB:  Yeah, probably towards, I don't know, the middle of June, somewhere in there I guess.

RM:  Okay. you never stopped or...

JB:  No.

RM:  Okay.

OS:  (inaudible) other property like you know did he have any guns or he have you know a lot of fishing gear or,

JB:  Had a couple of old worn out poles and,

OS:  I mean like any you know crabbing stuff he have any pots and

JB:  He had a bunch of pots out there I don't know (inaudible)

OS:  (Inaudible) still gotta go out there & take pictures an look at some (inaudible) Ahm, what about any guns or anything like that did he have anything that was of any value or,

JB:  He had a couple of old rifles there you know,

RM:  UmHmm, were they on the boat that sank? Or did (inaudible)

JB:  (Inaudible)

RM:  Did he ever carry an weapon (inaudible) keep anything on him.

JB:  (inaudible) seemed to have something around somewhere.

RM:  MmHmm. Do you know if he, ah, I, I'm assuming he was trying to raise this boat, do you know what was going on with that?

JB:  I have no idea. The only reason I know that it sank is because a fellow named Arnie lived out there came in and we were sittin at the bar side by side down at the Potlatch, and he said the Pacific ate the Atlantic, and I said, what do you mean, and he said that Ernie's boat had sunk, that's how I know it sunk.

RM:  Okay.

OS:  We, you know, John we knew he had a shotgun, and may of had some rifles, but we're not sure how many, ah,

6

EXHIBIT C
PAGE 6 OF 12

STATEMENT OF: JOHN W. BERGE

CASE #97-58269

JB: Ah, he, he had some guns out there you know but .....I would assume that, you know, the boat sank, probably where they went.

RM: MmHmm.

JB: I don't know.

OS: Okay, but what, when was the last time you were out there?

JB: I already said it was in June.

OS: Okay. (inaudible)

(Inaudible)

JB: (Inaudible) Only reason I was over here and

RM: (Inaudible)

JB: I was looking for work and that was my whole reason for being in Ketchikan. Once I got a hold of Roger and got steady in town (inaudible).

OS: What can you tell us about (inaudible)

JB: I can't tell you much about the guy except he was just wacked, ah, he, he, his reality was not ours.

OS: Yeah.

JB: Something, you know if something happened to Ernie, and ah, like you know, I'd like to get to the bottom of the story on that, ahm, there's, you know, indications that he may have drowned.

??: Yeah.

OS: But there are some ah, injuries (inaudible) that didn't quiet ah, tell proof positive that he drowned.

JB: What Happened?

JB: I was hoping asking you we understand you were over there when ah,......I don't know.

OS: Did you shoot Ernie?

JB: No I didn't shoot Ernie, I didn't shoot anybody, I never shot anybody.

7

EXHIBIT C
PAGE 7 OF 12

STATEMENT OF: JOHN W. BERGE

CASE #97-58269

RM: That's not what we hear John.

JB: Well, I don't know what you hear, but, but

RM: If there was a self-defense situation then we need to know about it, okay. I mean if something went wrong, if Ernie put the moves on you and you didn't like it, or he might of threatened you or something we need to know that.

OS: Now we want you to think cuz right now this will be about the most important time in your life, what happened here today. Now we know that there's a little bit more behind this. I'm going to let you know something that ah, some suspicions came up and Ernie was taken back in for an Autopsy back in Anchorage. Now we found the bullet holes, we found bullet fragments and, and that's why we're here. Now we know your story doesn't match up John and we know that you were involved with Ernie, we know you're the one that shot him. Shot him with a .243.

JB: I did not.

OS: A .243 rifle. Where's that at now?

JB: I have no idea.

OS: Well.

RM: Where, where's the rifle you shot him with.

JB: Sigh...

OS: You where out there. Shotgun you had on the boat?

JB: I've said all I have to say. You know, you guys are making a lot of accusations here I don't know anything about.

RM: Well John.

OS: Think about it John, because I figure it's the most important important part of your day right here,

RM: Right now.

OS: If it's a self-defense thing.

RM: We, we should know about it, if it's

OS: I mean we want a go up on the (inaudible) road hear and ah,

RM: no,

8

EXHIBIT C
PAGE 8 OF 12

STATEMENT OF: JOHN W. BERGE

CASE #97-58269

OS: end up charging you and then not have our jobs (inaudible)

RM: You know.

OS: But if it's

RM: I mean we're

OS: something, you know, if it's an accident, ah, it's a you know like you say he's gay, he may have of a threatened you with a gun, he may have been coming on to you we don't know all that, but you know.

RM: And, and if it was self-defense we're all ears, we'd love to hear about it, okay. We'd love to hear your story. But, what we're finding is like Trooper Siegfried said, Ernie didn't drown, Ernie was shot. We know he was shot four times, we know you were there. The time he was shot. We even know you've go back since the shooting. We know all these things and, you know, look, I mean looking at our perspective you know it, the way it (inaudible) now it looks pretty suspicious on your part, but if something else happened out there that we should know about, now's the time to tell us. If you don't want to talk to us, it's up to you. We're being, we're being fair with you aren't we? We're trying to find out the truth, right. We're being fair, aren't we?

JB: I told you all I have to say, that's all I have to say.

RM: Okay. Well

OS: You want to say anything else to us.

JB: No.

RM: Well, before you go John, there's, there's something I'd like you to listen to, okay...Right here is a tape recording of a conversation that we recorded a couple of days ago

(Inaudible - tape recording playing)

RM: There's a lot more there, we recorded the whole conversation, okay. Um like we're saying, if it's self-defense we need to know about it.

OS: We know where he was shot, he was shot in the leg, shot in the buttock, shot in the back.

RM: Two times in the back. We know you shot him. But what we need to know now is exactly what happened out there, and if something went down, prior to the shooting, that could be self-defense, we should hear about it.

9

EXHIBIT C
PAGE 9 OF 12

STATEMENT OF: JOHN W. BERGE

CASE #97-58269

OS: It's weighing on your mind quite a bit. You talked to people about it. What's going on John? What went on out there.

RM: You said something about Ernie pointed a gun at you. Is that true? Did he threaten you? If he threatened you with a gun, we need to know about that. I could understand what happened after that if we knew that was the case.

JB: I've got nothing more to say, if your going to charge me, charge me, get me a lawyer.

RM: (inaudible), Okay.

OS: Why don't you ahead and step out of the car John. John your under arrest, I want you to put your hands behind your back please. (inaudible) just relax there. (inaudible traffic noise), search you there, you don't have any weapons on you or anything?

JB: (inaudible)

RM: Anything to with (inaudible)

JB: Nope.

RM: Okay......your glasses here.... Okay we'll just put 'em down (inaudible).....You need your glasses to see.

JB: I do.

Lots of traffic sounds...

UNK: Inaudible......

RM: What?

UNK: Inaudible.....

Hear walking, car door shut.

RM: 905 2A1 10-8 10-80

905: 10-4

RM: 83s 2A1.....

RM: 1A2-- 2A1

1A2  Go Ahead

10

EXHIBIT C
PAGE 10 OF 12

STATEMENT OF: JOHN W. BERGE

CASE #97-58269

RM: ah, we're a 10-80 10-19 KCC, go ahead and execute your search.

905: 2A1 you need them notified?

RM: KCC?

905: Correct.

RM: Affirmative, we're at Carlanna, 10-19.

905: 10-4

RM: Ah, 223 Carlanna I think is the address.

Driving noises.

RM: 905--2A1

905: Go ahead.

RM: If you haven't already done it, advise 1A1 of the 10-80.

905: 10-4

905: KWA905 1200 hours.

RM: 2A1 10-6 KCC.

905: 10-4.

Inaudible. Door noise

RM: (inaudible)

??: (inaudible)

RM: It's ah, 100322046.

??: (inaudible)

RM: (inaudible)

??: (inaudible)

??: Take your shoes off please.

11

EXHIBIT C
PAGE 11 OF 12

STATEMENT OF: JOHN W. BERGE                                           CASE #97-58269

END OF TAPE

I have read the above and foregoing statement consisting of _____ page(s). I have been given an opportunity to make any corrections or changes that I might want to make. The changes which I have made are initialed by me in my own handwriting.

I now sign this statement in the presence of _____ and _____ to certify that the same is true and voluntarily made.

Signed at _____, Alaska,

this _____ day of _____, 19___

Signed _____

Signed _____
NOTARY PUBLIC IN AND FOR
ALASKA
My commission expires_____

12

**EXHIBIT C**
PAGE 12 OF 12